# EXHIBIT A

# CHEESWRIGHTS

### SCRIVENER NOTARIES | LLP

TO ALL TO WHOM THESE PRESENTS SHALL COME, I **EMMA NOON** of the City of London **NOTARY PUBLIC** by royal authority duly admitted and sworn DO HEREBY CERTIFY that the photographic copy hereunto annexed is a true copy of an original document purporting to be a final award issued on 26th March 2021, I having carefully collated and compared the said copy with the said original and found the same to agree therewith.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office at London aforesaid this fifteenth day of November in the year two thousand and twenty one.




International Union of Notaries

SCRIVENER NOTARIES

Regulated through the Faculty Office of the Archbishop of Canterbury
Bankside House, 107 Leadenhall Street, London, EC3A 4AF   tel 020 7623 9477
email notary@cheeswrights.com   **www.cheeswrights.com**   Canary Wharf office tel 020 7712 1565
**Cheeswrights LLP** is a limited liability partnership registered in England and Wales under number OC426084

IN THE MATTER OF AN ARBITRATION PURSUANT TO THE
AGREEMENT BETWEEN THE GOVERNMENT OF THE PEOPLE'S
REPUBLIC OF CHINA AND THE GOVERNMENT OF THE FEDERAL
REPUBLIC OF NIGERIA FOR THE RECIPROCAL PROMOTION AND
PROTECTION OF INVESTMENTS

BETWEEN:

ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO. LTD.

Claimant

- AND –

THE FEDERAL REPUBLIC OF NIGERIA

Respondent



### FINAL AWARD

Arbitral Tribunal:

Mr Rotimi Oguneso SAN, co-arbitrator

Mr Matthew Gearing QC, co-arbitrator

Lord Neuberger of Abbotsbury, presiding arbitrator

Place of arbitration: London, United Kingdom

Date of Award: 26 March 2021

Date of Hearing: 9th to 13th November 2020

# FINAL AWARD

A. **Introduction**

1.  The Claimant, Zhongshan Fucheng Industrial Investment Co. Ltd ("Zhongshan"), contends that, in the summer of 2016, entities for whose actions the Respondent, the Federal Republic of Nigeria ("Nigeria"), is liable in international law, deprived it of a substantial investment contrary to the provisions of articles 2, 3 and/or 4 of a Bilateral Investment Treaty ("the Treaty") between (i) the People's Republic of China ("the PRC") and (ii) Nigeria, and that Zhongshan is entitled to compensation from Nigeria to be assessed by an arbitration tribunal pursuant to article 9 of the Treaty.

2.  In the next section of this Award, Section B, we explain the basic relevant facts as advanced in this arbitration by Zhongshan on the basis of documents and oral evidence. Then, in Section C, we set out the relevant provisions of the Treaty. In Section D, we describe the relevant procedural history of this arbitration. Following that, in Section E, we address various jurisdictional and preliminary points raised by Nigeria. In Section F, we discuss misrepresentation and concealment arguments raised by Nigeria. Next, in Section G, we address the issue of Nigeria's liability. In Section H, we consider the appropriate level of compensation to be awarded. Section I deals with questions of interest and Section J with costs. Finally, in Section K, we make our award.

3.  Before setting out the history as described by Zhongshan, it is convenient to record that Zhongshan's claim relates to rights in the Ogun Guangdong Free Trade Zone ("the Zone"), a substantial area of land in Ogun State in Nigeria, which is owned by the Ogun State Government ("Ogun State") and which is not far from Lagos, Agapa Port and Lagos Airport. The history involves three companies in the Chinese-owned Zhuhai Zhongfu Industrial Group Co Ltd group of companies, Zhuhai Zhongfu Industrial Group Co Ltd ("Zhuhai"), Zhongfu International Investment (NIG) FZE (Zhongfu") and Zhongshan. The unchallenged evidence of Dr Jianxin Han, the manging director of, and majority shareholder in, Zhongshan, was that Zhuhai started in the early 1980s as a business manufacturing and repairing fishing nets, then developed a bottle manufacturing business, and finally expanded into operating in Special Economic Zones ("SEZ"s) also known as Free Trade Zones ("FTZ"s), initially in China, and then in other countries. He said that the Group had an excellent record in developing and managing FTZs. He also explained

that the private equity firm, CVC Capital, had purchased a 29% stake in Zhonghsan in 2007 for USD225 million.   Zhuhai and Zhongshan are and were Chinese registered companies, and Zhuhai is Zhongshan's parent company. Zhongfu was and is a Nigerian company and a wholly owned subsidiary of Zhongshan,.

**B.   The basic facts as alleged by Zhongshan**

*The involvement of Zhongfu and Zhongshan in the Zone*

4.   The Zone was the subject of a Joint Venture Agreement entered into on 28th June 2007 ("the 2007 JVA") between the Ogun State and Guangdong Xinguang International China-Africa Investment Ltd (also known as China-Africa Investment Ltd, and hereinafter "CAI"), and CCNC Group Ltd ("CCNC").   We know that CAI was a Chinese entity but, other than that, the Tribunal was told very little about it.   Under the 2007 JVA, the development of the OGFTZ was to be carried out through Ogun Guangdong Free Trade Zone Company ("OGFTZ"), which was to be jointly owned by Ogun State, CCNC and (as to 60%) CAI, for a period of 99 years. The arrangement envisaged by the 2007 JVA involved CAI effectively carrying out the development, marketing and management of the Zone, albeit through OGFTZ. In practice, it appears likely that the management was carried out by CAI, and that OGFTZ was not constituted as envisaged by the 2007 JVA.

5.   On 28 September 2007, Ogun State granted to OGFTZ a 99-year Certificate of Occupancy ("the 2007 Certificate") over  2,000 hectares of land in the Zone. On 2 April 2008, the Nigeria Export Processing Zones Authority ("NEPZA"), which has a statutory duty to supervise and coordinate the organisations operating within Nigerian FTZs, signed an agreement granting OGFTZ exclusive concessions to construct, manage, and operate the Zone. On 3 June 2008, OGFTZ was registered as a free trade zone company.

6.   Dr Han's evidence was that, by 2010, only limited development had been carried out and CAI was running short of funds, and that, as a result, Zhuhai was introduced to Ogun State as a potential alternative or additional developer and manager. Following discussions, Ogun State and Zhuhai agreed that Zhuhai would effectively take over the development and management of Fucheng Industrial Park ("Fucheng Park"), an area of 224 hectares within the 2,000 hectares the subject of the 2007 Certificate, and enjoy some sort of priority rights over the rest of the Zone

7. On 29th June 2010, Zhuhai and OGFTZ entered into a "*Framework Agreement on Establishment of Fucheng Industrial Park in the Zone*" ("the 2010 Framework Agreement"). This Agreement (of which there was a Chinese version and an English version) gave Zhuhai the right to develop and operate Fucheng Park, within the Zone, which was described as "*an area of 100 km² constructed and managed [OGFTZ] which is located in the southeast of Ogun State, Nigeria*". CAI was not a party to the 2010 Framework Agreement.

8. The 2010 Framework Agreement included the following provisions:

   a. Paragraph (A) of the preamble, which recorded that OGFTZ was formed by Ogun State and CAI "*to establish and operate*" the Zone and to "*acquire the land use rights*" over it "*for a period of 99 years*" from an unspecified date in 2008;

   b. Paragraph (B) of the preamble, which recorded that Zhuhai "*wishes to build up [the] Park*", and to develop on it "*factories and an industrial park*";

   c. Clause 2.2, which stated: "*[t]he actual operation and management organ of [the] Park shall be [Zhuhai's] wholly-owned subsidiary or a company under [its] control*";

   d. Clause 2.6, which stipulated that "*the 97-year land use rights regarding [the] Park shall be in the possession of*" Zhuhai, which was "*entitled to exercise its full right for such industrial land's occupancy, use, proceeds and disposal*";

   e. Clause 3, which provided for a "*97-year concession fee*" payable by Zhuhai to OFGTZ as well as an "*initial Concession Fee of Land Use Right*";

   f. Clauses 4.1 and 4.2, which set out Zhuhai's rights and obligations with regard to the development of Fucheng Park (and in particular the installation of infrastructure) and gave Zhuhai the right:

      i. To charge a "Comprehensive Administrative Fee" (clause 4.1.1);

      ii. To have "*certain administrative right over enterprises in [the] Park*" (clause 4.1.6);

iii.   After it had completed its infrastructure obligations in relation to Fucheng Park, to have *"priority to invest in and develop other areas in [the Zone] under the same conditions"* (clause 4.1.7); and

g.   Clause 5, which contained OGFTZ's obligations which were effectively to be supportive of the development of Fucheng Park, and which included an obligation not to develop any other part of the Zone until 80% of Fucheng Park was developed (clause 5.2.7).

h.   Clause 6, by which OGFTZ apparently agreed to transfer to Zhuhai the benefit of all existing contracts in respect of businesses already trading in Fucheng Park.

9.   Some fifteen weeks after the 2010 Framework Agreement was entered into, another document dated 10th October 2010 ("the 2010 Deed") was entered into by Zhuhai, OGFTZ and Zhongshan. This document, which is in Chinese, whose English translation is a little hard to understand, appears to have the effect of entitling Zhuhai to carry out its obligations under 2010 Framework Agreement through third parties. According to the testimony of Dr Han, the 2010 Deed was treated by Zhongshan and Zhuhai as having the practical effect of transferring Zhuhai's rights and obligations under the 2010 Framework Agreement to Zhongshan (which, as we have mentioned, is a subsidiary of Zhuhai).

10.   On 24th January 2011 Zhongfu (which, as we have mentioned, is a subsidiary of Zhongshan) was registered by NEPZA as a Free Trade Zone Enterprise in the Zone.

11.   A document ("the 2011 receipt"), which is dated 25th July 2011 and was signed on behalf of Zhongshan and OGFTZ, contains an acknowledgment by OGFTZ that Zhongshan had paid *"the first instalment of the land use rights fees"* under the 2010 Framework Agreement in the sum of RMB 5,455,129.50.

12.   On 28th November 2011, Mr Taiwo Adeoluwa, who had recently become the Secretary to the Ogun State Government ("Ogun State") (and remained so until 2019) wrote a letter ("the November 20111 letter) to CAI, referring to earlier correspondence and complaining of *"wanton violation of the terms of the [2007 JVA]"*, *"the unsatisfactory share arrangements"* (presumably with regard to OGFTZ), and *"rampant smuggling"*. The letter then went on to refer to the fact that *"following …. extensive due diligence enquiries in both Nigeria and China"*, CAI or its parent company, Guangdong Xinguang

*International Group Co Ltd, "is now officially bankrupt"* and that *"a top executive is alleged to be involved in criminal activity"*.  The letter invited CAI's response to these allegations.  If there was such a response, the Tribunal was not provided with it.

13. On 15th March 2012, Mr Adeoluwa wrote two letters on behalf of the Ogun State ("the March 2012 letters"). The first was to CAI. It referred to earlier correspondence, including the November 2011 letter, which had contained a number of complaints which Ogun State had made against CAI, based on its *"incompetence and flagrant violation of the terms of the [2007 JVA]"*. The letter then went on to state that Ogun State was *"constrained to terminate forthwith your participation in the [Zone] in accordance with the terms of that Joint Venture Agreement"*, on various grounds including *"that the company has been adjudged bankrupt"*, as well as illegality, fraudulent practices, failing to provide a business plan, a Master Plan, or a Phased Design Plan, and failure to contribute to the share capital of OGFTZ.

14. The second letter of the March 2012 letters was to the Managing Director of Zhongfu. It stated that Ogun State had decided to appoint Zhongfu *"the interim Manager/Administrator"* of the Zone (and not just Fucheng Park) for *"an initial period"* of three months, *"subject to a renewal thereof upon satisfactory performance"*. The role was briefly described in the letter as *"attracting sufficient business to the Zone to boost economic activities"* and *"rejuvenating generally the Free Trade Zone"*. It appears that the three months was extended either expressly or implicitly, until the arrangements were placed on a more permanent basis on 28th September 2013 as explained below.

15. The arrangements set out in the March 2012 letters had the approval of NEPZA.  On 10th April 2012, it wrote to the General Manager of CAI *"confirm[ing] the termination of your appointment as Manager and operator of the [Zone] by [Ogun State]"*, and requiring CAI to *"handover all assets and documentation which belongs to the Ogun Guangdong Free Trade Zone to the newly appointed Management company [Zhongfu]"*. The following day, NEPZA wrote to Mr Wang Junxiang of Zhongfu *"confirm[ing] the appointment of your organisation as the Managers and operators of [the Zone]"*.

16. Meanwhile, on 15th January 2013, by a document ("the 2013 document"), which is in Chinese (and of which we were supplied with an English translation), Zhuhai assigned its interest in the 2010 Framework Agreement to Zhongfu. As we have mentioned, it appears

that Zhongshan, the parent company of Zhongfu had already taken over Zhuhai's rights and responsibilities under the 2010 Framework Agreement, at least in practical, if not in legal, terms, some thirty months earlier.

17.  There is also a document ("the 2013 acknowledgement") written in Chinese, dated 13th April 2013, which is signed on behalf of Zhongshan and Ogun State, and which (according to the English translation) is an acknowledgment by OGFTZ that Zhongshan had not only paid the sum referred to in the 2011 receipt, but also RMB 4,544,870.50 "*to make up the deficiency of land use transfer fee that should be paid by Zhuhai*".

18.  On 28th September 2013, Ogun State, Zhongfu and Zenith Global Merchant Limited ("Zenith") entered into a "*Joint Venture Agreement For the Development, Management and Operation*" of the Zone ("the 2013 JVA"). The preamble to the 2013 JVA recorded, inter alia, that:

   a.  The "*participation*" of [CAI] in the Zone "*has been terminated by [Ogun State] vide a letter dated 15th March 2012*"; and

   b.  Zhongfu "*has been appointed as the new manager of the [Zone] has invested in the infrastructure of the [Zone] and has proved its expertise to partner in the development, operation, management and administration of a free trade zone*".

19.  Clause 3 of the 2013 JVA provided that OGFTZ would be the joint venture company, and that it would owned as to 60% by Zhongfu, and 20% each by Ogun State and Zenith. Clause 4 was concerned with the control and running of OGFTZ. Clauses 6 and 12 of the 2013 JVA contained a number of obligations on the parties. They included:

   a.  In clause 2.3, an obligation on Zhongfu to contribute to the share capital of OGFTZ, and an obligation on Ogun State to provide "*10,000 hectares of land (in phases) to the [Zone]*", and it was recorded in a Schedule that the "*parties try their best to locate maximum 7,000 hectares as a major land [sic] of the Zone*" and the remaining 3,000 hectares could be "*located in a different place if the cost to be spent in locating the 10,000 hectares in a place is too high for [Ogun State]*"

   b.  In clause 6.1,

        i.     an obligation on Ogun State to grant OGFTZ a 99-year term in respect of 10,000 hectares;

        ii.    an obligation on Ogun State together with Zhongfu and Zenith to work to get all necessary licences to enable any contemplated development and occupation to take place;

        iii.   an obligation on Ogun State to make the 10,000 hectares available to OGFTZ to enable it to "*conduct development and construction activities*" during the 99 years;

    c.     In clause 6.2, a requirement that Zhongfu prepare a Master Plan, a Phased design Plan and a business plan, and also to begin construction within two months of getting the necessary licences;

    d.     In clause 12.1, a requirement that Zhongfu carry out development in accordance with the Master Plan;

    e.     In clause 12.3, an obligation on Zhongfu to instal infrastructure;

    f.     Elsewhere in clause 12, a number of obligations on Zhongshu with regard to development, managing and marketing;

    g.    In clause 15.1, the obligation on Ogun State to provide 10,000 hectares of land was effectively repeated, along with other obligations on Ogun State designed to assist the operations of Zhongfu, and in particular to "*strictly observe the provisions of [the Treaty] … and provide adequate protection to the investment of [Zhongfu and Zenith] in OGFTZ and the Zone*".

20.    Clause 18 of the 2013 JVA included provisions for early termination by one party if the other party was in breach, became insolvent, or ceased to carry on business. So far as early termination for breach was concerned, it could only be implemented if (i) the breach was material, (ii) a notice specifying the breach had been served; and (iii) the breach was not remedied within 60 days of receipt of the notice. And clause 27 provided that, in the event of any dispute arising under the 2017 JVA, it should first be the subject of an attempt to settle, and if that failed, either party could refer the dispute to arbitration under

the UNCITRAL Rules in Singapore under the aegis of the Singapore International Arbitration Centre ("SIAC").

