# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

ZHONGSHAN FUCHENG INDUSTRIAL
INVESTMENT CO., LTD.,

        Petitioner,

    v.                                          Civil Action No. 22-170 (BAH)

FEDERAL REPUBLIC OF NIGERIA,

        Respondent.

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONDENT'S MOTION TO DISMISS FOR LACK OF JURISDICTION UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605

## TABLE OF CONTENTS

GLOSSARY ........................................................................................................................... iv

I.     PRELIMINARY STATEMENT ................................................................................. 1

II.    STATEMENT OF FACTS ......................................................................................... 3

       A.    Petitioner Files Breach Of Contract Claims Against Ogun State In
             Nigerian Court. .................................................................................................. 3

       B.    Petitioner Initiates Separate Arbitration Proceedings Against Nigeria
             Claiming Breach Of International Law Under The Nigeria-China Treaty,
             But Does Not Raise Any Commercial Contract Claims. ...................................... 4

       C.    The Tribunal Applies International Law And Rules That Nigeria, Through
             Ogun State, Breached Its Obligations Under The Nigeria-China Treaty. ............. 5

III.   ARGUMENT ............................................................................................................. 6

       A.    Nigeria Is Immune From Suit Because Petitioner Cannot Establish An
             Exception To Sovereign Immunity Under the FSIA. ........................................... 6

       B.    The New York Convention Does Not Apply To The Award, which Arises
             From The Nigeria-China Treaty. ........................................................................ 8

       C.    The Arbitration Tribunal Agreed With Petitioner That The Underlying
             Dispute Was Non-Commercial. ......................................................................... 10

       D.    Petitioner Has Not Sufficiently Alleged That Nigeria Waived Its
             Sovereign Immunity. ........................................................................................ 14

       E.    Nigeria Is Entitled To A Threshold, Conclusive Determination Of Its
             Sovereign Immunity Without Waiving Any Substantive Defenses Against
             Enforcement. .................................................................................................... 16

IV.    CONCLUSION ........................................................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Africard Co. v. Republic of Niger*, 210 F. Supp. 3d 119 (D.D.C. 2016)........................................ 14

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ................................ 6

*\*Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99 (D.C. Cir. 2015)...................................... 8

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312 (2017)...
    16

*Campagnie Sahélienne d'Enterprise v. Republic of Guinea*, No. 20-1536, 2021 U.S. Dist. LEXIS
    10442 (D.D.C. June 14, 2021) ................................................................................................... 14

*Chevron Corp. v. Republic of Ecuador,* 949 F. Supp. 2d 57 (D.D.C. 2013) ................................ 10

*Citizens Bank v. Alafabo, Inc.*, 539 U.S. 52 (2003) ...................................................................... 13

*Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118 (D.C. Cir. 1999)................................................ 14

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.,* 244 F. Supp. 3d 100 (D.D.C. 2007)..... 10

*Customs & Tax Consultancy LLC v. Dem. Rep. Congo*, No. 18-1408, 2019 U.S. Dist. LEXIS
    162136 (D.D.C. Sept. 16, 2019) ............................................................................................... 14

*\*Diag Human v. Czech Ministry of Health*, 824 F.3d 131 (D.C. Cir. 2016) ..................... 7, 13, 15

*Foremost-McKesson v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990)....................... 16

*Luxexpress 2016 Corp. v. Gov't of Ukraine*, No. 18-cv-812, 2020 U.S. Dist. LEXIS 47629
    (D.D.C. Mar. 19, 2020)............................................................................................................. 14

*Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723 (D.C. Cir. 2021)................................................. 16

*Princz v. Fed. Republic of Ger.*, 998 F.2d 1 (D.C. Cir. 1993) ..................................................... 17

*\*Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 27 F.4th 771 (D.C. Cir. 2022) *(Process II)*
    ..................................................................................................................................................... 7

*\*Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 962 F.3d 576 (D.C. Cir. 2020) *(Process I)*
    ................................................................................................................................................... 16

*S.K. Innovation Inc. v. Finpol*, 854 F. Supp. 2d 99 (D.D.C. 2012) ............................................. 15

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)............................................................................... 6

*Authorities upon which Nigeria chiefly relies are marked with asterisks.

*Stati v. Republic of Kaz.*, 199 F. Supp. 3d 179 (D.D.C. 2016) .................................................... 10

**\*Tatneft v. Ukraine**, 771 F. App'x 9 (D.C. Cir. 2019)................................................................. 14

*United States v. Morrison*, 529 U.S. 598, (2000) ...................................................................... 13

**Statutes**

Fed. R. Civ. P. 12(b) ........................................................................................................................ 3

\* Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*............................................................... 2, 7, 15

\* Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.*........................................ 2, 7, 14

\* New York Convention, 21 U.S.T. 2517 (1970)................................................................. passim

**Other Authorities**

Anthea Roberts, Divergence Between Investment and Commercial Arbitration, 106 Proceedings
    of the Annual Meeting (Am. Soc'y of Int'l L.)Confronting Complexity 297-300 (2012) ......... 8