*The development of the Zone*

21.　From 2010, Zhuhai and Zhongfu carried out significant work on at Fucheng Park, and this work consisted of developing infrastructure, marketing and letting sites in Fucheng Park ("sites") for development to potential occupiers, and managing Fucheng Park as it was developed and occupied. Evidence to this effect was given to us by:

　　a.　Dr Han, who visited the Zone in early 2010 and then went there to work more or less full time as Chief Executive Officer and Joint Chief Operating Officer of OGFTZ from October 2012 until June 2016,

　　b.　Mr Zheng Xue, who worked more or less full time at Zone, and principally at Fucheng Park as Joint Chief Operating Officer of OGFTZ from October 2012 until June 2016, and

　　c.　Mr Wenxiao Zhao, who was Chief Financial Officer of OGFTZ from April 2012 until June 2016, and spent almost all his time there in that period.

22.　The work carried out by Zhongfu, according to this evidence, included the erection of a perimeter fence round Fucheng Park, the installation or upgrading of roads, the upgrading of the sewerage system, and the upgrading of the power network in Fucheng Park. In addition, Zhongfu negotiated improved communication systems, and the opening of a bank, a supermarket, a hospital, and a hotel in order to assist to draw potential occupiers to Fucheng Park.

23.　Dr Han, Mr Xue and Mr Zhao also said that, from 2010, efforts had been made to let out sites in Fucheng Park to occupiers for fixed terms, initially 90 years, but then normally between 10 and 50 years, most commonly 20 years. In 2011, there were, according to Mr Zhang, five occupiers of sites in Fucheng Park (and this is consistent with the documentary evidence, which suggests that agreements were entered into with seven potential occupiers that year). He also said that this increased to around 16 occupiers by early 2014, when much of the work just summarised had been completed. At that point, Zhongfu started to focus more sharply on finding occupiers of sites in Fucheng Park, and

of Zenith who had been appointed to act for Ogun State as chief co-ordinator of the Zone, was distributed to occupiers of the Zone.

26.   A letter dated 28th April 2014 in similar terms was sent by M.A. Banire and Associates ("Banires"), solicitors acting at that time for OGFTZ, to the Managing Director of Zhongfu, which stated that Ogun State has "*long terminated the interest of [CAI in the Zone]*" and referred to the letter to CAI of 15th March 2012. Banires' letter went on to explain that Zhongfu had been appointed to replace CAI under the "*able leadership of Dr Jason Han the Managing Director and Prof John Xue, the Chief Operating Officer*", and asked Zhongfu to disregard any communication from or on behalf of CAI "*as they have no authority or approval of ... Ogun State ... to act or do anything in respect of the ... Zone*".

27.   Thereafter, at least until 2016, there appears to have been no further intervention in the Zone from CAI or NSG.

28.   Meanwhile, Dr Han and Mr Xue were seeking out potential investors and partners for the development of the remainder of the Zone, travelling to China and the United States for this purpose. They were assisted by the fact that Zone was receiving a degree of international recognition. For instance, in April 2016, the Economist Intelligence Unit published a video entitled "*Growth Crossings: Ogun Guangdong Free Trade Zone in Nigeria*".

29.   On 18th May 2015, Mr Adeoluwa wrote to the Managing Director of Zhongfu making a number of complaints about Zhongfu's operations, and stating that, while terminating the JVA was Ogun State's "*initial reaction*", it invited Zhongfu to attend a meeting to "*clear the air*" two days later. It does not seem that this meeting took place. It also appears that, although Zhongfu did not reply to the letter, Ogun State did not pursue the complaints any further.

30.   On 20th January 2016, following discussions between Dr Han and a former MBA classmate, a Mr Li, who had 30 years' experience in the pharmaceutical industry, Ogun State and OGFTZ entered into a memorandum of understanding ("the 2016 MoU"), which was written in Chinese and English) with an entity called Xi'an Industrial Delegation, and which related to the development of a pharmaceutical park ("the

Pharmaceutical Park") in the OFGTZ. It was expressed in very general terms, but it referred to "*setting up a Xi'an Hi-Tech Industrial Park with USD1 billion investment on 10 square kilometers of land over 10 years*". It referred to the "*hope*" that Ogun State would provide the requisite "*information ..., planning materials, personnel support, geographical data, ... plans etc*". It also contained a statement that another company in the Xi'an group ("Xi'an") was "*willing to cooperate with [Ogun State] to improve the infrastructure*", including building bridges, roads and a port, for which it needed the "*support*" of Ogun State..

31.  This was followed on 20th April 2016 by a "*Framework Agreement*" ("the 2016 Framework Agreement") between OGFTZ and an entity called Xi'an Ogun Construction and Development Limited Company (which the second recital records as having been formed by the Xi'an Industrial Delegation to implement the 2016 MoU). It was signed when President Buhari of Nigeria was on an official visit to China in April 2016, and it set out in rather more detail how the Pharmaceutical Park would be managed and operated. Thus, it envisaged that OGFTZ would provide the infrastructure outside the park necessary to support the Pharmaceutical Park, and that Xi'an would carry out the development of the park. The 2016 Framework Agreement also provided for a slightly different arrangement from the Fucheng Park underleases so far as level of rents and allocation of administrative fees were concerned.

32.  Dr Han and Mr Xue also had discussions with Professor Issa Baluch and Mr Jon Vandenheuvel, both of whom gave evidence to us. Professor Baluch is an experienced businessman with over 35 years involvement in FTZ world. He was one of the principal individuals responsible for the setting up and running of the Jebel Ali Free Zone in Dubai, which he said had been very successful and which he had then used as a model for other FTZ developments. Together with Mr Vanderheuvel, who is his partner in First Hectares Capital ("FHC") and had a background in academia and government, he started advising Zhongfu in autumn 2015. On 30th March 2016, FHC entered into a formal agreement with OGFTZ under which it was to be paid USD 7,500 per month. Together with Dr Han and Mr Xue, FHC started to develop a proposal for raising USD 250m "*to expand infrastructure across the Zone and the southwest region of Nigeria in order to attract new businesses to the Zone*", to quote from Mr Vandenheuvel's evidence. This got as far as

the production of a couple of brochures, but they were never finalised, let alone distributed or circulated.

*The events of April to August 2016*

33.   The reason that the brochure was not circulated was that Ogun State was challenging Zhongfu's right to any interest in the Zone through OGFTZ. This challenge appears to have been precipitated by a *note verbale* ("Note 1601") dated 11th March 2016 from the Economic and Commercial Section of the Consulate of the PRC in Lagos ("the Consulate") to Ogun State. Note 1601 stated that the Consulate had been "*officially notified*" by a PRC authority "*about the replacement of shareholdings owner of [CAI] to Guangdong New South Group*", which, the Note said, "*will legally lead to the replacement of the management rights of the OGFTZ which is now in the hands of [Zhongfu] to Guangdong New South Group*". A certificate dated 9th July 2013 from the Guangzhou Notary Public Office confirmed the fact that 51% of CAI had been acquired by NSG.

34.   On 12th April 2016, Mr Adeoluwa wrote a letter ("the April 2016 letter") to the Managing Director of OGFTZ. The letter stated in the first (unnumbered) paragraph, that the PRC government "*through [the Consulate]*" had directed that Ogun State "*be notified of the transfer Shareholding interests of [CAI] in the OFGTZ to the New South Group*" and that "*[a]s a result of this development, the Consulate is requesting the Management Rights over the Zone be given to the new share owners*". Paragraph numbered 2 said that Ogun State had been provided with "*what appears to be valid Share transfer documents*", and stated that "*Ogun State was carrying out an investigation*". Paragraph numbered 3 requested that "*you furnish this office with proof that your company, [Zhongfu], is legitimately entitled to the shares and management rights over the Zone*", and suggested that, "*[w]ithout prejudging the outcome of the investigation*", "*the implication*" could be that the "*agreement between [Ogun State] and Zhongfu was premised upon misrepresentation and concealment of facts, and, therefore cannot be allowed to stand.*" Zhongfu was invited to "*clarify the position and respond to the demand of*" the PRC government.

35.   OGFTZ responded to the April 2016 letter on 26th May, saying that Dr Han and Mr Xue were out of the country, and seeking a meeting. The following day, Mr Adeoluwa wrote

a letter to the Managing Director of Zhongfu, referring to the April 2016 letter and saying that "*[t]he allegation against you bothered [sic] on fraud and material misrepresentation*" in that "*you were alleged to have fraudulently converted State assets ... and you misled Ogun State*" and that "*in the absence of new facts, we are obliged to accept the facts as presented by the Chinese government [in Note 1601] and act accordingly*". The letter then went on to suggest that OGFTZ's letter of 26th May "*deliberately did not address any of the issues, particularly the criminal allegations*", and ended by requiring Zhongfu "*to hand over all OGFTZ assets in its possession to [Zenith] and to vacate the Zone within 30 days hereof*".

36.   On 14th June 2016, Banires, who were by then acting for Zhongfu, responded in a letter apologising for the failure to deal with the issues raised in the April 2016 letter, and saying that the accusations in that letter and the "*termination*" in the May 2016 letter were "*based on some erroneous facts as misrepresented to you by the Chinese Consular*". Banires' letter then stated that the "*issue on which your letter of termination is based is not just coming up for the first time*", that it had arisen "*first in 2014*" and that Zhongfu's "*response*" at that time "*eventually laid to rest that issue*", and that "*it is now surprising that this issue is coming up again*". The letter than explained that CAI's rights had been terminated by Ogun State by the first of the March 2012 letters, and Zhongfu had then been subsequently appointed and had entered into the 2013 JVA, and then stated that "*the Chinese Consular misrepresented the facts to you*" but that, if the Consulate wished to persist, CAI "*should institute an action against [Zhongfu]*". The letter ended by "*urg[ing] your restraint*" and "*plead[ing] for a convenient date for a meeting wherein this issue can be appropriately discussed*".

37.   On 14th July 2016, Ogun State informed NEPZA that it should "*withdraw recognition and stop all dealings with [Zhongfu] with regard to any matter relating or connected to the [Zone]*", and "*implored ... all agencies to step in and fully investigate the activities of [Zhongfu]*". Two days later, Mr Adeoluwa sent a text to Dr Han, which ended by saying that his advice to Dr Han "*as a friend*" was that he should "*leave peacefully when there is opportunity to do so, and avoid forceful removal, complications and possible prosecution*". On 19th July, Dr Han said that he visited Mr Odega of the NEPZA who told him that Ogun State would use security personnel to get Zhongfu out of Nigeria. Dr Han also said that Mr Onas informed him in a telephone call around the same time that if he

did not hand over the Zone to Ogun State, his passport would be seized and he would be put in jail. Dr Han described himself as "*very scared*" by all this.

38. There was also indirect evidence from Dr Han that, on 21st July, Mr Onas visited Fucheng Park and informed the tenants that Zhongfu's appointment had been terminated, and that a handover to the new manager had been scheduled for the following day. On 22nd July (again based on Dr Han's indirect evidence), Mr Onas again attended at Fucheng Park, this time with a member of the Nigerian police ("the police"), and introduced NSG as the new manager, and according to Mr Zhao caused some of Zhongfu's employees to be frightened.

39. There was other evidence about activities and statements made on behalf of Ogun State which are said by Zhongshan to amount to threats to individuals working for Zhongfu, with the apparent aim of getting Zhongfu to vacate the Zone, and its personnel to leave Nigeria. However, it is only appropriate to refer to one or two further aspects. First, on 27th July, NEPZA wrote to the Nigerian Immigration Service asking it to collect the original form of immigration papers (in particular, work permits known as CERPACs) from all foreign staff, who would not have been able to work in Nigeria without such papers. The letter stated that the staff should only be allowed to leave with copies of the immigration papers.  Secondly, on 4th August 2016, warrants citing "*criminal breach of trust*" were issued, apparently at the request of the police, for the arrest of Dr Han and Mr Zhao. Thirdly, on 17th August, Mr Zhao was arrested at gunpoint, and was then deprived initially of food and water, intimidated, physically beaten, and detained for a total of ten days, by the police.  During his detention he was shown a copy of his warrant. Mr Zhao's evidence is that when in custody the police repeatedly asked him about the whereabouts of Dr Han. Mr Zhao was eventually freed on bail.  He was initially required to deposit his passport with the police but after three visits to the relevant police station he was able to get the passport back and therefore he was able to leave Nigeria.

40. Dr Han was never arrested and was also able to leave Nigeria.  Mr Zhao left Nigeria on 2 October 2016. Dr Han left on 11 October 2016.  Neither has returned since.

41. We will refer to the oral and written communications from, and the actions of, Ogun State, NEPZA and the police as set out in paragraphs 33 to 39 above as "the 2016 Activities".

*Proceedings in Nigerian courts*

42.   On 18th August 2016, Zhongfu started proceedings ("the Federal court proceedings") by way of a writ issued out of the Federal High Court in Abuja against NEPZA, the Attorney-General of Ogun State ("the A-G") and Zenith seeking declaratory and injunctive relief, effectively seeking to be reinstated as manager of the Zone. Some three weeks later on 9th September 2016 it started proceedings ("the State court proceedings") by way of a Statement of Claim issued out of Ogun State High Court against OGFTZ, Ogun State and the A-G of Ogun State, seeking possession of the Zone, an injunction, damages (in excess of USD 1 billion) and interest. On the same day, Mr Zhao issued proceedings ("Mr Zhao's proceedings") out of the Federal High Court in Abuja against the police, the Inspector General of Police, the Commissioner of Police for the Federal Capital Territory, Abuja and Wang Junxiong for damages in connection with his mistreatment.

43.   The Federal court proceedings essentially relied on the proposition that there had been breaches of (i) Zhongfu's contractual rights as a manager of the Zone appointed by the first of the March 2012 letters, as approved in NEPZA's letter of 10th April 2012 confirming the termination of CAI's rights, and (ii) Zhongfu's rights under a *"tenancy"* of Fucheng Park under the 2010 Framework Agreement. In the State court proceedings, the claim was based on Zhongfu's right to possession of Fucheng Park under the 2010 Framework Agreement. The only reference to the 2013 JVA in either proceedings was in paragraph 5 of the Statement of Claim in the State court proceedings, where it was stated that *"[t]his action is filed by [Zhongfu] to recover possession of land based on documents existing prior to 2013 and without prejudice to any claims arising pursuant to agreements made by the parties to the [2013 JVA] which claims may be pursued in other proceedings"*.

44.   It appears that nothing happened in the Federal court proceedings or the State court proceedings (together "the Court proceedings") or in Mr Zhao's proceedings for a substantial period, and that deadlines imposed by court rules were not complied with by the defendants, apparently with impunity. In March and April 2018, these three proceedings were discontinued.

45.   Meanwhile, Zhongfu began SIAC arbitration proceedings against Ogun State and Zenith pursuant to clause 27 of the 2013 JVC, but on 5th January 2017, Zenith applied in the

Ogun State High Court for an anti-suit injunction restraining the arbitration. The application was heard by Justice Akinyemi, who gave judgment on 29th March 2017 granting the injunction sought on a permanent basis, essentially on the grounds that Nigeria (not Singapore) had a substantially closer connection to the arbitration and was therefore the seat of arbitration, and that the issue of the Federal court proceedings operated a waiver of the right to arbitrate or otherwise rendered the arbitration abusive or oppressive. On 23 June 2017, Zhongfu appealed this decision, but that appeal was were discontinued in 2018, together with the discontinuance of the Court proceedings.

C.   **The Treaty**

46.   The Treaty describes itself as an "Agreement Between the Governments of the PRC and Nigeria "*for the Reciprocal Promotion and Protection of Investments*". Save where the contrary is stated, all references hereafter to articles are to articles of the Treaty.

47.   Article 1(1) defines "*investment*" as "*every kind of asset invested by investors of one Contracting Party in accordance with the laws and regulations of the other Contracting Party in the territory of the latter*", and it goes on to identify certain more specific items "*in particularly [sic] but not exclusively", including "(a) ... any property rights ...", (b) shares .... and any other kind of participation in companies ...., (c) claims to money or to any other performance with economic value ..., (e) business concessions ...*".

48.   Article 2(2) provides that "*Investments of the investors of either Contracting Party shall enjoy the continuous protection in the territory of the other Contracting Party*", and article 2(3) prohibits a Contracting Party "*[s]ubject to its laws and regulations*" from "*tak[ing] any unreasonable or discriminatory measures against the management, use, enjoyment and disposal of the investments  by the investors of the other Contracting Party*".