Brief of The United States as Amicus Curiae at 6, *Process and Indus. Devs. Ltd.*, No. 21-7003
    (D.C. Cir. Jan. 20, 2022)............................................................................................................ 16

*Compania de Aguas del Aconquija SA and Vivendi Universal SA v. Argentine Republic*, ICSID
    Case No ARB 97/3 Award (Nov. 21, 2000) ............................................................................ 13

Contracting States: New York Arbitration Convention,
    https://www.newyorkconvention.org/countries (last visited June 11, 2022).......................... 16

Kenneth Vandevelde, Bilateral Investment Treaties: History, Policy & Interpretation (2010)...... 9

*The Robert E. Huder Article on Global Trade: Enabling Private Ordering: Function, Scope and
    Effect of Umbrella Clauses in International Investment Treaties*, 18 Minn. J. Int'l L. 1, 31-32
    (2009) ........................................................................................................................................ 13

**Treatises**

\* Restatement (Third) of the Foreign Relations L. of the U.S. (2012) ........................................ 13

\* Restatement (Third) of U.S. L. of Int'l Com. & Inv. State Arb. (2012) ................................. 8, 9

**GLOSSARY**

| ABBREVIATION | DEFINITION |
|---|---|
| Award | The March 26, 2021, arbitration award issued in favor of Zhongshan and against Nigeria under the Treaty. |
| CAI | Guangdong Xinguang International China-Africa Investment Ltd. |
| NEPZA | Nigeria Export Processing Zone Authority |
| Nigeria | Federal Republic of Nigeria |
| Nigeria-China Treaty | The Agreement Between the Government of the People's Republic of China and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments |
| New York Convention | The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 |
| OGFTZ | Ogun-Guangdong Free Trade Zone Company |
| Ogun State | A state in southwestern Nigeria |
| OSG | The Ogun State Government |
| Zhongfu | Zhongfu International Investment, a subsidiary of Zhongshan |
| Zhongshan | Zhongshan Fucheng Industrial Investment Co., Ltd. |
| The Zone | Ogun Guangdong Free Trade Zone |

## I.     PRELIMINARY STATEMENT

The Petition seeks to enforce a March 26, 2021, arbitration award that arises out of the sovereign exercise of police powers and alleged expropriation by a political subdivision of the Federal Republic of Nigeria, and not out of a breach of contract or other commercial claim.  The Award derives from a bilateral investment treaty, the Agreement Between the Government of the People's Republic of China and the Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of Investments ("Nigeria-China Treaty"), which provides for arbitration of breaches of that Treaty by China or Nigeria.  *See* Final Arbitration Award (Dkt. No. 2-1) (the "Award").

China and Nigeria undertook under the Nigeria-China Treaty to "encourage, promote, and protect" investments made by their respective nationals in the territory of the other party.  Nigeria-China Treaty (Dkt. No. 2-2).  The Treaty is not a commercial agreement, nor does it govern the terms of investments subject to its protection.  Instead, the Treaty binds Nigeria and China to certain standards of conduct with respect to protected investments.  *See, e.g., id.* Art. 2 (neither country shall take "unreasonable or discriminatory measures" with respect to protected investments); Art. 3 (countries shall "accord fair and equitable treatment" to protected investments); Art. 4 (neither country "shall expropriate, nationalize or take similar measures" unless four specific conditions are met <u>and</u> the expropriating party pays fair, freely transferable compensation "without unreasonable delay and include interest at a normal commercial rate").

Public international law provides the contours of the sovereign protections afforded under the Nigeria-China Treaty and the sovereign conduct that may give rise to their breach.  Consistent with that, the Award is explicit that the arbitrated disputes were governed by public international law, as they fell outside of the commercial sphere.  Award ¶¶ 72-73.  This distinction is dispositive of the Court's jurisdiction in light of the sovereign immunity protections granted to Nigeria by the

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605, because Petitioner Zhongshan Fucheng Industrial Investment Co., Ltd. ("Zhongshan" or "Petitioner") relies for enforcement exclusively on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), Art. I(1), 21 U.S.T. 2517 (1970), which Nigeria and the United States have elected to apply only to commercial relationships.[1]

Further, Petitioner's claims that are the subject of the Award are based on sovereign conduct attributed to Nigeria under public international law and determined to be an internationally wrongful act that violates the Nigeria-China Treaty.  *See* Award (Dkt. No. 2-1) ¶¶ 72–73.  These claims are distinct from those arising from a commercial relationship.  The Restatement (Third) of Foreign Relations Law of the United States articulates the same principle: "[I]nternational law is not implicated" in the "breach[] [of] a commercial contract with a foreign national for commercial reasons" such "as a private contractor might" have.  *Id.* § 712.  Petitioner's pursuit of its claims has been consistent with both the Award and the Restatement (Third) in this regard, and is a concession that the claims underlying the Award do not arise from a commercial relationship.  In fact, Petitioner's claims at issue in the Award are distinct in nature and origin from Petitioner's separate commercial claims it brought before Nigeria courts against its contractual counter-parties (which did not include Nigeria).  More to the point, to justify the arbitration tribunal's jurisdiction over Nigeria, Petitioner insisted that it was seeking relief under international law from Nigeria's sovereign conduct and that it claims did not arise from a purely commercial relationship.  Ex. B to Mañón Decl. (Statement of Claim), ¶¶ 181, 218–95.  Petitioner is estopped from arguing otherwise in this action in an attempt to push the Award within reach of the New York Convention.