49.   Article 3(1) requires each Contracting Party to accord "*fair and equitable treatment*" to the "*[i]nvestments of investors of [the other] Contracting Party*" in its territory.

50.   Article 4(1) prohibits a Contracting Party "*expropriate[ing] against the investments if investors of the other Contracting Party in its territory*", unless it is "*for the public interests*", "*under domestic legal procedure*", "*without discrimination*" and "*against fair compensation*". Article 4(2) describes "*fair compensation*" as "*the value of the*

*expropriated investments immediately before the expropriation is proclaimed*". Article 4(2) also stipulates that such compensation is to be paid "*without unreasonable delay*", and that it must "*include interest at a normal commercial rate*".

51.  Article 9 is concerned with the "*Settlement of disputes between investors and one Contracting Party*". Article 9(1) provides for amicable settlement "*as far as possible*". Article 9(2) states that, if amicable settlement is unachievable "*through negotiations within six months, the [sic] either Party shall be entitled to submit the dispute to a competent court to [sic] the Contracting Party accepting the investment*". Article 9(3), first sentence, provides that if "*a dispute cannot be settled within six months after resort to negotiations ... it may be submitted at the request of either Party to an ad hoc tribunal*". The second sentence of article 9(3) states that "*[t]he provisions of this Paragraph shall not apply if the investor concerned has resorted to the procedure specified in paragraph 2 of this article*". Article 9(4) provides for the constitution of the ad hoc tribunal, with each party nominating an arbitrator, and the two party-appointed arbitrators appointing a "*Chairman*". Article 9(5) stipulates that the tribunal "*shall determine its own procedure*", although it goes on to provide that it may take guidance from ICSID's Arbitration Rules. Article 9(6) states that the tribunal's decisions are to be "*by a majority of votes*" and are to be "*final and binding on both parties to the dispute*". Article 9(7) provides that the tribunal shall "*adjudicate in accordance with the law of the Contracting Party to the dispute accepting the investment ... as well as the generally recognized principles of international law ...*". Article 9(8) deals with costs.

**D.   This arbitration**

52.  On 21st September 2017 Zhongshan sent to Nigeria a notice of dispute and request for negotiations ("the 2017 notice"), in which it expressed its willingness to discuss the dispute which had arisen as a result of the actions taken and statements made between April and August 2016 as described above. No response was received.

53.  On 30th August 2018, Zhongshan served a Request for Arbitration (a "Request") pursuant to article 9, setting out the history of Zhongfu's involvement in the Zone, and contending that the actions taken between April and August 2016 were in breach of Nigeria's obligations under the Treaty, nominating Mr Matthew Gearing QC as arbitrator, and claiming compensation, interest and costs.

54.  On 7th November 2018, Zhongshan applied to the International Centre for Settlement of Investment Disputes ("ICSID") for the appointment of an arbitrator for Nigeria pursuant to article 9(4). On 8th November, 2018, Nigeria nominated Mr Rotimi Oguneso SAN as its arbitrator, whereupon Zhongshan withdrew its application to ICSID.

55.  By a Notice of Appointment dated 5th January 2018, Mr Gearing QC and Mr Oguneso SAN formally appointed Lord Neuberger of Abbotsbury as the Chairman, whereupon the Tribunal was formerly constituted.

56.  The Tribunal had its first meeting on 15th January, 2019 via telephone conference. On 23rd February 2019, the Tribunal appointed the Permanent Court of Arbitration to provide support in managing the deposit and in connection with the hearing.

57.  Following a series of discussions between the Tribunal and the parties conducted by email, Consolidated Terms of Appointment were agreed and circulated on 24th April 2019, and Procedural Order No 1 ("PO 1") was made on 19th February 2019. PO 1 included a timetable ("the timetable") which, inter alia, provided for Nigeria to make a request for bifurcation by 2 September 2019 and for a hearing starting on 15th June 2020.

58.  On 1st May 2019, as prescribed in the timetable, Zhongshan served its Statement of Claim together with the witness statements of the witnesses on whose testimony it intended to rely, including evidence from an expert witness, Mr Matthews, an accountant, on the issue of quantum of compensation.

59.  Nigeria requested an extension of time for the date in the timetable (2nd September 2019) for the service of its Statement of Defence and associated witness statements and its Request for Bifurcation, and, following discussions, a revised timetable was directed by the Tribunal on 30th September 2019.

60.  In accordance with the revised timetable, Nigeria served (i) its Statement of Defence and associated witness statements, but no evidence from an expert witness, and (ii) Requests (a) for Bifurcation, (b) that the Tribunal determine the law applicable to the dispute, on 14th October 2019.

61.  Zhongshan responded to the Request for Bifurcation and the Request for a determination of the applicable law on 28th October 2019. On 7th November 2019, we decided that (i)

the proceedings should not be bifurcated, and (as amended by a subsequent email on the same day) (ii) it was premature to determine the applicable law. Pursuant to further representations from the parties, the Tribunal reconsidered its decision (ii) and on 14th November 2019 ruled that the governing law was "*the law of Nigeria as supplemented by international law as provided by article 9.7 of the Treaty*".

62.  Meanwhile, on 5th November 2019,  Zhongshan made a Request for Production of Documents, to which Nigeria replied on 19th November 2019, which reply was answered by Zhongshan on 25th November 2019, and Nigeria made a brief further rejoinder on 27th November 2019. The Tribunal gave its ruling on the Request for Production on 29th November 2019. Nigeria thereafter failed to give production of any of the documents which the Tribunal ordered that it produce.

63.  On 31st January 2020, in accordance with the revised timetable, Zhongshan served its Statement of Reply together with supporting witness statements. On 3rd February 2019, Nigeria sent corrected versions of a witness statement, and on 2nd March 2020, it served its Statement of Rejoinder, well in time.

64.  On 15th May 2020, there was a pre-hearing conference, at which Nigeria applied for (i) an adjournment of the hearing due to start on 15th June 2020 and (ii) permission to amend its Statement of Defence, both of which were opposed by Zhongshan. On 18th May 2020,

   a.  The Tribunal ruled that, albeit only "*on balance*", application (i) should be granted the start of the hearing  would be moved to 9th November 2020,  making it clear that "only very exceptional circumstances could possibly justify a further adjournment";

   b.  The Tribunal also granted Nigeria permission to amend as sought;

   c.  The Tribunal gave certain other directions.

65.  On 12th June 2020, Zhongshan served an amended version of its Statement of Reply to respond to the amendment to the Statement of Defence.

66.  On 31st August and 2nd September 2020, Nigeria applied to serve a Further Statement of Rejoinder and to amend its Statement of Defence respectively, to which Zhongshan responded on 11 September 2020, and Nigeria answered on 17th September 2020. The

Tribunal ruled on 21ˢᵗ September 2020 that the Defence could be amended but that the Further Rejoinder could not be served.

67.   On 2ⁿᵈ October 2020, following submissions from the parties, the Tribunal directed that the hearing due to start on 9ᵗʰ November 2020 should proceed electronically owing to the problems which would be likely to be encountered by the parties' respective representatives, counsel and witnesses in connection with travelling and meeting owing to the continuing Covid-19 emergency.

68.   A case management conference took place electronically on 26ᵗʰ October 2020, at which Nigeria applied (i) for the hearing due to start on 9ᵗʰ November to be adjourned, and (ii) to adduce an expert report on the issue of quantum. In a ruling provided on 26ᵗʰ October 2020, the Tribunal rejected both applications on the grounds set out in the ruling, and in particular, that an adjournment of the hearing, which would occur if either application was granted, could not be justified, not least in the light of the fact that Nigeria had already been granted an adjournment over Zhongshan's objection, and had been warned that the Tribunal would require exceptional circumstances before it would consider granting a further adjournment.

69.   The hearing took place electronically from and including 9ᵗʰ to 13ᵗʰ November 2020. Zhongshan was represented by Mr Christopher Harris QC, and Mr Hussein Haeri and Ms Emma Lindsay as advocates, Withers LLP, Asato & Co, and G Elias & Co acting, and they called Mr Xue, Dr Han, Mr Zhao, Professor Baluch and Mr Vandenheuvel as witnesses of fact, and Mr Noel Matthews as an expert witness. Nigeria was represented by Mr Chikwendu Madumere as advocate, supported by Chemezie Ojiabo, Dr Peter Oniemola, Z S Adeyanju, Mrs Maimuna Shiru, Philomena C Uwandu, and Ifeoluwa M Olaweye, and they called Mr Adeoluwa, Mr Akanni Akinosi, and Mr Olumide Aderemi as witnesses of fact.

**E.   Nigeria's jurisdictional and preliminary points**

*Introductory*

70.   Nigeria took a number of points of principle, some of which are jurisdictional in nature, as to why Zhongshan's claim should fail, and it is convenient to consider them before turning to the issues of liability and quantum. The points of principle are as follows:

a.   That Zhongshan's complaints are not about the conduct of the Federal State of Nigeria, and therefore there is no claim against Nigeria;

b.   That Zhongshan has no claim because it did not hold an "*investment*" within the meaning of article 1(1);

c.   The Tribunal has no jurisdiction because the six-month period referred to in the first sentence of article 9(3) had not expired when this arbitration was launched;

d.   The Tribunal has no jurisdiction as the Court proceedings operated as a bar in the light of the second sentence of article 9(3) (the "fork in the road" point);

e.   Zhongshan's claim should not be adjudicated in the absence of the PRC government being involved in the arbitration;

f.   In so far as Zhongshan is basing its claim on the Court proceedings and/or the anti-suit injunction, it cannot do so, because of its failure to pursue an appeal;

71.   The Tribunal will deal with these contentions in turn.

*No valid claim against Nigeria*

72.   We reject the argument that Zhongshan has no valid claim against Nigeria, which is advanced on the ground that none of the actions complained of were carried out by the Federal State (save in connection with the Court proceedings and the anti-suit injunction). We accept that Zhongshan's case is primarily based on actions of Ogun State, although the actions of other entities, namely the police and NEPZA, are also strongly relied on. However, for the purposes of a claim such as this, all organs of the State, including those which have an independent existence in domestic law, are to be treated as part of the State. This is customary international law, and is clear in the light of the Articles on *Responsibility of States for Internationally Wrongful Acts* ("ARSIWA") adopted by the International Law Commission in August 2001. Article 1 of ARSIWA provides that "*[t]here is an internationally wrongful act of a State when conduct consisting of an act or omission (a) is attributable to the State under international law; and (b) constitutes a breach of an international law obligation.*" And article 4.1 of ARSIWA provides that "*[t]he conduct of any State organ shall be considered an act of that state under international law, whether the organ exercises legislative, executive, judicial or any other*"

*functions"*, and article 9.2 of ARSIWA stipulates that an organ *"includes any person or entity which has that status in accordance with the internal law of the State"*. Article 5 of ARSIWA extends the rule to apply to *"a person or entity which is not an organ of the State under article 4, but which is empowered by the law of that State to exercise elements of the governmental authority"*.

73.  The principles which are enshrined in these provisions have been recognised and applied in a number of arbitral decisions relating to alleged breaches of bilateral investment treaties – see e.g. *Deutsche Bank AG v Democratic Socialist Republic of Sri Lanka* ICSID Case No ARB/09/2, Award, 31 October 2012, §§357ff; *Flemingo DutyFree Shop Private Limited v Republic of Poland* UNCITRAL Award, 12 August 2016, §§416ff; *Nissan Motor Co Ltd v Republic of India*, PCA Case no. 2017-37, relating in substantial part to actions taken by the State Government of Tamil Nadu and engaging the responsibility of the Republic of India.  Quite apart from legal principle, it would render Investment Treaties almost meaningless if they did not apply to actions of local, as opposed to national, government.

74.  Nigeria relied on decisions where a breach of contract by a local authority could not be attributed to the state concerned (e.g. *Compania de Aguas del Aconquija SA and Vivendi Universal SA v Argentine Republic* ICSID Case No ARB 97/3 Award, 21 November 2000, §§77-82, and *Azinia, Davitian, & Baca v The United Mexico States* ICSID Case ARB (AF)/97/2 Award, 1 November 1999, §84). However, they were cases where the claim was based on a breach of contract by the local authority, and it was held that a "mere" breach of contract by a local authority could not of itself be attributed to the state. Indeed, it was implicit in the reasoning in those cases that, if the action complained of would otherwise amount to a breach of the treaty in issue, then it would be attributed to the state. And that is clear from decisions such as *Interocean Oil Development Company and Interocean Oil Exploration Company v Federal Republic of Nigeria* ICSID Case No ARB/13/20, Decision on Preliminary Objections, 29 October 2014, §§ 111 and 112, and *Garanti Koza LLP v Turkmenistan* ICSID Case No ARB/11/2019 Award, 16 December 2016, §244. In *Interocean*, the tribunal stated that *"the existence of contractual claims under the JVA does not preclude the claimants from filing a separate set of claims pursuant to international law"* because *"[t]he substantive claims in this arbitration are not for breach of the JVA per se"*.  That is precisely the case here.

75.   We therefore conclude that, if and in so far as the 2016 Activities would otherwise amount to a breach of the Treaty, they can and should be attributed to Nigeria.

76.   We add that, although we do not rely on this point as it was not argued, we draw comfort from the fact that it appears to have been the intention of the parties to the 2013 JVA, in the light of clause 15.1 thereof, that Ogun State would "*strictly observe*" the terms of the Treaty, thus reflecting an apparent understanding that the actions of Ogun State would be subject to the terms of the Treaty.

## No investment

77.   The contention that Zhongshan did not hold an investment seems to us to be untenable. The more difficult issue is whether the investment should be treated as its ownership of Zhongfu or Zhongfu's indirect 60% ownership of the interests created by the 2010 Framework Agreement and the 2013 JVA ("Zhongfu's rights"). Orthodox legal analysis might suggest that it should be the former approach: Zhongshan was the Chinese party who invested in Nigeria through its ownership of a Nigerian company, Zhongfu. On the other hand, commercial reality can be said to favour the latter approach, in that in economic terms Zhongshan indirectly owned Zhongfu's interests, and the only purpose which Zhongfu had was to hold what were in practice Zhongshan's Nigerian assets. It is not necessary to decide the point, because, whichever approach is right, the far-reaching definition of "investment" in article 1(1) is wide enough to cover either the shareholding in Zhongfu or Zhongfu's interests – see for instance the discussion in *Mytilineos Holdings SA v The State Union of Serbia & Montenegro and Republic of Serbia* UNCITRAL Partial Award on Jurisdiction, 8 September 2006, §§101 to 109.

78.   It is right to add that, even for the purpose of assessing compensation, it would not in our opinion matter which was the right approach. What would be treated as lost is Zhongfu's rights, and it is they that were valued by Mr Matthews, as we discuss below. In the absence of any suggestion to the contrary in argument, evidence or cross-examination, it seems to us that the natural inference is that the depreciation in the value of Zhongfu as a result of the loss of its interests would have been equivalent to the value of the rights which were lost.

79.  As we understood it, Nigeria also argued that Zhongshan could not in any event contend that it held an investment because it had not invested its own money or other assets in the alleged investment. Even assuming that the legal basis for that contention is made out, we would reject it on the facts. We have no reason to think that the 2010 Framework Agreement, the 2011 Receipt, the 2013 Document, the 2013 Acknowledgment and the 2013 JVA are anything other than genuine documents, which had the effect which they purport to have. In other words, they demonstrate that Zhongshan paid money, and Zhongfu undertook obligations, which were referable, indeed solely referable, to the acquisition and enjoyment of the rights which Zhongshan says that Zhongfu had. On top of that, there is no reason to doubt the evidence of Dr Han, Mr Xue and Mr Zhao, supported as it is by documents, that Zhongshan, through Zhongfu, spent considerable sums on works to the infrastructure of the Zone, and in particular Fucheng Park, as well as on marketing and managing Fucheng Park and the Zone. This is supported by the fact that that the audited accounts of Zhongfu and OGFTZ for the calendar year 2015 ("the 2015 Accounts") record expenditure (in rounded figures), respectively, of NGN 54m on "road construction" and NGN 297m on infrastructure expenditure (and, to put that in context, in 2015 the exchange rate was around 200 NGN per USD).

*The six-month wait*

80.  We also reject Nigeria's contention that this arbitration is ill-founded because Zhongshan failed to allow the six month period referred to in the first sentence of article 9(3) to expire before serving the Request. We are in some doubt whether a failure on the part of Zhongshan to wait six months would necessarily invalidate the Request or this arbitration, particularly if it had become clear that there was no possibility of settling its claim. However, it is unnecessary to decide that point, because Nigeria's contention fails, in our view, on the facts.