---

[1] *See* Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.* (codifying New York Convention, and providing that the Convention applies to an arbitral award when it "aris[es] out of a legal relationship, whether contractual or not, which is considered as commercial" ).

Petitioner consequently is precluded from relying on the New York Convention to recognize and enforce the Award in this Court.  Because Petitioner relied exclusively on the Convention to circumvent Nigeria's sovereign immunity, Petitioner has failed to establish an exception to the FSIA and thus this Court's jurisdiction over the Petitioner. The Petition accordingly should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2).

## II.    STATEMENT OF FACTS

This dispute involves Petitioner's alleged loss of its development, management, and operational rights over the Ogun Guangdong Free Trade Zone ("the Zone"), an area of land which is owned by Ogun State in Nigeria.  *See* Award (Dkt. No. 2-1), ¶ 1.  Petitioner entered into a series of agreements to develop the Zone, which culminated in a 2013 joint venture agreement between Petitioner's wholly owned subsidiary, Zhongfu International Investment (NIG) FZE ("Zhongfu"), and Ogun State.  *Id.* ¶¶ 3, 18–19.  Ogun State is a separate juridical entity from Nigeria.  *See* Constitution of the Federal Republic of Nigeria 1999, ch. 1, parts 1 & 2 (providing for federal and state governments with distinct structures and powers).  Nigeria was not a party to any of those agreements. *See* Award (Dkt. No. 2–1), ¶ 72.

In 2016, the relationship between Ogun State and Petitioner dissolved after Ogun State terminated Zhongfu's appointment as the manager of the Zone. *See* Award (Dkt. No. 2-1), ¶¶ 33–41.  Nigeria was not involved in that relationship or in the conduct undertaken by Ogun State.  *Id.* ¶¶ 33–41.

A.  Petitioner Files Breach Of Contract Claims Against Ogun State In Nigerian Court.

On August 18, 2016, and September 9, 2016, Zhongfu brought breach of contract claims in Nigerian federal court against Nigeria Export Processing Zone Authority ("NEPZA"), the Attorney General of Ogun State, and Zenith Global Merchant Limited, arguing breaches of

Zhongfu's contractual rights under the various agreements as manager of the Zone. *Id.* ¶¶ 42–43. Petitioner purportedly defaulted in those proceedings, which were terminated by the courts for Petitioner's failure to meet deadlines and other obligations. *Id.* ¶ 44.

Nigeria was not a party to those proceedings. *Id*. ¶ 85.

B. <u>Petitioner Initiates Separate Arbitration Proceedings Against Nigeria Claiming Breach Of International Law Under The Nigeria-China Treaty, But Does Not Raise Any Commercial Contract Claims.</u>

On August 30, 2018, Zhongshan served Nigeria with a Request for Arbitration pursuant to the Nigeria-China Treaty, and submitted its Statement of Claim on May 1, 2019. *Id.* ¶¶ 53, 58. The Nigeria-China Treaty permits protected investors to bring claims for violation of the Treaty "to an ad hoc arbitral tribunal." *Id.* Art. 9(3). The Treaty does not mention or reference the New York Convention. *See generally id*.

Petitioner pleaded only claims for breach of international law under the Nigeria-China Treaty, and did not include any breach of contract or similar commercial claims. *See* Ex. B to Mañón Decl. (Statement of Claim), ¶¶ 218–75. Petitioner argued that, under principles of attribution pursuant to public international law, Ogun State's conduct was attributable to Nigeria. Ex. A to Mañón Decl. (Statement of Reply), ¶ 184. It argued that the conduct, as attributed to Nigeria, breached the Nigeria-China Treaty, making Nigeria liable under public international law. *See* Award (Dkt. No. 2-1) ¶ 58. Specifically, Petitioner asserted that, during a three-month period in 2016, Ogun State officials initiated an investigation into Petitioner's management rights in the Zone and sent police to the Zone to intimidate Petitioner's employees. *See* Pet. (Dkt. No. 1) ¶¶ 33–41 ("Mr[.] Onas again attended at Fucheng Park, this time with a member of the Nigerian police . . . , and introduced NSG as the new manager, and according to Mr[.] Zhao caused some of Zhongfu's employees to be frightened."). Petitioner claimed that Ogun State officials detained Petitioner's employee. *See id.* ¶ 39 ("Mr[.] Zhao was [allegedly] arrested at gunpoint . . . . Mr[.]