81.  As already mentioned, on 21st September 2017 Zhongshan sent Nigeria the 2017 notice in which it expressed its willingness to discuss the dispute which had arisen as a result of the 2016 Activities. The 2017 notice specifically described itself as "*a request for negotiations concerning a dispute between [Zhongshan] and [Nigeria] in connection with [Zhongshan's] investments in Nigeria in and through [Zhongfu]*." Nigeria did not even acknowledge this notice. It seems to us both clear as a matter of principle and in

accordance with common sense and fairness that in these circumstances, the six month period referred to in the first sentence of article 9(3) should be treated as running from the date of the 2017 notice. As a matter of simple analysis, Zhongshan started the negotiating process and then nothing happened, and consequently, after six months, Zhongshan was free to initiate arbitration proceedings. So far as common sense is concerned, it would be contrary to justice if Nigeria could rely on its own failure to take up the invitation to negotiate in order to say that Zhongshan had failed to allow for a sufficient negotiating period. We draw support from the reasoning of the tribunal in *Khan Resources Inc, Khan Resources BV and CAUC Holdings Company Ltd v The Government of Mongolia* PCA Case No 2011-09, Decision on Jurisdiction, 25 July 2012, §406, where it was held that the stipulated period for negotiations was triggered by a letter from the claimant expressing *"willingness to discuss the issues"*. Indeed, this case is a stronger one for Zhongshan than that of the successful claimant in *Bayinder Insaat Turizm Ticaret Ve Sanayi AS v Islamic Republic of Pakistan* ICSID Case No ARB/03/29, Decision on Jurisdiction, 14 November 2005, §102.

### *The fork in the road*

82.   Nigeria contended that the second sentence of article 9(3) precludes Zhongshan bringing this arbitration, on the ground that Zhongfu opted for Court proceedings. Nigeria relies on both the Court proceedings, but in particular on the State court proceedings where Zhongfu claimed substantial damages, which apparently included loss of income which it would have enjoyed if it had not been effectively deprived of its rights under the 2010 Framework Agreement and the 2013 JVA. In effect, therefore, Nigeria contends that the Court proceedings or either of them consisted of the submission of *"the dispute to a competent court"* in Nigeria.

83.   There are a large number of tribunal decisions where such a fork in the road point has been considered in connection with a provision equivalent to the second sentence of article 9(3), and it is not easy to reconcile the approach adopted in all the decisions on the issue. We mean no disrespect to the various tribunals to whose decisions we were referred, but it does not seem to us that it would be helpful to analyse all the decisions, given that we have resolved that the correct approach on this issue is that adopted by a very distinguished and experienced tribunal in the *Khan v Mongolia* decision, already

cited in the last paragraph but one of this Award. At §389, the tribunal identified the two familiar tests, "*the triple identity test*" (which requires the domestic court proceedings to involve the same parties, the same cause and the same object as the treaty arbitration) and "*the fundamental basis test*" (which involves asking whether the basis of the domestic court proceedings was fundamentally the same as the basis for the treaty arbitration). At §390, the tribunal saw "*no reason to go beyond the triple identity test*" for whose application there was "*ample authority*". In the following paragraph, the tribunal addressed the argument that it would be "*unrealistic to expect all three prongs [of the triple identity test] to be satisfied*", and said that "*the test for the application of fork in the road provisions should not be too easy to satisfy, as this could have a chilling effect on the submission of disputes by investors in domestic fora, eve when the issues at stake are clearly within the domain of local law*". Having made that point, in §392, the tribunal accepted that the triple identity test may nonetheless be "*too strict ... where one only of [its] requirements ... is not satisfied*", but explained that "*this is not the case here*", as "*not one of*" the three requirements was satisfied.

84.   We agree with the approach of the tribunal in those passages in *Khan v Mongolia*, and consider that it should be applied here. On that basis, the fork in the road argument raised by Nigeria should be rejected.

85.   First, neither of the parties to this arbitration, Zhongshan and Nigeria, was party to either of the Court proceedings. In this connection, we note in particular that article 9(3) refers to the "*investor concerned*", which is a reference back to the definition in article 1(2), so that, in the present context, it refers to the Chinese investor, Zhongshan, not the Nigerian subsidiary, Zhongfu. On that basis alone, the "*investor concerned*" has not commenced any proceedings at all in the Nigerian courts and hence article 9(3) has not been triggered. (We accept that there is a powerful case for saying that this factor alone should be enough to defeat Nigeria's case on the fork in the road point, but, as we have explained, we consider it more appropriate to look at the issue more widely.)

86.   Secondly, in the Court proceedings, the case of the plaintiff, Zhongfu, was based (in the State court proceedings) on alleged breaches of its contractual and possessory rights under the 2010 Framework Agreement and the 2013 JVC, and (in the Federal court proceedings)

on alleged breaches of Nigerian domestic public law; whereas Zhongshan's case in this arbitration is based squarely on the Treaty.

87.   Thirdly, as to the relief sought, subject to one point, it is different also. In both of the Court proceedings, Zhongfu sought declaratory and injunctive relief, whereas in this arbitration, Zhongshan seeks compensation. The one area of overlap is that in the State court proceedings, Zhongfu also claimed damages in USD 1,000,797,000. However, we do not consider that this factor justifies not following the approach of the tribunal in *Khan v Mongolia*. First, it is the only overlap; secondly, the claim for damages was very much of a subsidiary claim in the State court proceedings, the principal object of which appeared to be to seek an enforceable determination that Zhongfu was entitled to occupy the Zone and to continue to operate there peacefully and without harassment; thirdly, the State court proceedings got nowhere following their issue, and, particularly, as this does not appear to have been the fault of Zhongfu, it seems inappropriate for Nigeria to invoke those proceedings to justify reliance on the second sentence of article 9(3).

88.   Whilst the Tribunal has decided to apply the triple identity test, we consider that the same result would obtain if we had applied the fundamental basis test. Three decisions were principally relied on to support an application of the fundamental basis test. In two of the three decisions there are two obvious differences from the present case, in that the Claimant in the subsequent Treaty arbitration had itself commenced local litigation which it had lost – up to and including the Supreme Court in *Pantechniki v. Albania*, ICSID case no. ARB/07/21, §§21-27, and in a local arbitration and in local court proceedings up to the Cairo Court of Appeals in *H&H Enterprises v Arab Republic of Egypt*, ICSID Case no. ARB/09/15, §§373-375.   In the present case the Claimant commenced no local proceedings and neither set of proceedings commenced by Zhongfu made any progress at all, as explained above. In the third decision, *Supervision y Control v Costa Rica*, ICSID case no. ARB/12/4/2017, the local proceedings were commenced by a subsidiary of the Claimant and it was found that those proceedings must be considered as filed by Claimant (see §329).   That is not a conclusion this Tribunal feels able to make in respect of Zhongshan and Zhongfu in this case. However, the *Supervision y Control* decision may also be distinguished by the facts that the Claimant failed to withdraw the local proceeding once it had initiated the arbitration (§330) and the Claimant pursued the local proceedings all the way to the Costa Rica Supreme Court, to a judgment some two years

after the treaty arbitration proceedings had commenced (§307). As the tribunal put it, "*What, in the end, matters for the application of fork in the road clauses is that the two relevant proceedings under examination have the same normative source and pursue the same aim.*" (§330) As we have explained, the Court proceedings did not pursue the same aim as are pursued in this Arbitration.

89.   Accordingly, we find for Zhongshan on the fork in the road argument. Before leaving this topic, there are two further points we should mention in connection with this argument.

90.   First, we note that (i) the JVA expressly referred to the Treaty in clause 15.1, and (ii) Zhongfu did not rely on its rights under the Treaty or even under the 2013 JVA in the Nigerian Court proceedings, and specifically reserved its rights under the 2013 JVA in the State court proceedings. While we have not taken those points into account when arriving at our conclusion on the fork in the road issue because they were not raised, our present view is that they supports Zhongshan's case on that issue. In particular, while we do not suggest that an investor can automatically avoid being defeated by a fork in the road argument automatically by stating in domestic proceedings that it was reserving its other rights, it does seem to us to be a relevant factor for a tribunal to take into account when considering the issue, and that it could in some cases be decisive.

91.   Secondly, we note that the Court proceedings were issued well before the expiry of the six months referred to in article 9(2), and it may therefore be arguable that, quite apart from what we have said in the preceding two paragraphs, neither the Federal court proceedings nor the State court proceedings were capable of falling within the ambit of the second sentence of article 9(3). We doubt that that argument would have succeeded if it had been raised by Zhongshan, and it is unnecessary to address it but we mention it for completeness.

*The involvement of the PRC*

92.   Nigeria contends that "*[t]he Tribunal cannot meaningfully engage in a consideration of Nigeria's conduct when another State – whose conduct would necessarily also be in issue – is not present before the Tribunal to explain its position and action*", and in particular the conveying of Note 1601 to Nigeria.

93.  It is true that the facts and reasoning behind the existence and contents of Note 1601 are by no means entirely clear and that only a representative of the PRC government or an agency of that government is likely to be able to explain them. However, that does not mean that, in the absence of such evidence, Zhongshan should be precluded from proceeding with this arbitration, or that the Tribunal should be precluded from publishing an award. Zhongshan does not need to rely on such evidence, as its case is based on the existence of Zhongfu's rights in Nigerian law as a result of entering into the 2010 Framework Agreement and the 2013 JVA, and its contention that Zhongfu was deprived of those rights by the statements and actions of various organs of the Nigerian state between April and August 2016, and that deprivation was a breach of Nigeria's obligations under the Treaty. Note 1601 is irrelevant to that claim, save in so far as its existence or contents provide Nigeria with a defence to Zhongshan's claim – or would provide Ogun State, NEPZA and the police with a domestic law defence to Zhongfu's claim.

94.  If Nigeria wished to contend that not merely that the 1601 Note itself, but that the PRC's explanation for the Note, is relevant to Nigeria's case in this arbitration, then it would have been open to Nigeria to call, or at least to seek to call, relevant employees or agents of the PRC government to give evidence to us. No such witness was called by Nigeria and no proof or statement from such a witness was put before us. Indeed, it has not been suggested to us by Nigeria that it has sought to identify, let alone to take a proof of evidence or statement from such a witness or to call such a witness.

95.  Accordingly, we can see no ground for accepting Nigeria's argument that the arbitration should not conclude without evidence from the PRC government.

*No reliance on the Court proceedings or the anti-suit injunction*

96.  At least on the face of it and in the light of the very limited information we have been provided with, there do appear to have been significant and unjustified delays, and considerable latitude given to the defendants, in the Court proceedings. However, we were not provided with any details as to the steps which Zhongfu took or could have taken to ensure that the proceedings were dealt with more speedily. While we see the force of the point that the anti-suit injunction was processed very quickly in comparison with the very slow progress of the Court proceedings, we consider that the evidence is

insufficiently strong or clear or strong to enable us to conclude that the way in which they were dealt with could represent a breach of the Treaty.

97.    As for the anti-suit injunction, although we consider that the reasoning and conclusion of Justice Akinyemi were, with all due respect to him, misconceived, we are disinclined to hold that the grant of the anti-suit injunction amounted to a breach of the Treaty. There was nothing to prevent Zhongfu from appealing the decision, and indeed it did so, although it subsequently abandoned the appeal (when the proceedings were discontinued). Given that there is no reason to think that the grant of the anti-suit injunction by Justice Akinyemi was anything other than simply a wrong decision (at least in our view), Zhongfu's failure to prosecute its appeal, for no apparent reason, and certainly for no compelling  reason, should, we think, disentitle it from relying on the decision as an infringement of the Treaty.

98.    We have expressed our views in the preceding two paragraphs in somewhat tentative terms, because, as Zhongshan confirmed in argument, if we accept that its claim, based on the 2016 Activities, which are attributable to Nigeria, is well founded, it would not need to rely on the Court proceedings or the anti-suit injunction. For the reasons given in the following section, we do accept that that claim is well founded, and therefore it is unnecessary to reach a definitive conclusion on the issues discussed in those two paragraphs.

## A further point raised by Nigeria

99.    Before we move on from the jurisdictional and preliminary points, we should mention a further point which was raised by Nigeria in its skeleton argument for the hearing and which it mentioned at the hearing with some force (albeit briefly), namely that Zhongfu's investment was not made in accordance with Nigerian domestic law. This was not a point which had been pleaded by Nigeria. Indeed, in our ruling on 21st September 2020, we had refused permission for it to be raised in Nigeria's proposed Rejoinder. Accordingly, it is not a point which Nigeria can rely on, and therefore it is not a point which Zhongshan could have be expected to meet, and indeed, it was not a point on which we were addressed by Zhongshan.

100. While we therefore do not propose to rule on the point, it is, we think, right to say that we are very doubtful whether there would have been anything in the point even if Nigeria could have relied on it. Nigeria's primary argument on this point was that the 2010 Framework Agreement transferred or created an interest in land, and was therefore invalid because it required the consent of the Governor of Ogun State. However, (i) it was the duty of OGFTZ as transferor or grantor, not Zhuhai as transferee or grantee, to obtain the Governor's consent, (ii) Ogun State was a substantial shareholder in OGFTZ, (iii) in reliance on the 2010 Framework Agreement, Zhuhai and its successor-in-title Zhongfu, to the knowledge of Ogun State made substantial investments, and (iv) Ogun State both directly and as a substantial shareholder in OGFTZ benefitted from these investments. Accordingly, even assuming (which seems to us to be open to serious doubt) that the 2010 Framework Agreement did involve the creation or transfer of an interest in land, we would have thought that Nigeria could not have successfully impugned the Agreement on the basis that the consent of Ogun State's governor was not obtained.

101. Nigeria also wished to argue that the 2010 Framework Agreement violated domestic law because Zhuhai was not registered as a Nigerian company at the time it was entered into, but once again we are very sceptical whether this argument could have succeeded, bearing in mind the points just made, and the fact that the benefit of the 2010 Framework Agreement became vested in a Nigerian registered company within a few months of its execution.

**F.    Nigeria's case on misrepresentation and concealment**

*Introductory*

102. Nigeria contended that Ogun State was wrongfully induced by Zhongfu to enter into the 2013 JVA and that accordingly no claim could be brought against it based on the loss of Zhongfu's rights thereunder. Essentially, Nigeria's contention was that Ogun State had been induced by what counsel for Nigeria referred to as a "*fraudulent misrepresentation and concealment of material facts*" made by Zhongfu to persuade Ogun State to write the March 2012 letters and, eighteen months later, to enter into the 2013 JVA with Zhongfu. Nigeria's case was that this misrepresentation and concealment entitled it to invalidate, or, in more technical terms, to rescind, the 2013 JVA, on discovering the misrepresentation and concealment.

*The alleged misrepresentation*

103. The misrepresentation was said in Nigeria's Statement of Defence (and effectively repeated in its opening submissions) to be that *"[i]n order to achieve its target of securing appointment as substantive manager of the Zone, Zhongfu represented to [Ogun State] that CAI and its parent company have [sic] been liquidated and wound up without successor companies"*. It was claimed that this misrepresentation led Ogun State to decide to write the November 2011 letter and the March 2012 letters ("the 2011/2012 letters"), and then to enter into the 2013 JVA.

104. This contention is strongly denied by Zhongshan, and on the basis of the documentary and oral evidence before us in this arbitration, we are satisfied that Nigeria has failed to make out the contention.

105. First, in his witness statement, Mr Adeoluwa said that, when sending the 2011/2012 letters he had relied on *"mouthwatering representations"* by Zhongfu about its ability to manage the Zone, *"as well as representations concerning and relating to CAI's incapability to manage the Zone and the criminal investigation in China involving its parent company"*. Mr Adeoluwa expanded in his witness statement on the alleged criminal activity of senior members of CAI and parent company, Guangdong Xinguang International Group Co Ltd ("GXIG"), but he did not refer to being told that CAI or GXIG were in liquidation. Mr Akinosi said much the same, albeit rather more concisely. Further, Mr Adeoluwa described himself as having written the 2011/2012 letters because he was *"[s]wayed by the representations of Zhongfu, especially as regards its expertise and experience"*. There is thus no suggestion in the witness statements of anything having been said about CAI being in liquidation or ceasing to exist prior to the 2011/2012 letters having been sent.