Zhao was eventually freed on bail")); *see also* Ex. B to Mañón Decl. (Statement of Claim), ¶ 129 (describing alleged "abuse of police power").

Petitioner also contended that its forced abandonment of the Zone amounted to an expropriation by Ogun State, attributable to Nigeria under public international law. *See* Award (Dkt. No. 2-1), ¶ 131; *see also* Ex. B to Mañón Decl. (Statement of Claim), ¶¶ 12, 109, 129.   In Petitioner's words, "Nigeria—through actions of the Ogun State Government, the Nigeria Export Processing Zones Authority and the Nigeria police—took over the entirety of the Claimant's rights and assets in the Zone and forcibly evicted Zhongfu Nigeria from the Zone, thereby destroying the entire value of the Claimant's investment in Nigeria."  Ex. B to Mañón Decl. (Statement of Claim), ¶ 12.

C. <u>The Tribunal Applies International Law And Rules That Nigeria, Through Ogun State, Breached Its Obligations Under The Nigeria-China Treaty.</u>

On March 26, 2021, the arbitration tribunal issued the Award.  Agreeing with Petitioner, it found that "Zhongshan's case [was] primarily based on the actions of Ogun State" and by "the police and NEPZA", all of which was sovereign conduct attributable to Nigeria under public international law.[2]  Award (Dkt. No. 2-1), ¶¶ 72–73. The Award distinguished Zhongfu's separate breach of contract claims—that were the subject of the discontinued proceedings in Nigeria—from the arbitration under the Nigeria-China Treaty, emphasizing that the parties were distinct in either proceeding and that the arbitration was predicated on the Treaty, not on the contracts between Zhongfu, Ogun State, and other entities.  *Id.* ¶¶ 82–91.

The tribunal concluded that Nigeria failed to afford Petitioner's investment the protections contained in the Nigeria-China Treaty thereby violating public international law.  First, the tribunal

---

[2] The tribunal rejected the application of Nigeria law on the issue, proceeding exclusively under principles of public international law.  *See* Award (Dkt. No. 2-1), ¶¶ 72-73.

concluded that Nigeria did not afford "continuous protection" to Petitioner's investment because "the police, whose function it is to prevent and deal with breaches of the law, actually supported . . . threats [against] Petitioner and helped carry them into effect." *Id.* ¶ 128.  Second, the tribunal found that Petitioner was subjected to "unreasonable or discriminatory measures" because "there were no apparently justifiable grounds in domestic law to shut Zhongfu from the Zone and from its legal rights" and "illegitimate actions, and threats of illegitimate actions . . . were taken or made to achieve that end." *Id.* ¶ 129.  Third, the tribunal found that certain "written and oral communications directed and actions taken by Ogun State, NEPZA and the police against Zhongfu and its staff … breached Nigeria's obligation under article 3(1) to accord 'fair and equitable treatment' to Zhongfu's rights." *Id.* ¶ 130.  Finally, the tribunal concluded that the "actions and statements" of Ogun State, NEPZA and the police "were aimed at, and succeeded in, 'expropriat[ing]'" Zhongfu's rights in violation of Article 4 of the Nigeria-China Treaty. *Id.* ¶ 131.  The tribunal awarded Petitioner more than USD $65 million for these alleged breaches. *Id.* ¶ 198.

## III.   ARGUMENT

A.  <u>Nigeria Is Immune From Suit Because Petitioner Cannot Establish An Exception To Sovereign Immunity Under the FSIA.</u>

The FSIA provides the exclusive basis for establishing jurisdiction over a foreign sovereign in the United States. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).  The FSIA encompasses both personal and subject matter jurisdiction, which will lie only if Petitioner establishes an exception to the FSIA applies to lift Nigeria's sovereign immunity protections.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Petitioner must carry the burden to produce "evidence that an exception applies . . . and once shown, the sovereign bears

the ultimate burden of persuasion to show the exception does not apply." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 696 (D.C. Cir. 2022) (cleaned up).

Petitioner relies on the so-called "arbitration exception" to the FSIA, 28 U.S.C. § 1605(a)(6), and asserts it has established the exception because the Award allegedly is governed by the New York Convention.  Pet. ¶ 11.  Under the arbitration exception, a foreign state will be deemed to have waived its sovereign immunity protections under the FSIA if an award "is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6).  The New York Convention is an international treaty ratified by the United States that allows for "the recognition and enforcement of arbitral awards made in a territory of a State other than the State where the recognition and enforcement of such awards are sought."  New York Convention Art. I.  The New York Convention requires U.S. courts to "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the articles of the Convention."  *Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 27 F.4th 771, 774-75 (D.C. Cir. 2022) (cleaned up) (*Process II*); *see also* 9 U.S.C. § 203 (codifying original jurisdiction in U.S. courts over cases arising under the New York Convention).