106. It is true that the November 2011 letter refers to CAI and GXIG as being *"officially bankrupt"* and Mr Adeoluwa described that letter describes itself as having been written *"[b]ased on the information given ... by Zhongfu"*, but that does not assist Nigeria. It is clear that, even on Mr Adeoluwa's evidence, he did not rely on Zhongfu as the sole source of information for what he wrote in the letter - and it would be astonishing if it were otherwise. Thus, in May 2011, as Mr Adeoluwa accepted in cross-examination (albeit very reluctantly, even though it was in his witness statement), Ogun State representatives

had visited the Zone and remarked on the "*low activity*" and "*were not satisfied*" with CAI's management of the Zone. Mr Adeoluwa also confirmed in cross-examination that (as he had said in the November 2011 letter) he had made enquiries about CAI and GXIG in China, although he was evasive about the extent of the enquiries and as to the identity of his informant.

107.   In these circumstances, in relation to the 2011/2012 letters, it seems to us that the misrepresentation case has simply not been made out on Nigeria's own evidence. That evidence instead supports a different statement which has not been pleaded (and anyway has not been shown to be untrue, let alone dishonestly so).

108.   Quite apart from this, there are other problems in the way of our concluding that Zhongfu made any misrepresentations about CAI or GXIG. First, Mr Adeoluwa and Mr Akinosi never identified the individuals who had made any alleged representations. Secondly, the November 2011 letter seems to suggest someone in China as the source of the information about CAI's status, and that was, as we have mentioned, confirmed in Mr Adeoluwa's cross-examination (though he was evasive about this and said that he could not remember who the individual was). Thirdly, the first of the March 2012 letters, addressed to CAI, justified the termination of the 2007 JVA on a number of different grounds, almost all of which concerned CAI's alleged poor performance, in managing the Zone, and, although CAI's bankruptcy is mentioned, it reads as something of an afterthought.

109.   Fourthly, there is the fact that Nigeria says that what persuaded Ogun State that Zhongfu had misled it in 2012 was the 1601 Note. While that Note does indicate that the Chinese authorities believed that CAI was still in existence, it also suggests that the Chinese authorities also believed that CAI still had management rights over the Zone, which as Ogun State knew, was wrong, and had been wrong for some four years. Fifthly, Mr Adeoluwa does not seem to have suggested in either of his letters of 12th April 2016 and 27th May 2016 that Ogun State had been misled in 2012 by Zhongfu into thinking that CAI had been wound up. In the former letter, he said that Ogun State was "*persuaded by the argument of the Consulate that the problem Ogun State had with [CAI] was as regards management rights and practices, not shareholding*", which is, with respect, somewhat opaque, but it is not an allegation that CAI were falsely said to have been wound up. And in the letter of 27th May 2016, Mr Adeoluwa said that what Zhongfu was "*alleged*" to

have done was "*to have fraudulently converted State assets ... and ... misled Ogun State thereby*", which again is not an allegation that Zhongfu falsely represented that CAI had been wound up. Sixthly, even as late as 18 August 2016, Mr Adeoluwa was emailing Radix Legal and Consulting, who were now acting for Zhongshan and Zhongfu, that "*Ogun State ... has no issues with ... Zhongfu*" and that "*[t]he complaint against them, as you know, came from the Government of the [PRC]*", who, he suggested, said in Note 1601, that NSG "*rather than your clients were the ones who bought the shares of [CAI]*". He added that the PRC government had suggested that "*to continue to allow Zhongfu to manage the Zone is a fraud on the [PRC]*".

110. Finally on this aspect, it had come to the attention of Ogun State and indeed of Mr Adeoluwa, that CAI appeared to be in existence and in business in Spring 2014, as is evidenced by the letters written to and by Mr Adeoluwa on, respectively, 25th and 28th April that year. If he had considered that he had been seriously misled into agreeing to Zhongfu being manager of the Zone by Zhongfu telling him that CAI had been wound up, then we consider that Mr Adeoluwa would have raised with Zhongfu the fact that CAI appeared to be very much in existence in April 2014, rather than, as he did, unreservedly supporting Zhongfu as manager of the Zone.

111. In so far as the pleaded misrepresentation relates to the execution of the 2013 JVA, Nigeria's position seems even weaker, as by that time CAI had been stood down as manager of the Zone for more eighteen months. Again there is nothing in Mr Adeoluwa's witness statement to support the contention that the alleged misrepresentation was made, let alone that Ogun State acted on it when entering into the 2013 JVA. The only additional statement attributed to Zhongshan is that its "interim status was negatively affecting its effectiveness". Accordingly, all the points made in paragraphs 105 to 110 above in relation to the 2011/2012 correspondence apply at least equally to the 2013 JVA.

112. Quite apart from this, we are unpersuaded that any statements as to the status of CAI or GXGI played any significant part in Ogun State's decision to write the 2011/2012 letters or to enter into the 2013 JVA.

113. In the light of the way in which the 2011/2012 letters are expressed and in the light of Mr Adeoluwa's testimony, it seems reasonably clear that what really motivated Ogun State into replacing CAI with Zhongfu as de facto manager of the Zone was CAI's

disappointing performance and the expectation that Zhongfu would do much better. Accordingly, even if we had found that the alleged misrepresentation was made, it nonetheless is apparent that what "swayed" Mr Adeoluwa into writing the 2011/2012 letters was, according to him, Zhongfu's record and promises, as well as CAI's poor performance.

114.  Again, that point applies with even more force to the 2013 JVA. By the time it was executed Ogun State had seen Zhongfu in action at Fucheng Park for well over a year, and common sense strongly suggests that Ogun State's assessment of Zhongfu's ability would have been by far the most important factor in deciding to enter into the 2013 JVA. In addition, having terminated the arrangement with CAI by the first of the March 2012 letters, it seems very unlikely that Ogun State would have been influenced more than a year later by Zhongfu saying that CAI had been wound up, especially as the letter had cited CAI's bankruptcy.

*The alleged concealment*

115.  The concealment of material facts relied on by Nigeria arises from the fact (not so far mentioned in this Award) that Zhuhai and GXIG entered into an "*Entrustment of Equity Management Agreement*" ("the Equity Agreement"), on 29th March 2012. This document is written in Chinese, and we have been provided with a translation into English. Clause 1 stated that GXIG owned 51% of CAI, which owned 60% of OGFTZ. Clause 2 stated that GXIG "*agrees to entrust*" this shareholding to Zhuhai, which is "*willing to accept the entrustment*". Clause 3 provided for a valuation of the CAI shares, and clause 4 stipulated that (i) the period of entrustment started when the CAI shares are "*transferred to [Zhuhai] or the third party*" (and it is unclear who that is), and (ii) the arrangement could not be terminated unless Zhuhai is in breach. Clause 5 appears to have envisaged that, at least while the Equity Agreement subsisted, Zhuhai would have control and de facto effective ownership rights over CAI's 60% shareholding in OGFTZ, but that it could not "*dispose [of] any major asset of OGFTZ*" without GXIG's consent. Clause 12(3) provided for the consent of Ogun State to the arrangement before it could proceed.

116.  On 10th June 2012, GXIG and Zhuhai entered into a Supplemental Agreement to the Equity Agreement (in Chinese, and again we refer to the English translation) to "*entrust*" the 51% shareholding in CAI "*speedy and to promote the Ogun State Government to*

*withdraw the relevant decision*". Although clause 2 of this Supplemental Agreement refers to a valuation of RMB 33,785,500, clause 3 stipulates that owing to "*the unpredictable situation and uncertainties of the entrusted target*", this "*assessed result shall not be equaled to the final transaction value of the 51% shares*", which should be "*separately assessed or reconfirmed*". Clause 4 states that Zhuhai should "*manage the entrusted target and operate the Company diligently*".

117.  The Equity Agreement was only executed on 29th March 2012, which was two weeks after Ogun State had written the March 2012 letters dismissing CAI and appointing Zhuhai as interim de facto manager of the Zone, so it is hard to see how that Agreement could have been said to have been concealed from Ogun State at that stage. Having said that, we accept that it is likely that the Equity Agreement was being negotiated at the time of those letters.

118.  Quite apart from this, at least according to the testimony of Dr Han, there is an innocent explanation for the Equity Agreement. He said that he had been told in October 2012 by Jeffrey Huang, the son of the founder of the group of which Zhongshan, Zhongfu and Zhuhai were members, that, earlier in the year Zhuhai had negotiated to purchase GXIG's shareholding in CAI, because Zhuhai feared that CAI's involvement in the Zone might be terminated, and Zhuhai wished to preserve the investment it had made since it had entered into the 2010 Framework Agreement.  Dr Han was also told by Mr Huang that, although an agreement in principle had been reached with GXIG, the parties could not agree on a price, and in any event the consent of Ogun State had not been obtained (or even, it appears, sought), and so the transaction envisaged by the Equity Agreement (as varied by the Supplemental Agreement) had not proceeded.

119.  The Tribunal had an initial degree of concern about the accuracy of this testimony. First, it was not immediately apparent why the Equity Agreement would have been entered into after CAI had been dismissed as de facto Zone manager on 15th March 2012. However, it may well have been thought that CAI could be reinstated (particularly as Zhongfu had only been appointed as manager on an interim basis for three months). Indeed, this was probably what was contemplated by the reference to "*promot[ing] the Ogun State Government to withdraw the relevant decision*" in the Supplemental Agreement. Secondly, at least if read on their own, clauses 4 and 5 of the Supplemental Agreement

appear to have been treating the Equity Agreement as if it had been completed. However, read in context and bearing in mind that the document has been rather idiosyncratically translated, the clauses appear perfectly capable of applying only when (and if) the Equity Agreement is completed. Further, the fact, mentioned above, that it appears that NSG acquired 51% of CAI in 2013 is plainly consistent with Dr Han's evidence that the Equity Agreement was not implemented. In any event, he was not challenged on the accuracy of his testimony as to the Equity Agreement, and no document or witness called what he said into question. Accordingly, although Dr Han's evidence on the issue was in part based on what he was told by Mr Huang, we accept it.

120.  Over and above this, we have some difficulty in seeing on what basis it can be said that the fact that Zhongfu did not inform Ogun State about the Equity Agreement, even if it became effective, amounted to some sort of wrongdoing on the part of Zhongfu. We accept that Ogun State might well have been surprised to discover that CAI and Zhongfu had entered into such an arrangement. However, in the absence of special circumstances, the fact that A is negotiating, or even has negotiated, a contract with B, who is in a contractual relationship with C, is not something which A is legally obliged to reveal to C when negotiating a contract with C, even if the negotiations are related to C's contract with B. In a particular case, there could of course be special facts which would mean that there was an obligation on A to reveal to C that A was having negotiations with B. It has not been suggested that there are such special facts in this case, and, having considered the facts, we do not consider that there are.

## G.   Nigeria's liability to Zhongshan

### The relevant facts

121.  Having rejected Nigeria's jurisdictional and preliminary points and its argument based on misrepresentation and concealment, we must now address the central question on liability, namely whether Zhongshan has established that Nigeria wrongly deprived Zhongfu of its rights under the 2010 Framework Agreement and/or the 2013 JVA, what we have called "Zhongfu's rights".

122.  So far as the facts are concerned, the Tribunal can see no good reason for not accepting as accurate both the documentary evidence, and the oral testimony, adduced by

Zhongshan and summarised in Section B of this Award. The genuineness or effectiveness of some of the documents was challenged by Nigeria, but it does not seem to us that there was any basis for those challenges. In particular, Nigeria contended that OGFTZ had not actually executed the 2010 Framework Agreement, and in any event that Ogun State was unaware of it. However, the seal of OGFTZ is visible on the copy of the 2010 Framework Agreement, and it appears to have been signed on behalf of OGFTZ. Further, there is no reason to doubt the genuineness and accuracy of the 2011 Deed, the 2011 Receipt and the 2013 Document, all of which are consistent with the 2010 Framework Agreement being in existence, as is the work carried out by Zhuhai and Zhongfu before the March 2012 letters were written by Mr Adeoluwa. Quite apart from this, while we are of the view that it is unlikely that Ogun State was unaware of the 2010 Framework Agreement, it would not in any event be invalidated because of such unawareness.

123.   Further, Nigeria called no evidence which materially challenged the witness and documentary evidence relied on by Zhongshan. Thus, although Nigeria suggested that the carrying out of infrastructure work to Fucheng Park and the organisation of letting to occupiers of sites in Fucheng Park after the execution of the 2010 Framework Agreement, was effected by CAI, at any rate up to 15th March 2012, Nigeria called no witness to support that contention, or to contradict Zhongshan's documentary evidence and witness testimony which supported the contention that it was Zhuhai and Zhongfu, not CAI, who were responsible for these matters from the time of the 2010 Framework Agreement.  The very existence of that Agreement, and the terms of the March 2012 letters also support Zhongshan's case on this.

124.   The 2016 Activities, in so far as they involved Ogun State and NEPZA between April and August 2016 and set out above, were clearly aimed at getting Zhongfu and its staff to vacate the Zone and abandon Zhongfu's rights. Whether the actions of the police in that period had that purpose may be thought to be less clear, not least because, unlike Ogun State and NEPZA, the police had no involvement with Zhongfu's management of the Zone and had no legitimate interest in Zhongfu in that capacity. Nonetheless, we are of the view that the police actions were taken to discourage Zhongfu from defending its rights and to discourage its staff from remaining in the Zone. First, no other reason was advanced for the existence, or indeed the timing, of the warrants for the arrest of Dr Han and Mr Zhao, or for the arrest and mistreatment of Mr Zhao. Secondly, the police were

involved when Mr Onas went to the Zone on 22nd July 2016, which suggests that they were parties to the attack on Zhongfu's rights. Thirdly, NEPZA and Ogun State stated that they would get the immigration service and the police to use their powers to put pressure on Zhongfu staff, as Ogun State's letter of 14th July 2016, NEPZA's letter of 27th July 2016, and Dr Han's evidence as to what he was told on or around 14th July 2016 by Mr Onas and Mr Odega, demonstrate.

*Conclusion on Nigeria's liability*

125.   In the light of these conclusions on the facts, it seems clear to us that Zhongshan's claim must succeed. More specifically, we have concluded that the written and oral communications and the actions taken by Ogun State, NEPZA and the police between April and August 2016, namely the 2016 Activities, infringed Nigeria's obligations under articles 2(2), 2(3), 3(1), and 4.

126.   The 2016 Activities were plainly designed to deprive, and indeed succeeded in depriving, Zhongfu of its rights under the 2010 Framework Agreement and the 2013 JVA in circumstances where there were no domestic law grounds for doing so, and in a way which involved a combination of actual and threatened illegitimate use of the state's power to achieve that end. The Nigerian courts' failure to grant any prompt interlocutory or declaratory order, and granting of the anti-suit injunction, while not enough on their own to constitute breaches of the Treaty, serve to compound the wrongness of these actions and statements.

127.   It is not even as if there is any convincing evidence to suggest that Nigeria considered that Zhongfu was doing a bad job in managing the Zone (although, as we have noted, complaints were made in the letter of 18th May 2015 letter, but they do not appear to have been pursued and no attempt was made by Nigeria to substantiate them in this arbitration). On the contrary: the Zone under Zhongfu's management in 2013 and 2014 resulted in a substantial number of occupiers by 2016, and produced tax revenues for Nigeria of over NGN 160m. We also were referred to an Article published in February 2015 the Assistant Comptroller of the Nigerian Customs Service said that Zhongfu *should be given a pat on the back for a job well done*". Further, in April 2016, as already mentioned, the Economist Intelligence Unit produced a video praising the Zone.

128.  Article 2(2) was infringed by Nigeria because Zhongfu's interests in the Zone were entitled to "the continuous protection" of Nigeria. This article is normally invoked where the investment has been harmed by someone other than the state, and the state has failed, by action or by law, to prevent or reverse the harm. However, in this case, far from stepping in to prevent or even discourage threats being made to Zhongfu and its staff, the police, whose function it is to prevent and deal with breaches of the law, actually supported those threats and helped carry them into effect.

129.  Article 2(3) prevents Nigeria from taking "*any unreasonable or discriminatory measures against the management, ... use, enjoyment ... of the investments by [Chinese] investors*". The combination of facts that (i) there were no apparently justifiable grounds in domestic law to shut out Zhongfu from the Zone and from its legal rights, and (ii) illegitimate actions, and threats of illegitimate actions, on the part of state bodies, which cannot have been in accordance with domestic public law, were taken or made to achieve that end, means that the actions and threats amounted to "*unreasonable measures*". The additional fact that there is no suggestion of other owners or operators were treated in such a way, and indeed that NSG was brought in as manager, suggests that the measures were also discriminatory.