The United States ratified the New York Convention subject to the "commercial reservation," 9 U.S.C. § 202, which makes the Convention applicable "only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the law of the State making such declaration."  New York Convention, Art. I (3); *accord Diag Human v. Czech Ministry of Health*, 824 F.3d 131, 136 (D.C. Cir. 2016).  The FSIA's arbitration exception to foreign sovereign immunity will not apply, warranting dismissal for lack of

jurisdiction, unless Petitioner can establish that the Award is commercial under the terms of the New York Convention.

As established below, it is not. Dismissal is warranted.

B. The New York Convention Does Not Apply To The Award, which Arises From The Nigeria-China Treaty.

The Nigeria-China Treaty does not establish a "legal relationship . . . which is considered as commercial," *Diag Human*, 824 F.3d at 136, as is required for the New York Convention to apply to the Award, because it is an international treaty between two sovereign states that extends sovereign protection to investors of the other nation's citizens. In this Circuit, "commercial" is a "term of art . . . Congress intended that word to have the meaning generally attached to that term in the international arbitration context." *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99, 105 (D.C. Cir. 2015). Accordingly, "commercial" is defined to mean "matters or relationships, whether commercial or not, that arise out of or in connection with commerce." *Id.* (quoting Restatement (Third) of U.S. L. of Int'l Com. & Inv. State Arb. § 1-1 (2012), and citing Restatement (Third) of Foreign Relations L. of the U.S.§ 487).

The Nigeria-China Treaty establishes a non-commercial legal relationship governing the exercise of sovereign state conduct pursuant to public international law. It eminently "involves public international law" and is a "treat[y]" between two "states acting in their public capacity as sovereigns (which enter into treaties) and regulators (which govern populations)."[3] The Restatement (Third) of Foreign Relations Law explicitly distinguishes between "international agreement[s]" of this nature and other forms of commercial arrangements to which a sovereign state might be a party. *See id.* §§ 301, 487 cmt. f. In contrast, where "an agreement to arbitrate is

_____

[3] Anthea Roberts, Divergence Between Investment and Commercial Arbitration, 106 Proc. of the Ann. Meeting (Am. Soc'y of Int'l L.) Confronting Complexity 297-300 (2012).

in the contract between a government and a private person," that legal relationship may be "commercial" in nature.  *Id*. § 487 cmt. f.  But "international agreements," like the Nigeria-China Treaty, that involve "two or more states" and are "governed by international law" are "not subject to the New York Convention" because they are not commercial.[4]  *Id*. §§ 301, 487.

Further, as a treaty granting <u>all</u> qualifying investments certain base-line protections against sovereign state conduct,[5] the Nigeria-China Treaty does not set forth the terms of those investments, nor is it a commercial agreement between Petitioner and Nigeria.  As noted, the Nigeria-China Treaty is comprehensively focused on regulating state conduct in the protection of investments.  *See, e.g.,* Art. 2 (prohibiting "unreasonable or discriminatory measures" by Nigeria or China); Art. 3 (requiring Nigeria and China to accord "fair and equitable treatment" to protected investments); Art. 4 (prohibiting Nigeria and China from "expropriat[ing], nationaliz[ing] or tak[ing] similar measures" unless four specific conditions are met <u>and</u> the expropriating sovereign pays fair, freely transferable compensation "without unreasonable delay").

While the New York Convention has been applied in other cases involving similar treaties,[6] those cases arose under either of two circumstances, neither of which applies to this dispute under

---

[4] The Restatement (Third) of International Commercial Arbitration similarly includes "investor-State arbitrations" within its definition of commercial, but clarifies this definition is intended to bring such arbitration within the "ambit of the … Restatement," which is limited to international commercial arbitration: "The broad meaning given to the term 'commercial' corresponds to the relatively wide ambit of the present Restatement.  But the term is not intended to provide a unified definition governing every context in which the commercial character of a transaction or relationship leads to application of the principles restated."  Restatement (Third) of Int'l Commercial Arbitration (2019), § 1-1 cmt. E, Reporters Note e.

[5] *See* Kenneth J. Vandevelde, Bilateral Investment Treaties: History, Policy & Interpretation 1, 3 (2010) ("The remedy provided by BITs is that they ensure that the treatment of foreign investment is subject to the rule of law" and therefore function "like foundational or constitutional documents that create a long term legal framework within which the host country must apply its international investment law and policy").