130.  The written and oral communications directed and actions taken by Ogun State, NEPZA and the police against Zhongfu and its staff between April and August 2016 also breached Nigeria's obligation under article 3((1) to accord "*fair and equitable treatment*" to Zhongfu's rights under the 2010 Framework Agreement. In this connection, there was a wholesale "*lack of due process leading to an outcome which offends judicial propriety*" as it was put in *Waste Management Inc v United Mexican States (Number 2)* ICSID Case No ARB(AF)/00/03, Final Award, 30 April 2004, §98.  The threats to individuals, the peremptory requirements to vacate, and the use of police, in particular in the treatment of Mr Zhao, amounted to "*forms of coercion that may be considered inconsistent with the fair and equitable treatment to be given to international investment*", to quote from *Desert Line Projects LLC v Republic of Yemen*, ICSID Case No ARB/05/17, Award, 6 February 2008, §§151-9. Another way of making the point is that the 2016 Activities were arbitrary in the sense of having been, as it was put in *Ronald S Lauder v The Czech Republic* UNCITRAL, Final Award, 3 September 2001, §221, "*founded on prejudice or preference rather than on reason or fact*" – or indeed rather than on any domestic legal basis (and

see also *Biwater Gauff (Tanzania) Lt v United Republic of Tanzania* ICSID Case No ARB/05/22, Award, 24 July 2008, §709).

131. As to article 4, the actions and statements between April and August 2016 were aimed at, and succeeded in, "*expropriat[ing]*", or involved "*tak[ing] similar measures ... against*", Zhongfu's Rights. It was rightly observed in *Metalclad Corporation v The United Mexican States* ICSID Case No ARB(AF)/97/1, Award, 30 August 2000, §103, that "*[e]xpropriation ... includes not only, open, deliberate and acknowledged taking of property, such as outright seizure ..., but also covert or incidental interference with the use of property which has the effect of depriving the owner ... of the use or reasonably-to-be-expected economic benefit of property*". In other words, an action or statement which has the intended effect of enabling the state to take possession of the investment in question can fall within article 4. There can be no doubt that the 2016 Activities had such an intention and effect in relation to Zhongfu's Rights. Nigeria produced no evidence that this expropriation was "*for the public interests*", and there is no reason to infer that it was. It is clear that the expropriation was not effected "*under domestic legal procedure*". As we have observed, the expropriation appears to have been discriminatory. And there can be no doubt that there has been no "*fair compensation*": indeed, there has been no compensation. It follows that none of the four requirements of article 4 in relation to an expropriation have been satisfied.

132. Accordingly, we conclude that Zhongshan has made out its case that Nigeria breached its obligations under the Treaty when it effectively deprived Zhongfu of its rights under the 2010 Framework Agreement and the 2013 JVC, and that Zhongshan is entitled to require compensation to be paid by Nigeria under article 5. We now therefore turn to the question of the quantum of that compensation.

## H.   The level of compensation

*Introductory*

133. Zhongshan contended that it was entitled to a sum which was the aggregate of (i) compensation for the loss of its rights under the 2010 Framework Agreement and the 2013 JVA and (ii) what is often called moral compensation or moral damages. We will

refer to these two categories of relief as, respectively, (i) "Compensation," and (ii) "Moral Damages".

134.  So far as Compensation is concerned, Zhongshan's case is that it is entitled to be awarded a sum equal to the value of its rights under the 2010 Framework Agreement and the 2013 JVA ("the two Agreements") as at the date those rights were effectively lost, namely 22nd July 2016. In particular, Zhongshan contends that there should be no adjustment for a possible fall in the value of those rights since that date. We consider that that submission is correct. We have concluded that there was more than a single act of expropriation, but we agree with Zhongshan's suggestion that 22nd July 2016 is the right date to select, and it was not challenged by Nigeria. Zhongshan's submission that there be no adjustment for a fall in value (if any) since that date appears to reflect the terms of article 4(1)(d) and 4(2), in which the Treaty requires an expropriation of an investment to be for "*fair compensation*", which is defined as "*the value of the expropriated investments immediately before the expropriation is proclaimed*". Where, as here, the expropriation infringes the Treaty, it would seem wrong if Zhongshan's compensation was less than it should have been if the expropriation had been lawful. Although the Treaty does not expressly state what the basis of the assessment of Compensation should be, we consider that, in respect of all breaches of an Investor-State treaty, the standard is one of "full reparation" for a claimant's losses.  This reflects Article 34 of ARSIWA.  Article 36(2) further makes it clear that compensation may extend to loss of profits. There are a number of ICSID tribunal decisions which support this approach – see e.g. *Ioannis Kardassopoulos v Georgia* ICSID Case No ARB/05/18, Award, 3 March 2010, §517, and *Compania del Desarrollo de Santa Elena S.A. v Republic of Costa Rica* ICSID Case No ARB/96/1, Award, 17 February 2000, §78.

135.  As to Interest, again article 4 appears to assist Zhongshan's case that it should be paid interest on any Compensation. Further, article 38(2) of ARSIWA provides that "*[i]nterest runs from the date when the principal sum should have been paid until the obligation to pay is fulfilled*".

136.  So far as Moral Damages are concerned, such a head of compensation can be traced back at least to *Lusitania (US v Germany)* (1923) VII RIAA 32 at §40, where the tribunal held that damages could be awarded for "*injury inflicted resulting in mental suffering, injury*

*to his feelings, humiliations, shame, degradation ... and such compensation should be commensurate to his injury*". Such damages have been frequently recognised and awarded where appropriate in investor-state arbitration awards – see e.g. *Desert Line Projects LL C v The Republic of Yemen* ICSID Case No ARB/05/17, Award, 6 February 2008, §§290-291. That decision is also in point because the mistreatment for which moral damages were awarded was of an employee of the claimant.

137. When it comes to the assessment of the Compensation, the Tribunal is in the uncomfortable position of having a fully reasoned and detailed expert report from a qualified expert witness, Mr Noel Matthews, in support of Zhongshan's primary contention that it should receive Compensation of USD 1,078 million (plus interest) (or USD 1,446 million using an approach based on a comparable transaction), without any expert evidence on behalf of Nigeria in response. This is very unfortunate, and the circumstances in which it comes about are set out in our ruling of 26th October 2020: as explained above, Nigeria failed to instruct an expert when it had the opportunity to do so in accordance with the procedural timetable, and, when it finally applied to do so late, it sought an adjournment of the hearing, which we considered that we could not grant as Nigeria had already been granted one adjournment over Zhongshan's strong and understandable objection, and with a warning that a further adjournment would only be granted in wholly exceptional circumstances.

138. Because of the absence of any expert witness for Nigeria, the Tribunal considered it appropriate to ask Mr Matthews significantly more questions about his evidence than we would have done had Nigeria called an expert witness. Before doing so, we told the parties that we would take that course, and added that we appreciated that this should not be done in a way which would, or would be perceived to, affect our impartiality, and that if either party felt that any questions were inappropriate, they should feel free to object. In the event, there were no objections to our questions, all of which Mr Matthews answered. After the hearing, as explained below, we also asked Mr Matthews to produce some revised calculations. We gave the parties the opportunity to comment on those revised calculations. The Respondent commented briefly and the Claimant did not wish to add anything to its earlier submissions.

*Assessment of Compensation*

139. Mr Matthews is an experienced chartered accountant, a Fellow of the Institute of Chartered Accountants, a Senior Managing Director of FTI Consulting LLP, and a member of the FTI Consulting Inc. Group. He has considerable experience in the quantification of damage, the valuation of shares and businesses, and has given evidence and advice in a large number of investor-state and similar arbitrations involving the loss or depreciation of an asset or a right.

140. His primary assessment of the value of Zhongfu's rights in the figure of USD 1,078 million was principally based on a discounted cash flow, or DCF, exercise, which involved assessing the likely income and outgoings which would have been enjoyed and incurred each year over the term of the Agreements and capitalising the net annual income as at 22nd July 2016. This exercise thus involved assessing each year (i) the likely revenues which would be generated by the Zone and paid to Zhongfu, and (ii) the likely costs which would be incurred in developing and managing the Zone and paid by Zhongfu, and then taking the capitalised value of the difference between those two sets of figures.

141. This DCF assessment exercise involved making a number of assumptions:

   a.  That the assessment should be based on a period ("the Term") ending in December 2106, the contractual expiry date of the 2013 JVA;

   b.  As to the development period

      i.   That Fucheng Park would have been fully developed within 12 months on the basis that Dr Han said that it "*would have been at full or close to full capacity within six to twelve months*",

      ii.  That the Pharmaceutical Park would have been fully developed and occupied within ten years from the end of 2017, in light of what was said in the 2016 Framework Agreement and the 2016 MoU; and

      iii. That the remainder of the Zone ("the Rest of the Zone") would have been fully developed within about 20 years from the end of 2017, based on the

evidence of Dr Han, who described the Zone as "*a long term project expected to be developed over a period of 20 years*".

c.  That full development would involve 60% of the area of the Zone being let off as sites to occupiers on underleases, with "*the remaining 40% of the land being used for road, public utilities and green spaces*", again quoting from Dr Han's evidence, although the figure for the Pharmaceutical Park was 80% according to the 2016 Framework Agreement and the 2016 MOU;

d.  That each occupier would have been granted a 20 year underlease of a site, and that those underleases would have been renewed throughout the Term;

e.  That the land transfer fee income should be assessed on the basis of the median rent under underleases granted in 2015, USD 12 per square metre (USD 11.23 for the Pharmaceutical Park), adjusted each year for anticipated inflation;

f.  That Zhongfu's administrative fee income would be 1.35% (or 1.1% in the case of the Pharmaceutical Park) of the revenue generated by occupiers, which was assessed on the basis of a weighted average of the forecast income in the underleases, adjusted each year for anticipated inflation;

g.  That, while Mr Matthews said that he had "*relatively limited information with which to project the costs of developing land*", Dr Han's evidence that costs "*generally equated to around one-third of the land transfer fees*", should be adopted, although this seemed conservative in the light of other evidence;

h.  That the evidence of Professor Baluch, that USD 250m would be raised "*to expand infrastructure across the Zone and the southwest region of Nigeria*", should be assumed to be right, supported as it was by the evidence of Mr Xue that this sum would be used to "*upgrade infrastructure ... within and leading to the Zone, power generating capacity in the South West Region of Nigeria, ... power cables within and around the Zone, sewerage and water treatment facilities to support the Zone and a business centre at Lagos Airport*", and also by the evidence of Dr Han and Mr Vandenheuvel;

i.  In addition, that certain other running costs should be allowed for, which Mr Matthews assumed would increase from its 2015 level at a pro rata rate with respect to the increase in developed land;

j.  That a discount rate should be applied of 14.3% per annum, as the appropriate figure to take as the cost of equity, being the aggregation of (a) the product of a beta (which measures the volatility of the asset in question against the market) of 0.98 and the aggregate of the risk-free rate of 2.3% and an equity risk premium of 5%, and (ii) a country risk premium for Nigeria of 7.2%.

142.  The valuation which these assumptions produced resulted in a figure for compensation in the sum of USD 1,078 million, and this figure was arrived at on the basis of calculations summarised by Mr Matthews in the following table:

| Estimate of the value of Zhongshan's rights under the Fucheng Industrial Park Agreement (USD million) | | | | |
|---|---|---|---|---|
| | Fucheng Park | Pharmaceutical Park | Rest Of Zone | Total |
| Land transfer income | 1.0 | N/A | 44.9 | 45.9 |
| Administrative fee income | 49.8 | N/A | 625.2 | 675.0 |
| Other running costs | N/A | N/A | N/A | (11.4) |
| Infrastructure investment | N/A | N/A | N/A | N/A |
| Total | 50.8 | N/A | 670.1 | 709.5 |

| Estimate of the value of Zhongshan's rights under the JV Agreement (USD million) | | | | |
|---|---|---|---|---|
| | Fucheng Park | Pharmaceutical Park | Rest Of Zone | Total |
| Land transfer income | 1.8 | 14.0 | 67.8 | 83.5 |
| Administrative fee income | 29.9 | 71.1 | 375.1 | 476.1 |
| Other running costs | N/A | N/A | N/A | (67.5) |
| Infrastructure investment | N/A | N/A | N/A | (123.7) |
| Total | 31.6 | 85.1 | 442.9 | 368.4 |

| Summary of Zhongshan's loss based on my DCF analysis (USD million) | Value |
|---|---|
| Value of rights under the Framework Agreement | 709.5 |
| Value of rights under the 2013 JVA | 368.4 |
| Total Value of Zhongfu's Rights | 1,078 |

143. The use of a DCF calculation as a means of assessing compensation for the loss of an asset has been relied on by claimants in many cases where an income-producing asset has been lost or harmed, including in a large number of investor-state cases. In many decisions on investor-state disputes, tribunals have assessed compensation on a DCF basis. However, even in some cases where it has been adopted, the tribunal has emphasised that DCF should be used with caution. Thus, in *Enron Corporation Ponderosa Assets LP v Argentine Republic* ICSID Case No ARB/01/3 22 May 2007, §385, while explaining that DCF had been "*constantly used by tribunals in establishing the fair market value of assets to determine compensation of [sic] breaches of international law*", the tribunal also emphasised that "*it is to be used with caution as it can give rise to speculation*".

144. In many cases where use of the DCF approach was rejected by tribunals, it was because the investment had not really got under way and therefore had little or nothing to show by way of a track record. Decisions show that there is resistance to using DCF where the investment had not been implemented or was at a fairly early stage. Thus, in *Tecnicas Medioambientales Tecmed S. A. v United Mexican States* ICSID Case No ARB (AF)/00/2, 29 May 2003, §186 the tribunal refused to adopt a DCF approach because of "*the brief history of operation of the Landfill ... - little more than two years – and difficulty in obtaining objective data allowing the [DCF] method on the basis of estimates for a protracted future, not less than fifteen years*" coupled with the fact that the "*future cash flow depends upon investments to be made – building of seven additional cells – in the long term*". Similarly, the tribunal in *Wena Hotel v Arab Republic of Egypt* ICSID Case No. ARB/98/4, 8 December 2000, §124, considered that a DCF approach "*would be too speculative*" where the business had operated for only seventeen months, under a contract which was contractually due to last around between 22 and 25 years. And in the earlier decision in *SPP (Middle East) v Egypt* ICC Award, Case No 3493, 11 March 1983, 22 ILM 752 (1983), one of the reasons for rejecting a DCF approach was, as explained in *Wena Hotel*, §123, that "*by the date of the cancellation, the great majority of the work had still to be done*".

145. DCF valuations in the context of investment treaty cases were the subject of an article, *DCF: Gold Standard or Fool's Gold*" in *The Asia-Pacific Arbitration Review 2020*, written by two members of FTI, Mantek Mayal and Alex Davie. The authors consider

some of the investment treaty cases, where DCF has been adopted or rejected, and say that "*[p]erhaps the main drawback of DCF analysis is its sensitivity to uncertain inputs*" and that the "*uncertainty of appropriate inputs is compounded in the case of early stage businesses where there is no track record of steady historical cash flow generation*". The authors suggest that such uncertainty should not lead to a DCF valuation being rejected, but that it justified using "*other valuation methods*" in addition.

146.  In this case, we would summarise the information most relevant to the DCF valuation carried out by Mr Matthews as follows:

a.  Between mid-2009 and mid-2016, some 37 occupiers were granted underleases of sites totalling about 830,000 square metres or 83 hectares, i.e. somewhat over 0.8 square kilometres, in Fucheng Park;

b.  Copies of 32 of those underleases, which show the financial terms agreed with, and the anticipated income of, the respective occupiers;

c.  The audited annual accounts for the calendar year 2015 prepared in NGN (the exchange rate in 2015 was around 200 NGN per USD, and on 22nd July 2016 it was 295 NGN per USD), including:

   i.  Zhongfu's accounts, which show negligible expenditure, and profits of NGN 621m (compared with NGN 227m for 2014);

   ii.  OGFTZ's accounts, which show operating revenue of NGN 607m and a loss after administrative expenses etc of NGN 520m (compared with operating revenue NGN 252m and a loss of 673m for 2014);

   iii.  The Notes to Zhongfu's accounts, recording that NGN 54m was spent in 2015 on "road construction"; and the Notes to OGFTZ's accounts recording infrastructure expenditure in 2015 of NGN 297m;

d.  Witness evidence that USD 250m would be sought for installing infrastructure inside and outside the Zone;

e.  Dr Han's statements that Zhongfu had worked on the basis that it would take up to a year to fill Fucheng Park, and 20 years to fill the Zone with occupiers, and that

60% of the gross area of the Zone could be underlet with the remainder used for infrastructure, amenity etc;

f.   Witness and documentary evidence that agreements had been entered into by OGFTZ with Xi'an in relation to the development of the Pharmaceutical Park.