[6] It is undisputed that the United Nations Convention on Contracts for the International Sale of Goods and the Convention on the Settlement of Investment Disputes between States and Nationals

the Nigeria-China Treaty.  First, certain courts have concluded that treaties that explicitly reference the New York Convention constitute "agree[ments] that the relationship between [sovereign] and the petitioners is commercial under the New York Convention."  *Stati v. Republic of Kaz*., 199 F. Supp. 3d 179, 186 (D.D.C. 2016); *see also Chevron Corp. v. Republic of Ecuador,* 949 F. Supp. 2d 57, 70 (D.D.C. 2013) (observing the "[Bilateral Investment Treaty] … provides such awards shall be enforceable under the New York Convention").  Second, in certain instances the parties have agreed that the New York Convention applies to the particular dispute arising under the treaty. *See, e.g., Crystallex Int'l Corp. v. Bolivarian Republic of Venez.,* 244 F. Supp. 3d 100, 109 & n.12 (D.D.C. 2007) (observing "Venezuela does not object to this Court's jurisdiction" but also concluding New York Convention applied on basis of Canadian-Venezuelan Treaty, which expressly references the New York Convention).  The Nigeria-China Treaty makes no reference to the New York Convention or to enforcement in the United States.  Nigeria-China Treaty (Dkt. No. 2-2).  Accordingly, the Nigeria-China Treaty, as an international agreement governed by and applying public international law, falls outside the ambit of the New York Convention as a matter of U.S. foreign relations law.

C.  The Arbitration Tribunal Agreed With Petitioner That The Underlying Dispute Was Non-Commercial.

The record of the arbitration confirms the non-commercial nature of the parties' legal relationship that is the foundation for the Award.  For example, Petitioner argued to the arbitration tribunal that its relationship with Nigeria giving raise to its claims was not commercial, but rather was governed by public international law.  *See, e.g.,* Ex. B to Mañón Decl. (Statement of Claim), ¶ 21 (alleging "Respondent's violations of the Treaty and international law"), *see also id*. ¶¶ 176,

---

of Other States, two other avenues to enforcement of arbitral awards obtained pursuant to treaties, do not apply here.

181, 217.  Petitioner urged the arbitration tribunal to conclude that Ogun State's actions were sovereign conduct, attributable to Nigeria under public international law.  *See, e.g.*, Exs. A to Mañón Decl. (Statement of Reply), ¶¶ 184, 191-93 (alleging "occupation of the claimant's property by a Government agency" and "egregious due process violations" by the Nigerian police), B (Statement of Claim), ¶¶ 12–14 (describing seizure of property by the Nigerian Police and "draconian action of the Nigerian authorities" including threats and arrests and explaining "[t]he shocking treatment . . . breached Nigeria's international obligations under the Treaty").

        As a matter of customary international law, the activities of organs of a state are attributable to that state.  *See* Award ¶ 72 ("for the purposes of a claim such as this, all organs of the State … are to be treated as part of the state … [t]his is customary international law").  International law distinguishes between sovereign regulatory and police acts, for which a state may be liable as a matter of public international law, and "breach[] [of] a commercial contract with a foreign national for commercial reasons as a private contractor might" in which "international law is not implicated."  Restatement (Third) of the Foreign Relations L. of the U.S. § 712 (contrasting these circumstances from those where "in repudiating or breaching the contract, the state is acting essentially from governmental motives (akin to those that operate in cases of expropriation")).

        The tribunal agreed with Petitioner, and held Nigeria liable for certain of Ogun State's conduct precisely <u>because</u> that conduct constituted a sovereign exercise of power under public international law.[7]  *See* Award (Dkt. No. 2-1), ¶¶ 72–73 (holding that the actions of Ogun State were attributable to the Nigeria because they "constitute[d] a breach of an international law obligation" under the Treaty).  The tribunal explicitly distinguished between "a 'mere' breach of

---

[7] Nigeria reserves the right to challenge the arbitration tribunal's jurisdictional rulings under Article V of the New York Convention, should the need arise.  *See* Part III(E).

contract by a local authority [that] could not of itself be attributed to the state … [and an] action complained of [that] would otherwise amount to a breach of the treaty in issue, then it would be attributed to the state." *Id.* ¶ 74.  That sovereign offending conduct, as found by the tribunal, amounted to: (*i*) an "abuse of police powers," *see id.* ¶¶ 33–41 (describing facts as presented by Petitioner); Ex. B to Mañón Decl. (Statement of Claim), ¶ 129 (describing alleged "abuse of police power"); (*ii*) "unreasonable and discriminatory measures" and unfair and inequitable treatment in violation of public international law, *see* Ex. B to Mañón Decl. (Statement of Claim), ¶¶ 129–30; and (*iii*) expropriation in the form of a regulatory taking, *see id.* ¶¶ 258-60.

Further agreeing with Petitioner, the Award contrasts the facts and circumstances of Petitioner's claims, which featured an exercise of sovereign power, with other disputes that were purely contractual in nature and thus ungoverned by an international treaty.  *See id.* ¶ 74 (citing *Compania de Aguas del Aconquija SA and Vivendi Universal SA v. Argentine Republic*, ICSID Case No ARB 97/3 Award, 21 November 2000, §§ 77-82) ("[A]ll of the above-mentioned actions of the Province of Tucumán on which the Claimants rely for their position attributing liability to the Argentine Republic are closely linked to the performance or non-performance of the parties under the Concession Contract.").