147.   In the case of Fucheng Park, while one may have doubts about some of the details of the assessment, both the adoption of a DCF valuation, and the general thrust of Mr Matthews's approach to that valuation appear to us to be justified. We conclude that there is a sufficient track record upon which a DCF calculation may be based, albeit caution is needed as regards the appropriate assumptions to be adopted.  As at July 2016, around 830,000 square meters of land in that Park had been let by way of sites to occupiers under underleases which were long-term arrangements, and this had been achieved over some seven years. 830,000 square metres represents around 35% of the total area of Fucheng Park, and around 60% of the lettable land, on the basis of Dr Han's evidence that about 40% would be given over to infrastructure, amenity land and the like. It also appears that a substantial proportion of those sites which were subject to underleases had been developed by the occupiers. And a not insignificant amount had been incurred on infrastructure at Fucheng Park, as is revealed by the 2015 Accounts. It is true that there were accounts for only two years (although our information about the 2014 Accounts rests solely on the information in the 2015 Accounts), and they do not show a particularly profitable venture - particularly if one looks at OGFTZ's losses.

148.   It was not contended by Nigeria that the accounts did not present a true and fair view of the finances relating to the investment for these two years, 2014 and 2015, and we have no basis to doubt their accuracy  Despite the limited period covered by the accounts, it is not unreasonable to assume that there was a good prospect, based on the experience of the previous seven years, that Fucheng Park would be fully occupied within a few years or so. There were some 500,000 square metres of lettable area still unoccupied (given that 60% of 2.24 square kilometres is 1.34m square metres, of which 830,000 were occupied).

149.   According to Mr Matthews's evidence, the average rate at which space at Fucheng Park had been let between mid-2009 and mid-2016 was 120,000 square metres per year, and between mid-2012 and mid-2016, it was 150,000 square metres per year. During the last eighteen months of that four-year period, the rate was approximately 325,000 square

metres per annum. However, it would not be safe to assume that that rate could have been maintained: for example, it may have reflected a time of high demand in a cyclical market or it may have been a spurt due to temporarily pent-up demand. In that connection, we note that in the last six months of those eighteen months the rate appeared to be falling off.

150.  In those circumstances, we consider that, even taking the most pessimistic end of Dr Han's assessment that it would have taken "*six to twelve months*" to let off the remaining sites in Fucheng Park looks very optimistic, as it would involve letting some 500,000 square metres in a year. On the basis of the past experience summarised in the preceding paragraph, it seems to us that 30 months would be a more realistic assessment. After all, the only evidence as to the likely rate of letting is past performance and a statement by Dr Han, which was simply adopted by Mr Matthews. The basis of Dr Han's assessment was not explained and, in the absence of any convincing supporting evidence, we do not consider that it can be treated as anything more than an aspiration. Accordingly, the only reliable evidence as to the likely rate of letting after 2016 is the past performance summarised in the immediately preceding paragraph, and we have concluded that it suggests that it would be appropriate to assume a letting rate of 200,000 square metres per year. That is  more than the average rate achieved in the four years of Zhongfu's stewardship, and, although it is less than the average rate achieved in the last eighteen month period, that rate seems to have been levelling off towards the end of that period.

151.  We also consider that taking into account the income and outgoings over 30 years would amount to unrealistic speculation, particularly given the early stage of this investment and the considerable uncertainties as to infrastructure expenditure. As Mr Matthews fairly accepted, the effect of carrying out a DCF valuation on the basis of limiting the net income to 20 years rather than his approximately 90 years on the present value of Zhongfu's asset is relatively small. as each successive year's contribution is less than its predecessor. In all the circumstances of this case, it seems to us that 20 years is the right cut-off.

152.  Accordingly, we accept Mr Morrison's valuation of Zhongfu's loss insofar as it relates to Fucheng Park, subject to (i) assuming a 30-month period to let off the remaining lettable area, and (ii) limiting the period over which the DCF assessment is carried out to 20 years.

153.  The application of a DCF approach to valuing the Pharmaceutical Park and the Rest of the Zone on anything like the assumptions as to the rate of letting which Mr Matthews made, appears to us to be very problematic indeed. No underleases had been granted of any site in those parts of the Zone; no, or very little, infrastructure was in place in those parts of the Zone, and there was not even any finance in place to carry out infrastructure works; further, there were no feasibility or other business plans; no marketing proposals or investigation. Taking the Zone as a whole (i.e. including Fucheng Park) the total amount of land which had been let under underleases by July 2016 was less than 0.9% of the total area of the Zone (according to both the 2010 Framework Agreement and the 2013 JVA). That figure should be almost doubled, because, as just mentioned, we are proceeding on the basis that 60% of the land would be subject to underleases, with the rest being given over to infrastructure, amenity land and the like. But that makes little difference to the point: 1.5% is a very small proportion of the total lettable land in the Zone. A DCF valuation of the Pharmaceutical Park and the Rest of the Zone in those circumstances on anything like the basis assumed by Mr Matthews appears to us to be unjustifiable - especially when one bears in mind what was said in cases such as *Tecmed* and *Wena Hotel*.

154.  In such cases, tribunals have sometimes emphasised the desirability of a detailed business plan if a claimant is proposing a DCF valuation, and that must, self-evidently, be particularly true where, as in this case, the investment is at a relatively early stage of development. In his oral evidence, Mr Matthews acknowledged that a business plan "*would obviously be relevant*" and that it would be "*obviously it would be helpful*" to have such a document. Given that such a document does not exist (or at least none was drawn to our attention), it would have been helpful to have an in-depth independent expert assessment of the prospects of letting off units in the Zone and of the nature, extent, costs, and importance of necessary and desirable infrastructure works inside and outside the Zone, the time they would be likely to take and any difficulties they were likely to encounter. As it is, although Mr Matthews was able to draw some support from the underleases granted of sites in Fucheng Park up to mid-2016, when it came to assessing future lettings and future expenses, he was largely reliant on the statements of employees and agents of Zhongfu, which were not the subject of any sort of detailed analysis or justification.

155.  The speculative nature of the DCF exercise when applied to the Pharmaceutical Park and the Rest of the Zone is further demonstrated by the fact that OGFTZ and Zhongfu only have audited accounts for the two calendar years 2014 and 2015. Although they show that Zhongfu made a profit in those two years, it was not a large one when viewed in the context of Mr Matthews's projections, and, according to those accounts, OGFTZ, which was bearing most of the costs of management and the infrastructure costs, made a loss in each year.

156.  As with the 20-year estimate for letting the totality of the Zone, the assumptions on which Mr Matthews based his DCF assessment for the Zone involved substantially relying on relatively general statements by directors, employees or agents of Zhongfu, rather than on independent assessments of the required infrastructure, and the expenditure which it would involve and the time it would take to instal. The figure of USD 250m, to which Professor Baluch and Mr Vanderveuvel spoke, was not broken down, and did not appear to be based on any assessment of the specific nature and extent of the works involved, how long they would take, and how much they would cost. If there was such an assessment, we were not told about it. Nor was Mr Matthews, as he was unable to say what such works would involve, although he accepted that "*it matters to have a good infrastructure both outside and inside the Zone*", and he explained that "*underlying [his] valuation is the assumption that the infrastructure is in place inside the Zone and outside the Zone*". The figure of USD 250m derives some credibility from the fact that it is supported by the experienced Professor Baluch and Mr Vanderveuvel, but the fact that we do not know – and the fact that Mr Matthews did not know - what the works would consist of, how, indeed whether, they had been costed, and how long they would take, is a matter of obvious concern. This is particularly true in relation to the work which it was accepted would have to be carried out outside the Zone, because there could obviously be greater impediments in the way of carrying out such work, given the relative lack of control which OGFTZ and Zhongfu would have over what went on outside the Zone. Nor do we know how serious it would be for the profitability of the Zone, if some of the works outside the Zone could not be carried out, or what the risks of that happening were.

157.  The documentation to support the raising of the USD 250m was scant. It is far from clear how a fund-raising initiative would have been received by potential investors or how easy it would have been to raise the money. While we accept that the evidence of  Professor

Baluch and Mr Vanderveuvel assists Zhongfu's case on this question, there are obvious grounds for caution as to how easy it would have been to raise the money, given that the market had not been tested and there were apparently no lenders lined up to advance the funds. As Mr Matthews said "*they were still exploring how they were going to raise [the money]*", and there was no formulated or detailed plan to raise the money. When considering the appetite of the market for such an investment, it is, we think, also right to bear in mind Mr Matthews's evidence that "*[i]t appears that many Nigerian FTZ's have not been particularly successful to date*".

158. In the immediately preceding paragraphs, the Tribunal has been considering both the Pharmaceutical Park and the Rest of the Zone together. Unlike the Rest of the Zone, the development of the Pharmaceutical Park was at least the subject of a written arrangement, namely the 2016 MoU and the 2016 Framework Agreement. However, these documents do not take matters a great deal further, although we acknowledge that they do show that the projected development of the Pharmaceutical Park was not merely a matter of unsubstantiated hope, and was, at least potentially, ahead of that of the Rest of the Zone. The Pharmaceutical Park is a substantial area, 10 square kilometres, i.e. 10m square metres or 1,000 hectares, which is over four times the size of Fucheng Park. As far as the evidence goes, no development assessment of the Pharmaceutical Park had been undertaken, and, save that the documents contain a reference to USD 1 billion, there was no evidence as to the nature, cost or timing of any infrastructure work. We know nothing about the experience, record, capabilities or financial status of Xi'an, and it appears that the company which entered into the MoU was a Special Purpose Vehicle formed for that purpose. Nor is there any evidence as to the likely level of demand in the pharmaceutical industry for space in the Zone: apparently, there are no pharmaceutical business occupiers of Fucheng Park. Furthermore, it does not appear that there is any commitment from Xi'an to do anything specific under the terms of the 2016 MoU or the 2016 Framework Agreement.

159. Mr Matthews made the point that in a way it was artificial to divide up the Zone into three sectors and value each separately. We see the force of that, but it was the basis on which he decided to carry out his valuation. However, the point does provide some support for the notion that, if one looks at the Zone as a whole, it can be said that the letting history of Fucheng Park means that there was a track record, albeit a very preliminary and limited

track record, for the Pharmaceutical Park and the Rest of the Zone, namely the lettings and infrastructure in Fucheng Park.

160. Mr Matthews based his DCF valuation of Zhongfu's rights in relation to the Pharmaceutical Park and the Rest of the Zone on the assumption that it would take 20 years to let the totality of the sites in the Zone: that involves assuming that lettings will be achieved at the rate of just under 3,000,000 square metres per annum (on the basis that the Zone is 100,000,000 square metres, that 60% of the Zone would be lettable, and only a very small proportion, namely most of Fucheng Park, had been let). A letting rate of 3,000,000 square metres per annum is around 20 times the average rate at which sites were let in Fucheng Park between mid-2009 and mid-2016, and around 10 times the rate during the last eighteen months. Yet, the only basis which Zhongshan appears to advance for justifying this remarkably substantial increase in letting rate is Dr Han's description of the Zone as "*a long term project expected to be developed over a period of 20 years*". But that is an unsubstantiated and unexplained estimate from someone with an indirect interest, who was expressing what Zhongshan, the claimant had expected, and who was not proffered as an expert witness. So far as Mr Matthews was concerned, having explained in his Report that his 20-year assumption was based on Dr Han's view, he said in his oral testimony that he would not otherwise be "*able to benchmark*" his assessment "*to a data point is [sic] the period of time that it would take for the Zone to be developed*".

161. In the Tribunal's view, in order to justify such a very substantial differences between (i) the assumed future rates of letting of sites in the Rest of the Zone and the Pharmaceutical Park and (ii) the actually achieved rate of letting of sites in Fucheng Park over the preceding seven years, one would expect to have cogent expert evidence based on experience and examples and containing explanations as to why such a remarkable change could be expected. The unsubstantiated and briefly expressed expectations of a director of the company relying on what he said were "*expected*" future rates falls very far short of such an evidential requirement. Further, the uncertainties we have discussed in paragraphs 152 to 160 above reinforce the point that it would be inappropriate to assume that the letting rate would be significantly higher, let alone very substantially higher, than the letting rate achieved even in the last eighteen months in Fucheng Park.

162. In the light of these conclusions, the correct approach to the assessment of the Compensation other than in respect of Fucheng Park is not easy, particularly bearing in mind the warnings about the risks of speculating and the desirability of having a track record when carrying out a DCF valuation. So far as the Pharmaceutical Park is concerned, we consider that it should be assumed that land would be let off to occupiers at the rate of 200,000 square metres per annum (i.e. at the same rate as for Fucheng Park) on the basis that letting the Pharmaceutical Park will commence when Fucheng park is fully let (i.e. after 30 months). Although it does not actually affect our valuation, we consider that 60% of the Pharmaceutical Park would be lettable: the documents contained a suggestion that the right figures might be more but there was no independent support for this, so, again, we adopt the assumption made for Fucheng Park. This would mean that. 6,000,000 square metres would be available for letting in the Pharmaceutical Park.

163. Of course, if the Pharmaceutical Park turns out, or would have turned out, to be a great success, a letting rate of 200,000 square metres per annum would very probably seem to be an unduly cautious rate, but it is equally true that if the Pharmaceutical Park did not turn out, or would not have turned out, well, 200,000 square metres a year would very probably be an over-optimistic rate.

164. At 200,000 square metres per annum, and working on the same assumption as to 60% of lettable area, it would take 30 years until the Pharmaceutical Park was fully let. For the purposes of the valuation, we are prepared to take into account 17½ years of letting activity at this rate (i.e. 20 years less the 2½ years to let the remainder of Fucheng Park), and this would mean that a total of 3,500,000 square metres would have been let by the end of the 20-year period that we are prepared to consider for valuation purposes.

165. Subject to those adjustments, we would not make any amendment to Mr Matthews's DCF calculations for the Pharmaceutical Park.

166. The concerns we have expressed as to the lack of evidence as to the prospects of the Pharmaceutical Park apply with even more force to the Rest of the Zone. The uncertainty is even greater because OGFTZ and Zhongfu did not have the benefit of a development partner such a Xi'an, or the concomitant benefit of an arrangement such as the 2016 Framework Agreement or the 2016 MoU, in relation to the Rest of the Zone. In these

circumstances, we think that it would simply be too speculative to take into account any potential development of the Rest of the Zone.

167. In any event, the assumption of a letting rate of 200,000 square metres per year for the unlet part of Fucheng Park and the Pharmaceutical Park means that the Pharmaceutical Park would not be fully let by the end of the 20 years. If the Rest of the Zone was marketed at the same time as the Pharmaceutical Park, it would involve significant expenditure on infrastructure in both areas at the same time, and would at least potentially render the letting of the Pharmaceutical Park more problematic (in that the two areas might well compete for the attention of potential tenants), and so would justify a reduction in the 200,000 square metre letting rate that we have assumed for the Pharmaceutical Park. That also strongly suggests that it is right to assume that the Rest of the Zone will not be marketed until the Pharmaceutical Park is fully (or nearly fully) let. And the assumption of sequential letting of space in the three areas of Fucheng Park, the Pharmaceutical Park and the Rest of the Zone seems consistent with Mr Matthews's point that they are all part of a single Zone. In those circumstances, particularly in the light of the absence of any evidence as discussed in paragraphs 152 to 160 above, we take the view that we should assume the development of the Rest of the Zone is likely to be postponed beyond 20 years, in which case its prospects as at 2017 or today are very speculative indeed.  The prospects are simply speculative for us to be prepared to attribute any value to the Rest of the Zone.

168. We acknowledge that the assumption that the Zone as a whole will be let off at the rate of 200,000 square metres a year effectively implies that we are proceeding on the basis that it would take a very long time indeed to let off the whole of the Zone. But that is the consequence of the Zone extending over such a very substantial area. The size of the Zone seems unlikely to have a substantial effect on the demand for space within it, and, at least in the absence of some convincing expert evidence to support such a proposition, it would seem unjustifiable to conclude that, because the Zone is very large, the letting rate should be significantly increased beyond what it otherwise would be.