While Nigeria challenges the factual accuracy of these findings and the tribunal's jurisdictional holdings, the tribunal's conclusions make clear that the Award as rendered was *per se* noncommercial, because as a matter of public international law, Nigeria could only be liable for conduct sovereign in nature.  *See* Restatement (Third) of the Foreign Relations L. of the U.S. § 427 (2012); *see also The Robert E. Huder Article on Global Trade: Enabling Private Ordering: Function, Scope and Effect of Umbrella Clauses in International Investment Treaties*, 18 Minn. J. Int'l L. 1, 31-32 (2009) (referencing "'well established' jurisprudence that a simple, commercial

breach of an investor-State contract per se does not involve the breach of an investment treaty provision").

The Award distinguishes commercial claims from those governed by the Nigeria-China Treaty in much the same way the Commerce Clause of the U.S. Constitution is inapplicable to Congress's exercise of police powers, which are fundamentally non-commercial in character.  *See* U.S. Const., art. 1, § 8, clause 3 (Commerce Clause); *United States v. Morrison*, 529 U.S. 598, 618-19 (2000) (distinguishing between "police power" and the Commerce Clause); *see also id.* at 584 (Thomas, J., concurring) ("[W]e always have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power").   This Circuit in *Belize Soc. Dev.*, 794 F.3d at 99, 105, held that the Federal Arbitration Act ("FAA"), which codifies the New York Convention, reaches contracts "evidencing a transaction involving commerce"—"the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress's Commerce Clause Power."  794 F.3d at 104 (quoting *Citizens Bank v. Alafabo, Inc.*, 539 U.S. 52, 56 (2003)).

Finally, the arbitration tribunal's determination that Ogun State violated public international law in accord with the terms of the Nigeria-China Treaty is distinguishable from other Circuit decisions in which contractual or quasi-contractual arrangements between sovereign states and private parties constituted "commercial" legal relationships for purposes of the New York Convention.  *See, e.g., Diag Human*, 824 F.3d at 136 (considering claims pursuant to a "Framework Agreement" between Diag Human and the Czech Republic, under which "Diag Human agreed to supply commercial goods to the Czech Republic" in exchange for funding); *Belize Soc. Dev.*, 794 F.3d at 100 (finding commercial relationship where Belize entered into an "Accommodation Agreement" with Belize Telemedia Limited in order to "purchase properties

from Belize"); *Campagnie Sahélienne d'Enterprise v. Republic of Guinea*, No. 20-1536, 2021 U.S. Dist. LEXIS 10442, at *4 (D.D.C. June 14, 2021) ("Contracting to provide infrastructure upgrades is plainly commercial"); *Customs & Tax Consultancy LLC v. Dem. Rep. Congo*, No. 18-1408, 2019 U.S. Dist. LEXIS 162136, at *10 (D.D.C. Sept. 16, 2019) (holding that "service contract between a company and the government to consult in overhauling the collection of customs duties, is plainly commercial"); *Africard Co. v. Republic of Ni*ger, 210 F. Supp. 3d 119, 124 (D.D.C. 2016) ("[S]service contract between a company and a government to provide biometrics and electronic passports . . . clearly arises out of or in connection with commerce") (internal quotation marks and citation omitted).

D.  Petitioner Does Not Allege the Waiver Exception to the FSIA.

As noted, Petitioner's entire sovereign immunity argument hinges on the applicability of the New York Convention.  *See* Pet. ¶ 11.  The only other FSIA exception potentially applicable is the waiver exception, through which a "foreign state [can] waive[] its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  Petitioner correctly does not argue the waiver exception, because it is inapplicable.   This Circuit has emphasized "the 'virtually unanimous' precedents construing the implied waiver provision narrowly" and has concluded that "implicit in § 1605(a)(1) is the requirement that the foreign state have underlined intended to waive its sovereign immunity."  *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999) (emphasis added); *accord Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) (same).  There is no evidence that Nigeria intended to waive its sovereign immunity in the U.S. courts.  For example, the Nigeria-China Treaty's arbitration clause does not refer to U.S. courts, "nor does it purport to waive [Nigeria's] sovereign immunity."  *Luxexpress 2016 Corp. v. Gov't of Ukraine*, No. 18-cv-812, 2020 U.S. Dist. LEXIS 47629, at *24 (D.D.C. Mar. 19, 2020) (declining to find waiver exception met by BIT because BIT did not contain any reference to the New York Convention or

to a waiver of sovereign immunity) (quoting *S.K. Innovation Inc. v. Finpol*, 854 F. Supp. 2d 99, 115 (D.D.C. 2012) (same)).[8]   Nigeria demonstrates in Sections III(B)–(C) that the underlying dispute in this action was not commercial, because the arbitration tribunal concluded that the dispute fell within the ambit of the Treaty.   As a result, the waiver exception is inapplicable to Nigeria.   *See Diag Human*, 824 F.3d at 140 (Sentelle, J., dissenting) (writing that there is no "basis[] to find an implied waiver" because "the New York Convention is inapplicable to this case").