169. We also acknowledge that some of the findings and assumptions we have made in connection with the valuation exercise are somewhat speculative in nature. That is partly because a significant degree of uncertainty and unpredictability is almost always inherent

in the exercise of valuing a future income and outgoing stream. But, in this particular case, it is also because the evidential support for the two most important assumptions on which Mr Matthews's valuation was based, the likely rate of letting and the cost, nature and timetable of any infrastructure expenditure, is very thin indeed. This is not a criticism of Mr Matthews, who was plainly honest and competent; indeed it was Mr Matthews who provided the facts on which we have been able to arrive at an assessment of these factors, and without which we may well have had no alternative but to reject any allowance in relation to future lettings.

170.  In the event, we have concluded that we can properly base our assessment on a DCF valuation, on the basis that (i) we have the track record of Fucheng Park, which can be relied to support an evidence-based assumption as to  annual letting rates (and lettable area), (ii) we should proceed on the basis of a sequential letting policy for the Zone as whole, (iii) we can rely on Mr Matthews's assessment of the likely infrastructure costs based as it is on the Fucheng Park expenditure, and (iv) we should adopt a reasonably conservative but realistic valuation period of 20 years.

171.  In these circumstances, we consider that we should assess the Compensation on the following basis:

a.  Valuing Zhongfu's rights over Fucheng Park on the DCF basis proposed by Mr Matthews, save that (i) it should be assumed that it would be fully developed after 30 months rather than 1 year, and (ii) the cut-off should be after 20 years;

b.  Valuing the Pharmaceutical Park on the DCF basis proposed by Mr Matthews, save that (i) it should be assumed that it would be let off at the rate of 200,000 square metres per annum from the end of 2019, as opposed to being fully let within 10 years from some time in 2017, and (ii) the cut-off should be after 20 years, and therefore 3,500,000 square metres would be let after 17.5 years;

c.  Disregarding the letting prospects of the Rest of the Zone.

172.  Pursuant to a request from the  Tribunal at the Hearing, Mr Matthews provided us, a few days after the end of the Hearing, with his spreadsheet containing the figures which he used for his DCF valuations summarised in tabular form above, on the basis that we could change the inputs to arrive at what we considered to be the correct valuation. In the event,

only three inputs were variable, namely DCF period, area, and development time.  Having provisionally come to the conclusion that we should value along the lines summarised in paragraph 171 above, we realised that the spreadsheet might be insufficiently flexible to enable us to arrive at our valuation. We therefore wrote to the parties on 22nd January 2021 asking for a more flexible version of the document which he had sent us. After we received that more flexible version on 29th January 2021, we gave the parties the opportunity of commenting on it, which resulted in an email on 10th February 2021 from Mr Madumere on behalf of Nigeria with some concisely expressed comments, which we have taken into account.

173. Our valuation of the Compensation, based on Mr Matthews's primary, DCF, approach amended as described in paragraph 171 above is USD 55.6 million, made up in the following way:

| Estimate of the value of Zhongshan's rights under the Fucheng Industrial Park Agreement (USD million) | | | | |
|---|---|---|---|---|
| | Fucheng Park | Pharmaceutical Park | Rest Of Zone | Total |
| Land transfer income | 0.8 | N/A | 0.0 | 0.8 |
| Administrative fee income | 42.7 | N/A | 0.0 | 42.7 |
| Other running costs | N/A | N/A | N/A | (4.2) |
| Infrastructure investment | N/A | N/A | N/A | N/A |
| Total | 43.5 | N/A | 0.0 | 39.3 |

| Estimate of the value of Zhongshan's rights under the JV Agreement (USD million) | | | | |
|---|---|---|---|---|
| | Fucheng Park | Pharmaceutical Park | Rest Of Zone | Total |
| Land transfer income | 1.5 | 3.6 | 0.0 | 5.1 |
| Administrative fee income | 25.6 | 10.4 | 0.0 | 36.0 |
| Other running costs | N/A | N/A | N/A | (24.8) |
| Infrastructure investment | N/A | N/A | N/A | 0.0 |
| Total | 27.1 | 14.0 | 0.0 | 16.3 |

| Summary of Zhongshan's loss based on the above DCF analyses (USD million) | Value |
|---|---|
| Value of rights under the Framework Agreement | 39.3 |
| Value of rights under the 2013 JVA | 16.3 |
| Total Value of Zhongfu's Rights | 55.6 |

174. We have not so far referred to Mr Matthews's secondary approach to assessing Compensation. This produced a higher figure than his primary assessment of USD1,446 million. As a check on his DCF valuation, Mr Matthews relied on a single comparable transaction, which related to Nkok SEZ ("Nkok") which is a site of 1,126 hectares (i.e. just over 11 square kilometres) near the capital of Gabon, Libreville. His evidence revealed that Nkok had been the subject of two potentially relevant transactions, in 2014 and 2016. For various reasons, some of which were in his Report, but another of which was vouchsafed (voluntarily) in his oral evidence, Mr Matthews considered the 2014 transaction, which involved the sale of a 20% shareholding in Nkok, more reliable, and we agree. It suggested, he said, a value of 26.6 USD per square metre.

175. The Tribunal finds it very difficult to accept that the 2014 transaction relating to Nkok is of much if any help when assessing the value of Zhongshan's rights in respect of the Zone. Nkok is in a different country, and in the absence of a detailed assessment of the variations between Nigeria and Gabon in terms of economic prospects, political risk, and taxation policy, it appears to us that use of one as a comparable to value the other would be very dangerous even before one considers the differences in physical location. Mr Matthews was well aware of this and did his best to cater for these potential variations, but we are not persuaded that it would be safe to place any significant weight on this comparable. Having said that, we should acknowledge that Mr Matthews acted entirely reasonably in seeking a comparable given what we have said about the DCF approach, and that he appears to have done his best to find one: it is not his fault that Nkok was the best he could come up with.

176. Accordingly, we would award Zhongshan USD 55.6 million by way of Compensation.

*Moral damages*

177. The Tribunal is in no doubt that there were aspects of the 2016 Activities on the part of organs of the Nigerian state which justify an award of moral damages. By far the most significant of those activities for present purposes was treatment of Mr Zhao by the police in the second half of August 2016. It represented an indefensible and serious infringement of his human rights, and a humiliating and frightening experience, lasting the best part of two weeks. The threats to Dr Han by Mr Adeoluwa and Mr Onas in July 2016,and the

fact that Zhongfu's employees were intimidated on 22nd July 2016 reinforce the claim for moral damages.

178.  So far as the quantum is concerned, the Tribunal considers that USD 75,000 would be an appropriate sum. It represents around USD 5,000 for each day of Mr Zhao's mistreatment plus a further sum to reflect the other inappropriate behaviour of representatives of Nigeria towards employees and a director of Zhongfu.

## I.    Interest

179.  As already explained, Zhongshan is entitled to interest at least in the absence of a good reason, and we have not been provided with a  reason for not awarding interest. As the Compensation has been assessed as at 22nd July 2016, we consider that interest should run from that date.  We agree with the Claimant that the rate of interest should be the same both before and after the date of this award. There are two questions which have to be determined, however. The first is the rate of interest and the second is whether the interest should be awarded on a simple or compound basis (and if compounded, the frequency of the compounding).

180.  So far as the rate is concerned, Zhongshan has asked for 2% over LIBOR for the time being on the basis that that would represent the likely cost of borrowing. It is a rate which does not seem unreasonable, which has not been challenged by Nigeria, and which has been awarded in other investor-state arbitrations. Thus, in the *Enron* case referred to above, at §452 the Tribunal considered it right to award interest "*at the 6 month average LIBOR rate plus 2 per cent for each year, or proportion thereof*" and on the basis that "*[i]nterest shall be compounded semi-annually*". Compound interest has been said to be more normal than simple interest in investor-state arbitration awards – see e.g. the *Wena Hotel* case cited above, at §129, and the *Desarrollo v Costa Rica* decision also cited above, at §§101-104. However, there are still cases where simple interest has been awarded.

181.  Many tribunal decisions supporting each side in the compound interest versus simple interest debate were noted by the tribunal in a useful section of the decision in *Tenaris S.A. and Talta-Trading E Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela* ICSID Case No. ARB/11/26, 29 January 2016, §§588 to 594. In that case,

the tribunal acknowledged that either basis was appropriate, but, quoting from Dozer and Scheuer, *Principles of International Law* (2nd ed, 2008), they recognised that "*the practice of recent tribunals shows a trend towards compounding interest as more in accord with commercial reality*". In the end, the tribunal decided that the facts of the case justified an order for compound interest. We also note that the majority of the tribunal in *Foresight Luxembourg Solar 1 Sarl v. Kingdom of Spain*, SCC Case No. 2105/150, 14 November 2018, §544 expressed the view that compound interest is the generally accepted standard in international investment arbitration. Even if that is not right, the high-handed and inappropriate way in which Zhongfu was deprived of its rights, and the failure of Nigeria to engage with Zhongshan after the deprivation, persuade us that this is a case for compound interest.

182. Zhongshan cited decisions endorsing the notion that an award of interest should be compounded monthly, including *Foresight Luxembourg Solar*, §545. The Tribunal is satisfied that monthly compounding of interest is a reasonable approach to adopt in this case.

183. Accordingly we award Zhongshan interest on the Compensation and on the moral damages to run from 22nd July 2018 until payment, at the one month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly.

184. This produces a figure of USD 9.4 million on the basis that this award is made on 26 March 2021.

185. We add that in respect of the figures we have decided to award by way of Compensation and Interest we have not deviated from the figures rounded to USD millions and one decimal point as produced by Mr Matthews' spreadsheet. We were not given more precise figures and, even if we had been, to produce an award in those terms might convey a degree of precision with respect to the calculations that would be misleading.

## J.   Costs

186. It is clear that Zhongshan is the effective winner in these arbitral proceedings, in that (i) it has proved that its version of events is accurate, (ii) it has successfully resisted Nigeria's jurisdictional and preliminary objections, (iii) it has established that it has a valid claim

against Nigeria under the Treaty, and (iv) it has obtained an award for substantial damages.

187. In these circumstances, we consider that Zhongshan is entitled to recover at least a substantial proportion of its costs from Nigeria. This arbitration is being conducted according to English law and section 61(1) of the Arbitration Act 1996 states that "*[t]he tribunal may make an award allocating the costs of the arbitration as between the parties, subject to any agreement of the parties*". The parties are agreed that the UNCITRAL Rules on costs apply, and Article 42(1)of those Rules provides that the "*costs of the arbitration shall in principle be borne by the unsuccessful party or parties*", although the Tribunal can, "*if it determines that apportionment is reasonable, taking into account the circumstances of the case*". Again, this is consistent with section 61(2) of the 1996 Act.

188. Although a party may have won an arbitration dispute, there may be reasons to deprive it of some, or even all, of its costs. In this case, we consider that there is nothing in the conduct of Zhongshan or its representatives which would justify reducing the costs which it can recover on such grounds, and indeed Nigeria has not made any suggestion that there is any reason for reducing the costs claimed. It is true that we have awarded Zhongshan substantially less than it has claimed, but the size of the claim has not affected the conduct of this arbitration and Nigeria has not protected its position on costs by making a sealed offer.

189. However, that does not mean that we should simply award Zhongshan the entire amount which it seeks by way of costs. The costs payable by a successful party to its legal representatives and expert witnesses in connection with proceedings may well be reasonable as between as between payer and payee, but that does not mean that it would be reasonable to award those costs in full as against the other party to the proceedings.

190. Zhongshan claims a total of £3,012,067.61 for legal costs and disbursements aside from the other costs of the arbitration and the specific additional amount referred to below. That sum includes £292,035 in respect of the fees of FTI (Mr Matthews).  For an investment treaty arbitration claim seeking a substantial sum (and recovering a substantial, albeit significantly lower, sum), it is not excessive for a claimant to incur costs of this order, especially where an international law firm and Counsel are instructed. The Tribunal notes that Nigeria's claim for costs is significantly less, being N450,000,000

(approximately £850,000 at present exchange rates).  Although a significant difference is to be expected as Nigeria did not instruct international counsel or solicitors, the disparity is striking.

191.   Bearing in mind that a comparative exercise between the costs of the parties is one way of assessing reasonableness, the Tribunal in its discretion applies a reduction of a little over 20% to Zhongshan's claimed figure, and we award Zhongshan £2,400,000 by way of costs (plus the additional amount addressed in the next paragraph of this Award).

192.   Zhongshan separately claims £109,789.57 in respect of its costs of dealing with the Amended and Re-Amended Statement of Reply.  By its Order dated 18 May 2020, the Tribunal directed Nigeria to pay, irrespective of the outcome of the dispute, "*the costs of and occasioned by the amendment (including the costs of amending the Statement or Reply to deal with the new paragraphs)*".  Zhongshan's claim under this head appears reasonable and is accordingly awarded in full.

193.   To the extent it was claimed, the Tribunal does not award pre-award interest on legal and other costs, because it would be unusual to do so and we have not been given the information (as to when amounts were paid) to enable it to do so.

194.   The total of the other costs of the arbitration are £549,655.17, comprised as follows:

   a.   Tribunal fees:  £457,095.86, broken down as follows:

        i.    Fees of Mr Rotimi Oguneso SAN, co-arbitrator:  £130,113.36

        ii.   Fees of Mr Matthew Gearing QC, co-arbitrator:  £118,738.75

        iii.  Fees of Lord Neuberger of Abbotsbury, presiding arbitrator:  £208,243.75

   b.   Tribunal disbursements:  £147.76

   c.   PCA Fees:  £15,996.01

   d.   Hearing hosting fees (Opus 2) paid by Zhongshan:  £61,324.76

   e.   Interpretation fees paid by Zhongshan:  £7,067.76.

f.      All other expenses (bank costs, currency translation, telecommunication, cancelled court reporting arrangements, interpretation arranged by the PCA, etc.): £8,023.02.

195.   The Tribunal decides that Nigeria should bear all of these costs, as the unsuccessful party in the arbitration.

196.   Thus far, Zhongshan has advanced £295,000 and Nigeria £195,000, Zhongshan having made a substitute payment of £50,000 on Nigeria's behalf.  The costs of the arbitration not paid directly by the Parties, in the amount of £481,262.65, shall be deducted from the deposit held by the PCA.  The amount of £8,737.35 remaining in the deposit shall be returned to the Claimant, in view of the Claimant having made a substitute payment to the deposit.

197.   Bearing in mind the Parties' unequal contributions to the deposit, Nigeria shall pay £286,262.65 in respect of the costs of arbitration paid in the first instance from Zhongshan's share of the deposit and £68,392.52 in respect of the hearing and interpretation fees paid directly by Zhongshan.

**K.    Conclusion and Award**

198.   **Accordingly, the Tribunal concludes, orders and awards as follows:**

a.      Zhongshan has locus to pursue a claim for compensation under the Treaty in respect of its rights under the 2010 Framework Agreement and the 2013 JVA;

b.      Nigeria is in breach of its obligations under articles 2(3), 3(1) and 4(1) of the Treaty;

c.      Nigeria is ordered to pay to Zhongshan;

i.      Compensation for the expropriation  in the sum of USD 55.6 million

ii.     Moral damages in the sum of USD 75,000;

iii.    interest on the aforesaid two sums from 22nd July 2016 at the one month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of the award, in the sum of USD 9.4 million.

iv.   in respect of the Claimant's legal and related costs of the arbitration, the sum of £2,509,789.57

v.   £354,655.17 in respect of the other costs of the arbitration.

vi.   interest on the sums specified on all the amounts specified in sub-paragraphs (i) to (iii) above from the day after this award until payment  at at the one month USD LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, USD LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to USD LIBOR plus 2%, compounded monthly, until and including the date of payment ).

vii.   interest on the sums specified on all the amounts specified in sub-paragraphs (iv) and (v) above from the day after this award until payment  at at the one month GBP LIBOR rate plus 2 per cent for each year, or proportion thereof, such interest to be compounded monthly, until and including the date of payment (and should, for any reason, GBP LIBOR cease to be operative while any amount remains outstanding, the interest due shall from that date onward be calculated on the basis of whatever rate is generally considered equivalent to GBP LIBOR plus 2%, compounded monthly, until and including the date of payment ).

**Mr Rotimi Oguneso SAN, co-arbitrator**

**Mr Matthew Gearing QC, co-arbitrator**

**Lord Neuberger of Abbotsbury, presiding arbitrator**

Place of arbitration: London, United Kingdom

Date of Award: 26 March 2022