Recent Circuit decisions have questioned the prudence of applying the waiver exception in an enforcement action under the New York Convention, and have declined "to wade into the murky waters of the waiver exception" given the "significant policy concerns" that accompany it.   *Process & Indus. Devs. Ltd v. Fed. Republic of Nig.*, 27 F.4th 771, 775 n.3 (D.C. Cir. 2022) (*Process II*); *see also* Brief of The United States as Amicus Curiae at 6, *Process & Indus. Devs. Ltd.*, No. 21-7003 (D.C. Cir. Jan. 20, 2022) (arguing that applicability of waiver exception in New York Convention case is "a question that raises difficult questions of statutory construction and could also implicate adverse reciprocity concerns were foreign courts to take a broad view of waiver in cases brought against the United States").

---

[8] Circuit law is well established with regard to these principles, but some outlier decisions exist. In an unpublished decision from this Circuit, *Tatneft*, 771 F. App'x at 10, for example, the Court of Appeals held that "a sovereign, by signing the Ukraine, New York Arbitration Convention, waives its immunity from arbitration-enforcement actions."   That case is easily distinguished, however, because Ukraine did not make a commercial reservation to the New York Convention and thus could not be said to have limited the Convention's applicability for purposes of enforcement in the United States.   *See id.; see also* "Contracting States: Ukraine, New York Arbitration Convention", https://www.newyorkconvention.org/countries (last visited June 11, 2022). By contrast, like the United States, Nigeria explicitly limited the application of the Convention to relationships that are "commercial" under its laws.   Contracting States-Nigeria, New York Arbitration Convention, https://www.newyorkconvention.org/countries (last visited June 11, 2022).

E.   Nigeria Is Entitled To A Threshold, Conclusive Determination Of Its Sovereign Immunity
     Without Waiving Any Substantive Defenses Against Enforcement.

Nigeria is entitled to a conclusive, threshold determination of its sovereign immunity
before it must present its defenses on the merits.  A foreign sovereign is not required to defend the
merits before resolving issues of sovereign immunity.  *See Mowrer v. U.S. Dep't of Transp.*, 14
F.4th 723, 735 (D.C. Cir. 2021); *Process & Indus. Devs. Ltd. v. Fed. Republic of Nig.*, 962 F.3d
576, 584 (D.C. Cir. 2020) (*Process I*) (holding "the district court erred in requiring Nigeria to
defend the merits before resolving its colorable immunity assertion").   Requiring a foreign
sovereign to present its merits defenses along with its immunity defenses defeats the purposes
underlying sovereign immunity.  *Id.* at 585-86 (holding that "one of the 'basic objectives' of the
FSIA is to 'respect the independence and dignity' of foreign sovereigns, not simply to ameliorate
their litigation burdens." (citation omitted)).

Should the Court rule against Nigeria regarding sovereign immunity, Nigeria is entitled to
an immediate appeal from that threshold immunity determination without waiving any substantive
defenses.  *See id.* at 581–83 ("the collateral-order doctrine applies to the denial of a motion to
dismiss on the ground of foreign sovereign immunity") (collecting cases); *Foremost-McKesson v.
Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990) ("we adhere to the law of this circuit
. . . in granting interlocutory appeal of the District Court's denial of the foreign state's motion to
dismiss on grounds of sovereign immunity.  Such an appeal comes within the ambit of the
collateral order doctrine") (cleaned up) (collecting cases).  *See also Bolivarian Republic of Venez.
v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1323 (2017) (recognizing that foreign
states "enjoy a right to take an immediate appeal" from denials of immunity under the FSIA before
the merits are decided) (collecting cases); *Princz v. Fed. Republic of Ger.*, 998 F.2d 1, 1 (D.C. Cir.

1993) ("A district court's denial of a foreign state's motion to dismiss on grounds of sovereign immunity is immediately appealable") (R.B. Ginsburg & Wald, JJ.) (per curiam).

## IV.    CONCLUSION

For the foregoing reasons, the Petition to Recognize and Enforce Arbitral Award against Nigeria must be dismissed for lack of jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. 1602, *et seq.*


Date: June 13, 2022                         Respectfully submitted,

                                            SQUIRE PATTON BOGGS (US) LLP

                                            */s/ Raúl  B. Mañón*
                                            Raúl  B. Mañón (*Pro Hac Vice*)
                                            Maria Gomez (*Pro Hac Vice*)
                                            200 South Biscayne Boulevard, Suite 3400
                                            Miami, FL 33131
                                            T: (305) 577-7000
                                            F: (305) 577-7001
                                            Email: raúl.manon@squirepb.com
                                                      maria.gomez@squirepb.com

                                            -and-

                                            Alexandra E. Chopin (D.C. Bar No. 490736)
                                            2550 M Street, N.W.
                                            Washington, DC 20037
                                            T: (202) 457-5623
                                            F: (202) 457-6315
                                            Email: alexandra.chopin@squirepb.com

                                            *Counsel for Respondent Federal Republic of Nigeria*

- 17 -