IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------- X
ZHONGSHAN FUCHENG INDUSTRIAL
INVESTMENT CO., LTD.,

                Petitioner,

   v.

FEDERAL REPUBLIC OF NIGERIA,

                Respondent.
-------------------------------------------------------------------- X

Civil Action No. 22-170 (BAH)

**ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO., LTD.'S
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
RESPONDENT'S MOTION TO DISMISS FOR LACK OF JURISDICTION
<u>UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605</u>**

**Table of Contents**

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ II

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 3

I.   Petitioner Engaged in Commercial Activity in Nigeria Through the Development, Operation and Management of the Ogun Guangdong Free Trade Zone ............................ 3

II.  Petitioner's Investment in Nigeria Is the Basis of the Legal Relationship Underlying the Investment Treaty Arbitration and the Award .......................................... 3

III. The Tribunal Rendered the Award for the Damage that Respondent Caused to Petitioner's Investment in Nigeria ................................................................. 5

IV.  Petitioner's Damages in Arbitration Reflect the Lost Monetary Value of Its Investment in Nigeria as a Result of Respondent's Breaches of the Investment Treaty ................................................................................................. 5

ARGUMENT ........................................................................................................................ 6

I.   The Award Is Governed by the New York Convention ........................................ 6

    A.   Awards Arising out of Legal Relationships Considered to Be Commercial Are Governed by the New York Convention ............................. 6

    B.   The Term "Commercial" Must Be Construed Broadly ................................ 7

    C.   The Relationship Between Petitioner and Respondent Under the Investment Treaty Is Plainly Commercial .................................................... 8

    D.   This Circuit Considers Relationships Between Investors and Host States Under Bilateral Investment Treaties to Be Commercial ................... 12

II.  Nigeria Is Not Immune from This Court's Jurisdiction Because the Arbitration Exception to Sovereign Immunity Applies ............................................................ 15

CONCLUSION .................................................................................................................... 16

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*BCB Holdings Ltd. v. Gov't of Belize*,
    232 F. Supp. 3d 28 (D.D.C. 2017)...................................................................................7, 11

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
    794 F.3d 99 (D.C. Cir. 2015).............................................................................................7, 8

*\*Chevron Corp. v. Ecuador*,
    795 F.3d 200 (D.C. Cir. 2015)................................................................................................12

*\*Chevron Corp. v. Republic of Ecuador*,
    949 F. Supp. 2d 57 (D.D.C. 2013).........................................................................................15

*Diag Human v. Czech Ministry of Health*,
    824 F.3d 131 (D.C. Cir. 2016)....................................................................................7, 14, 15

*\*Gebre LLC v. Kyrgyz Republic*,
    No. CV 20-1795 (ABJ), 2022 WL 2132481 (D.D.C. June 14, 2022) ....................................15

*Gibbons v. Ogden*,
    22 U.S. 1, 6 L. Ed. 23 (1824)..................................................................................................8

*Island Territory of Curacao v. Solitron Devices, Inc.*,
    356 F. Supp. 1 (S.D.N.Y.), aff'd, 489 F.2d 1313 (2d Cir. 1973).............................................8

*\*LLC SPC Stileks v. Republic of Moldova*,
    985 F.3d 871 (D.C. Cir. 2021)................................................................................................12

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    27 F.4th 771, 775–76 (D.C. Cir. 2022)..................................................................................14

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    962 F.3d 576, 579, 586 (D.C. Cir. 2020)...............................................................................14

*Saudi Arabia v. Nelson*,
    507 U.S. 349, 113 S. Ct. 1471, 123 L. Ed. 2d 47 (1993).......................................................15

*Schneider v. Kingdom of Thailand*,
    No. 10 CIV. 2729 DAB, 2011 WL 12871599 (S.D.N.Y. Mar. 14, 2011), aff'd,
    688 F.3d 68 (2d Cir. 2012)....................................................................................................13

\*Authorities upon which Petitioner chiefly relies are marked with asterisks.

*Stati v. Republic of Kazakhstan*,
    199 F. Supp. 3d 179 (D.D.C. 2016) .................................................................7, 10, 15

*\*Tatneft v. Ukraine*,
    21 F.4th 829 (D.C. Cir. 2021) ...............................................................1, 12, 13, 14

*\*Tatneft v. Ukraine*,
    301 F. Supp. 3d 175 (D.D.C. 2018), aff'd, 771 F. App'x 9 (D.C. Cir. 2019) .........................13

*United States v. Morrison.*,
    529 U.S. 598, 120 S. Ct. 1740, 1751, 146 L. Ed. 2d 658 (2000) ..............................................8

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
    241 F.3d 135 (2d Cir. 2001) ..................................................................................7, 15

**Statutes**

\*Federal Arbitration Act Chapter 2, 9 U.S.C. §§ 201, *et. seq* .......................................7, 10, 11, 15

\*Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et. seq* ...........................................1, 2, 15

**Other Authorities**

AFFECTING COMMERCE, Black's Law Dictionary (11th ed. 2019) ...................................................8

Gary B. Born, *The New York Convention: A Self-Executing Treaty*, 40 MICH. J.
    INT'L L. 115 (2018) .............................................................................................7

\*New York Convention, 21 U.S.T. 2517 (1970) ................................................................. *passim*

Restatement (Third) of Foreign Relations Law (1987) ................................................................12

\*Restatement (Third) of U.S. Law of Int'l Com. & Inv. State Arb. (2019) .......................1, 6, 7, 14

Russia-Ukraine BIT. Available at:
    https://investmentpolicy.unctad.org/international-investment-
    agreements/treaty-files/2233/download ..............................................................................13

Petitioner Zhongshan Fucheng Industrial Investment Co., Ltd. ("**Petitioner**" or "**Zhongshan**") respectfully submits this Memorandum of Points and Authorities in opposition to the Motion to Dismiss for Lack of Jurisdiction Under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 (the "**Motion to Dismiss**"), filed by Respondent the Federal Republic of Nigeria ("**Respondent**" or "**Nigeria**").[1]  (*See* ECF No. 24.)

## PRELIMINARY STATEMENT

Petitioner's Award, obtained through an arbitration against Respondent under the bilateral investment treaty between Nigeria and the People's Republic of China (the "**Investment Treaty**") (*see* ECF No. 2-2), is enforceable under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "**New York Convention**").  Respondent's only contention against the Award's enforcement under the New York Convention is that Petitioner's claims under the Investment Treaty decided in the Award "do not arise from a commercial relationship." (ECF No. 24-1, Motion to Dismiss, at 2.)  However, Respondent's contention is contradicted by the routine enforcement of investment treaty awards under the New York Convention in this Circuit, including *Tatneft v. Ukraine*, 21 F.4th 829, 841 (D.C. Cir. 2021)—one of the cases upon which Respondent chiefly relies.  The Restatement (Third) of the U.S. Law of International Commercial and Investor–State Arbitration—also cited by Respondent—confirms that "a dispute or award may be commercial even though one of the parties to it is a sovereign State and even though the dispute arises out of public regulatory acts. ***Accordingly, investor–State arbitrations, and investor–State awards, are commercial as defined here.***" Restatement (Third) of U.S. Law of Int'l Com. & Inv. State Arb. § 1.1, cmt. e. (2019) (emphasis added).

There can be no debate that the multimillion-dollar investment that Petitioner made in

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as in Petitioner's Petition to Recognize and Enforce Foreign Arbitral Award dated January 25, 2022 (the "**Petition**").  (ECF No. 1.)

Nigeria to develop, manage and operate a free trade zone near Lagos was connected with commerce.  By investing in Nigeria, Petitioner became entitled to the treatment of its investment guaranteed by Nigeria under the Investment Treaty.  Article 1 of the Investment Treaty plainly shows a commercial relationship between the investor and the host State in which the investment is made.  Article 1 defines investment to mean "every kind of asset invested by investors of one Contracting Party[,] in accordance with the laws and regulations of the other Contracting Party in the territory of the latter" and provides a non-exhaustive list of the types of assets that an investor can invest in the host State so as to render the investment relationship subject to the protection of the Investment Treaty.  In the case of Petitioner's investment, these assets included "(a) movable and immovable property as well as […] property rights," "(b) shares", "(c) claims to money or to any other performance having an economic value associated with an investment[,]" and "(e) [a] business concession[] […] under contract permitted by law[.]"  Such assets are clearly commercial and form the basis for the investment relationship between Petitioner and Respondent according to the Investment Treaty's terms.  Thus, Petitioner's Award for Respondent's breaches of the Investment Treaty in respect of its investment arises out of a commercial relationship with Respondent and is enforceable under the New York Convention, and Respondent is not entitled to sovereign immunity under the well-established arbitration exception of the Foreign Sovereign Immunities Act ("**FSIA**"), 28 U.S.C. § 1605(a)(6).

With its strained central argument and unabashed threat of appeal, Respondent's Motion to Dismiss appears designed to delay Petitioner from enforcing its Award and recovering the tens of millions of dollars in damages that Respondent owes to Petitioner for the destruction of its investment in Nigeria.  The Court should reject such tactics, deny Respondent's Motion to Dismiss, and grant Petitioner's Petition.

**STATEMENT OF FACTS**

I.   **Petitioner Engaged in Commercial Activity in Nigeria Through the Development, Operation and Management of the Ogun Guangdong Free Trade Zone**

As detailed in the Petition—and acknowledged by Respondent in its Motion to Dismiss (at 2)—Petitioner made substantial commercial investments in Nigeria from approximately 2010-2016, securing the rights to develop, operate and manage a free trade zone located in Nigeria's Ogun State.[2] (*See* Petition, ¶ 15.) Petitioner's investment in the Zone was memorialized by a series of agreements, namely the 2010 Framework Agreement and the 2013 JVA. (*See id.*, ¶¶ 16-17.)

II.  **Petitioner's Investment in Nigeria Is the Basis of the Legal Relationship Underlying the Investment Treaty Arbitration and the Award**

On August 30, 2018, Petitioner commenced arbitration under the Investment Treaty and sought damages for its losses beginning in 2016 caused by Respondent "terminating [Petitioner's] management of the Free Trade Zone, expropriating its shareholding rights in the Zone management company and forcibly removing and chasing its employees out of the country." (ECF No. 24-4, Statement of Claim, ¶ 2; *see also* Petition, ¶¶ 18-23.)

Petitioner was a protected investor and held a qualifying investment under the terms of the Investment Treaty, which established a relationship entitling Petitioner to the standards of treatment guaranteed by Respondent. (*See* ECF No. 24-4, Statement of Claim, ¶¶ 160-175.) The broad language of Article 1(1) of the Investment Treaty defines an "investment" as follows:

> "Article 1 DEFINITIONS
>
> For the purpose of this Agreement,
>
> 1.   The term "investment" means every kind of asset invested by investors of one Contracting Party in accordance with the laws and regulations of the other Contracting Party in the territory of the latter, and in particularly, though not exclusively, includes:

---

[2] Petitioner incorporates by reference the factual allegations in its Petition. (ECF No. 1.)

3

(a)     movable and immovable property as well as any property rights, such as mortgages, liens and pledges;

(b)     shares, debentures, stock and any other kind of participation in companies;

(c)     claims to money or to any other performance having an economic value associated with an investment;

(d)     intellectual property rights, in particular copyrights, patents, trade-marks, tradenames, technical process, know-how and good-will; and

(e)     business concessions conferred by law or under contract permitted by law, including concessions to search for, cultivate, extract or exploit natural resources."

Petitioner argued in the Arbitration that its activities "directly and through its 100 percent owned subsidiary, Zhongfu Nigeria, evidence an investment in Nigeria which is protected under the [Investment Treaty][,]" which investment included "(a) [Zhongshan's] direct investment in Nigeria by way of the contractual rights and obligations acquired pursuant to the Fucheng Industrial Park Agreement, which corresponds to '*claims to money or to any other performance having an economic value associated with an investment*' and a '*business concession […] under contract permitted by law*';" and "(b) [Zhongshan's] direct shareholding in Zhongfu Nigeria, which clearly falls within the definition of '*shares*' in a Nigerian asset." (ECF No. 24-4, Statement of Claim, ¶ 164.)

The Tribunal confirmed that Zhonghan's Investment Treaty claims were indeed premised on a qualifying investment and found, *inter alia*, that "the far-reaching definition of 'investment' in article 1(1) is wide enough to cover either the shareholding in Zhongfu or Zhongfu's interest" (ECF No. 2-1, the Award, ¶ 77) and that "Zhongshan, through Zhongfu, spent considerable sums on works to the infrastructure of the Zone, and in particular Fucheng Park, as well as on marketing and managing Fucheng Park and the Zone." (*Id.*, ¶ 79.)

4

### III. The Tribunal Rendered the Award for the Damage that Respondent Caused to Petitioner's Investment in Nigeria

As Petitioner argued in the Arbitration, Respondent failed to accord the standards of treatment required by the Investment Treaty to Petitioner's investment when organs of the State took over Zhongshan's rights and assets and forcibly evicted its local subsidiary, Zhongfu, from the Zone.[3] (*See* ECF No. 24-4, Statement of Claim, ¶ 2.) Again, the Tribunal agreed with Petitioner and held Respondent liable for damages to Petitioner's investment for breaches of the Investment Treaty, including violation of the fair and equitable treatment obligation and expropriation. (ECF No. 2-1, the Award, ¶¶ 121-132; Motion to Dismiss, at 6.)

### IV. Petitioner's Damages in Arbitration Reflect the Lost Monetary Value of Its Investment in Nigeria as a Result of Respondent's Breaches of the Investment Treaty

Respondent acknowledges that the Tribunal "awarded Petitioner more than USD $65 million for these alleged breaches." (Motion to Dismiss, at 6.) The Tribunal did so based on a detailed analysis of the harm that Respondent's breaches of the Investment Treaty caused to Petitioner's investment and awarded Petitioner compensation for the loss of its rights in the Ogun Guangdong Free Trade Zone under the 2010 Framework Agreement and the 2013 JVA as well as for moral damages. (*See* ECF No. 2-1, the Award, ¶¶ 133-197.)

---

[3] Respondent mischaracterizes Petitioner's submissions in the arbitration, asserting variously that "Petitioner insisted that it was seeking relief under international law from Nigeria's sovereign conduct and that it[s] claims did not arise from a purely commercial relationship" (Motion to Dismiss, at 2); Petitioner "did not include any breach of contract or similar commercial claims" (*id*. at 4); "Petitioner argued to the arbitration tribunal that its relationship with Nigeria giving raise to its claims was not commercial, but rather was governed by public international law" (*id*. at 10). (*See also id.* at 1 (asserting that "the Award is explicit that the arbitrated disputes were governed by public international law, as they fell outside of the commercial sphere").) Each of these statements is misleading because Petitioner never took the position in the Arbitration—and the Tribunal did not find—that Petitioner's claims were not commercial or did not arise from a commercial relationship. As Respondent's underlying citations show, Petitioner's arguments focused on the applicable law in the Arbitration, namely that international law determined whether Respondent's actions were lawful or unlawful. (*See* ECF No. 24-4, Statement of Claim, ¶¶ 21, 176, 181, 184, 191-93, 217; ECF No. 2-1, Award ¶¶ 72-73.) This discussion of applicable law does not speak to whether there was a commercial relationship between Petitioner and Respondent, which was not in issue in the arbitration.

Respondent has not paid the Award, further delaying the recoupment of Petitioner's losses from Respondent's unlawful ouster of Petitioner as the developer, manager and operator of the Zone and necessitating this enforcement action.

## ARGUMENT

### I.     The Award Is Governed by the New York Convention

Respondent does not dispute that the Award was made pursuant to a valid agreement to arbitrate. Rather, Respondent claims that the Award is not enforceable under the New York Convention because the Convention applies only to awards that arise out of a commercial relationship and, in Respondent's submission, Petitioner's Award does not. Respondent is incorrect. Consistent with the plain meaning of the term "commercial" and this Circuit's precedent—precedent on which Respondent itself relies—an award in favor of an investor against a host State under an investment treaty arises out of a commercial relationship and falls within the scope of the New York Convention. *See* The Restatement (Third) of U.S. L. of Int'l Com. & Inv. State Arb. § 1.1, cmt. e., PFD (2019) ("[I]nvestor–State arbitrations, and investor–State awards, are commercial…").

### A.     Awards Arising out of Legal Relationships Considered to Be Commercial Are Governed by the New York Convention

The New York Convention (or "Convention") is a multilateral treaty providing for the "recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." Convention, art. I(1), 21 U.S.T. 2517 (1970). Article I(3) of the Convention provides that a Contracting State may "declare that it will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the State making such declaration." *Id.*, art. I(3). The United States made such a declaration and ratified and implemented

6

the Convention in Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201 et. seq (the "**FAA**"). Thus, in the United States, an "arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial," under U.S. law, "falls under the Convention." FAA, at § 202; *see also Stati v. Republic of Kazakhstan,* 199 F. Supp. 3d 179, 184 (D.D.C. 2016) (explaining that under the FAA the "subject matter" regarding the written agreement to arbitrate needs to be "commercial").[4] Respondent concedes that all Petitioner has to do to defeat dismissal is "establish that the Award is commercial under the New York Convention." (*See* Motion to Dismiss, at 7-8.)

      B.      <u>The Term "Commercial" Must Be Construed Broadly</u>

The "Convention, as codified in the FAA, does not define the term 'commercial.'" *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 103 (D.C. Cir. 2015). However, the term "commercial" is "construed broadly" in international arbitration and given the widest possible meaning consistent with the Convention's purpose. *See BCB Holdings Ltd. v. Gov't of Belize*, 232 F. Supp. 3d 28, 41 (D.D.C. 2017).[5] The term "commercial" refers to "matters or relationships, whether contractual or not, that arise out of or in connection with commerce." *Belize Soc. Dev. Ltd.*, 794 F.3d at 103–104 (citing Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1–1 (2012)); *see also Diag Human v. Czech Ministry of Health*, 824 F.3d 131, 136 (D.C. Cir. 2016) ("In the field of international arbitration, 'commercial' refers to '"matters or relationships, whether contractual or not, that arise out of or in connection with commerce"'". Accordingly, a matter may

---

[4] *See also infra* note 11 (listing cases that use the *Titan* test to determine jurisdiction under the FAA and FSIA arbitration exception and confirming that only the subject matter to which the agreement to arbitrate applies needs to be commercial).

[5] *See also* Gary B. Born, *The New York Convention: A Self-Executing Treaty*, 40 MICH. J. INT'L L. 115, 117, 184 (2018) ("The New York Convention was adopted to address the needs of the international business community and to facilitate international trade and commerce … [and] provides the framework for resolution of a substantial proportion of all international commercial disputes over the past half century and the foundation for greatly-expanded international trade and investment.").

be commercial even if not contractual, 'so long as it has a connection with commerce'.") (internal citations omitted).

As Respondent accepts, the phrase "involving commerce" has been interpreted in this Circuit to be the "functional equivalent of the more familiar term 'affecting commerce'–words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause Power." *Id.* at 104 (citing *Citizens Bank v. Alafabo, Inc.*, 539 U.S. 52, 56 (2003)). [6] In the Commerce Clause context, commerce has been defined as widely as "economic activity." *United States v. Morrison*, 529 U.S. 598, 610–613, 120 S. Ct. 1740, 1751, 146 L. Ed. 2d 658 (2000) (construing commerce as "economic activity" and opining that Commerce Clause permits regulation of activities that are "economic in nature" and does not permit the regulation of "noneconomic" conduct); *see also Gibbons v. Ogden*, 22 U.S. 1, 189–90, 6 L. Ed. 23 (1824) (Marshall, C.J.) ("Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."). Courts have explained that the purpose of the commercial limitation was "to exclude matrimonial and other domestic relations awards, [and] political awards," *Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1, 13 (S.D.N.Y.), aff'd, 489 F.2d 1313 (2d Cir. 1973), which does not exclude the Award at issue here.

    C.    <u>The Relationship Between Petitioner and Respondent Under the Investment Treaty Is Plainly Commercial</u>

Under this broad interpretive framework, the Award arises out of the Investment Treaty which unequivocally establishes a legal relationship between Petitioner, an investor in Nigeria,

---

[6] *See also* AFFECTING COMMERCE, Black's Law Dictionary (11th ed. 2019) (defining 'affecting commerce' as "touching or concerning business, industry, or trade.").

8

and Respondent, the host State whose wrongful actions damaged Petitioner's investment, that is commercial.

As detailed in Petitioner's Statement of Claim in the arbitration and the Award, Petitioner invested millions of dollars in Nigeria from 2010-2016 to develop, operate, and manage the Zone—plainly a commercial undertaking—only to have Respondent destroy its significant investment beginning in 2016 when Respondent "terminat[ed] [Petitioner's] management of the Free Trade Zone, expropriate[ed] its shareholding rights in the Zone management company and forcibly remov[ed] and chas[ed] its employees out of the country." (ECF No. 24-4, Statement of Claim, ¶ 2; *see also* Petition, ¶¶ 18-23.) Petitioner commenced arbitration under the Investment Treaty to recoup the lost economic value of its investment resulting from Respondent's breaches of its Investment Treaty obligations to accord Petitioner's investment certain protections. In arbitration, the Tribunal confirmed that Petitioner had a qualifying investment under Article 1 of the Investment Treaty and ordered Respondent to pay damages to Petitioner because Respondent breached its Investment Treaty obligations to Petitioner and damaged Petitioner's investment. It defies logic to see the Investment Treaty, Petitioner's investment in the development, management and operation of a free trade zone in Nigeria, Respondent's destruction of the economic value of Petitioner's investment, the arbitration of Petitioner's claims against Respondent under the Investment Treaty, and the Award ordering Respondent to pay Petitioner more than $65 million in damages as anything other than commercial.

Respondent argues that the parties do not share a legal relationship that is considered commercial because "as a treaty granting all qualifying investments certain base-line protections against sovereign state conduct, the [Investment Treaty] does not set forth the terms of those investments[.]" (Motion to Dismiss, at 9.) This argument is misconceived because the specific

9

terms of the investment are beside the point—the chief consideration is whether "*the subject matter is commercial*[.]" [7] *Stati v. Republic of Kazakhstan,* 199 F. Supp. 3d 179, 184 (D.D.C. 2016) (emphasis added); *see also infra note* 11. In any event, the definitions of "investor" and "investment" in the Investment Treaty demonstrate the terms under which a qualifying investor with a qualifying investment in Nigeria is entitled to protection by Respondent under the Investment Treaty, including that Respondent accord to that investment standards of treatment (as reflected, for example, in Investment Treaty Articles 2-4).

Respondent next contends that Petitioner and Respondent's legal relationship under the Investment Treaty is not connected with commerce because it is "comprehensively focused on regulating state conduct in the protection of investments." (Motion to Dismiss, at 9.) However, the regulation of such State conduct "arise[s] out of or in connection with commerce," *Gebre LLC v. Kyrgyz Republic*, No. CV 20-1795 (ABJ), 2022 WL 2132481, at *4 (D.D.C. June 14, 2022), because the purpose behind regulating Respondent's conduct is so the Investment Treaty remains "conducive to stimulating [the] business initiative[s] of [] investors," like Petitioner. (*See* Investment Treaty, Preamble); *see also* Restatement (Third) of the U.S. Law of Int'l Comm. and Inv. State Arb. § 1.1, cmt. e., PFD (2019) ("[A] dispute or award may be commercial even though one of the parties to it is a sovereign State and *even though the dispute arises out of public regulatory acts*.") (emphasis added).

Based on the plain language of the Investment Treaty, Respondent's purpose for entering into the Investment Treaty was related to commerce. (*See* Investment Treaty, Preamble

---

[7] Nigeria's other argument posits that the Convention does not apply because "Zhongshan's case [was] primarily based on the actions of Ogun State and by the police and NEPZA," and thus the relationship between Zhongshan and Nigeria was not commercial because Nigeria violated "public international law." (Motion to Dismiss, at 5.) This argument also misses the mark. What is relevant under the Convention and the FAA is whether the "legal relationship" between the parties is "considered commercial," not which law applies to the claims that were arbitrated. *See* FAA, at § 202.

10

("Recognizing that the reciprocal encouragement, promotion, and protection of such investments will be conducive to *stimulating business initiative* of the investors and will increase prosperity in both States[.]") (emphasis added); *see also* Art. 2 ("[Nigeria] shall promote *economic cooperation* and encourage investors [] to make investments in its territory…") (emphasis added).)

Likewise, from Petitioner's perspective, the Investment Treaty facilitated Petitioner's multi-faceted investment in Nigeria because of the standards of treatment that Respondent was required to accord investors like Petitioner. (*See e.g*., Investment Treaty Art. 2(3)-(4) (Respondent promised to refrain from taking "unreasonable or discriminatory measures against the management, maintenance, use, enjoyment and disposal of the investments").) In the context of these assurances, Petitioner made multiple investments in Ogun State that qualified as investments under Article 1 of the Investment Treaty. (*See* ECF No. 2-1, Award, ¶ 77.)[8]

The Investment Treaty's facilitation of Petitioner's investments in Nigeria validates "the commercial legal relationship between the parties." *See e.g., BCB Holdings Ltd. v. Gov't of Belize*, 232 F. Supp. 3d 28, 41 (D.D.C. 2017) (finding a settlement deed, which "resolve[d] [a] dispute arising out" of a transaction "commercial for purposes of the FAA and the New York Convention" because it "*facilitated* the commercial legal relationship between the parties") (emphasis added).

---

[8] For example, as described by Petitioner in the Arbitration, Petitioner acquired a bundle of rights over time to develop and manage the 10,000-hectare Zone. (*See* ECF No. 24-4, Statement of Claim, ¶ 3.) With these rights, Petitioner made significant infrastructure investments in the Zone and registered its Nigerian subsidiary, Zhongfu, that entered into with the 2013 JVA with Ogun State. (*See id.,* ¶¶ 3-8.) Pursuant to the joint venture, Petitioner (through Zhongfu) acquired further rights to develop, manage, and operate the Zone. (*See id.,* ¶¶ 9-10.) This resulted in, *inter alia*, the construction of roads, the establishment of a power plant and electrical cables, water supply, sewage, improved telecommunications, and influxes of capital from multiple foreign investors to establish a pharmaceutical park. (*See id.,* ¶ 7.)

11

D.   This Circuit Considers Relationships Between Investors and Host States Under Bilateral Investment Treaties to Be Commercial

Contrary to Respondent's assertion, bilateral investment treaties, such as the Investment Treaty here, are not only connected to commerce, but are based in commerce.[9] This is why investor-State arbitral awards, like the Award, are commonly found to arise out of legal relationships that are considered commercial and recognized under the New York Convention. *See e.g., Tatneft v. Ukraine*, 21 F.4th 829, 833 (D.C. Cir. 2021) (recognizing under New York Convention investor-State arbitral award rendered in Paris pursuant to "Russia–Ukraine Bilateral Investment Treaty," which "incorporate[d] the United Nations Commission on International Trade Law's (UNCITRAL) arbitration rules[,]" and finding that FSIA arbitration exception applies); *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 874 (D.C. Cir. 2021) (recognizing under New York Convention French investor-State arbitral award rendered pursuant to Energy Charter Treaty signed by both Ukraine and Moldova and finding that FSIA arbitration exception applies); *Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015) (recognizing under New York Convention investor-State arbitral award rendered pursuant to US–Ecuador BIT, which does not explicitly mention that awards arising thereunder are to be considered to arise out of commercial relationships, and finding that FSIA arbitration exception applies); *Gebre LLC v. Kyrgyz Republic*, No. CV 20-1795 (ABJ), 2022 WL 2132481, at *4 (D.D.C. June 14, 2022) (finding investor-State arbitral award rendered under 2003 Kyrgyz Investment Law, which does not explicitly mention

---

[9] Respondent cites to Restatement (Third) of Foreign Relations Law § 301 (1987) to support the assertion that "international agreements, like the Nigeria-China Treaty, that involve two or more states and are governed by international law are not subject to the New York Convention because they are not commercial." (Motion to Dismiss, at 9.) In the section on which Respondent relies, the Restatement states that "[a]n international agreement, as defined, does not include a contract by a state, even with another state, that is essentially commercial in character and is intended to be governed by some national or other body of contract law." Restatement (Third) of Foreign Relations Law § 301, cmt. f. (1987). The Restatement goes on to make clear that "disputes arising out of investment agreements are ***not*** excluded by [the commercial] declaration." (*Id.* at § 487, cmt. f., emphasis added.) Respondent's assertion that the Award falls outside the "ambit of the New York Convention as a matter of U.S. foreign relations law," (Motion to Dismiss, at 10) is contradicted by the Restatement (Third) of Foreign Relations Law (1987) itself.

the New York Convention, was governed by the Convention because "[t]he dispute [], which arose out of a series of license agreements between the parties to transfer shares of company stock and mine rare earth elements in Kyrgyzstan, arise[s] out of or in connection with commerce within the broad meaning of commercial…") (internal quotations omitted); *Schneider v. Kingdom of Thailand*, No. 10 CIV. 2729 DAB, 2011 WL 12871599, at *1 (S.D.N.Y. Mar. 14, 2011), aff'd, 688 F.3d 68 (2d Cir. 2012) (finding investor-State arbitral award which arose under a bilateral investment treaty that did not explicitly mention the New York Convention was governed by the Convention).

Instructively, in *Tatneft*, the award—which was recognized under the New York Convention—was conferred in an arbitration conducted under the "auspices of the Permanent Court of Arbitration, seated in Paris, France, and pursuant to the 1976 Arbitration Rules of the United Nations Commission on International Trade Law ("UNICITRAL") and the 1998 Agreement between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments" (the "**Russia-Ukraine BIT**"). *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 180 (D.D.C. 2018), aff'd, 771 F. App'x 9 (D.C. Cir. 2019), and aff'd, 21 F.4th 829 (D.C. Cir. 2021). The Russia-Ukraine BIT is identical to the Investment Treaty in that it does not mention that the New York Convention applies to enforcements of awards arising under it.[10]

Although *Tatneft* is one of the authorities upon which Respondent chiefly relies in its Motion to Dismiss, *Tatneft* plainly contradicts Respondent's assertions that awards arising out of the present Investment Treaty "fall[] outside the ambit of the New York Convention" because the Convention only applies to Awards arising under treaties that "explicitly reference the New York

---

[10] *See* Russia-Ukraine BIT. Available at: https://investmentpolicy.unctad.org/international-investment-agreements/treaty-files/2233/download.

13

Convention" or when parties "have agreed that the New York Convention applies[.]" (Motion to Dismiss, at 10.)

Respondent does not cite any cases where an investment treaty award like Petitioner's was held to arise out of a non-commercial relationship and therefore falls outside the New York Convention, and Petitioner is aware of none. *See* The Restatement (Third) of U.S. Law of Int'l Com. & Inv. State Arb. § 1.1, reporters' note e, PFD (2019) ("The commercial relationship requirement of FAA § 202 and the New York Convention has not been the subject of detailed elaboration by courts in the United States[.]"). Indeed, Respondent was left to rely on *Tatneft*, where the Court recognized an investment arbitration award under the New York Convention under very similar circumstances to this case.

The key cases upon which Respondent relies do not support Respondent's argument that the Award should not be enforced under the New York Convention because of a lack of commercial relationship. Rather, Respondent's cases support Petitioner's argument that the subject matter of the underlying Arbitration and Award is commercial and that the Award is enforceable under the New York Convention. *See Tatneft*, 301 F. Supp. 3d at 181, 186–90 (D.D.C. 2018), aff'd, 771 F. App'x 9 (D.C. Cir. 2019), and aff'd, 21 F.4th 829 (D.C. Cir. 2021); *Diag Human*, 824 F.3d at 136 ("[A] matter may be commercial even if not contractual, 'so long as it has a connection with commerce.'"); *Belize Soc. Dev. Ltd*, 794 F.3d at 105 (D.C. Cir. 2015) (interpreting "commercial" broadly). Others of Respondent's cases are inapposite because they addressed non-investment treaty awards and did not hold that investment treaty awards are non-commercial and unenforceable as Respondent suggests. *See Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 775–76 (D.C. Cir. 2022); *Process & Indus. Devs. Ltd. v. Fed.*

14

*Republic of Nigeria,* 962 F.3d 576, 579, 586 (D.C. Cir. 2020); *Diag Human*, 824 F.3d at 134–37; *Belize Soc. Dev. Ltd.*, 794 F.3d at 103–05.

## II. Nigeria Is Not Immune from This Court's Jurisdiction Because the Arbitration Exception to Sovereign Immunity Applies

Because the Award falls under the New York Convention as demonstrated above, this Court has subject matter jurisdiction over Respondent under the established FSIA arbitration exception to sovereign immunity. *See* 28 U.S.C. § 1605 (a)(6)(B) (codifying the arbitration exception); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S. Ct. 1471, 1476, 123 L. Ed. 2d 47 (1993) ("Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts[,] unless a specified exception applies[.]"); *Chevron Corp. v. Republic of Ecuador,* 949 F. Supp. 2d 57, 62 (D.D.C. 2013) ("[T]he FSIA provides an exception to foreign sovereign immunity for actions to confirm certain arbitration awards" that are (1) "made pursuant to [] an agreement to arbitrate," and (2) are "governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards.").[11]

Respondent concedes that personal and subject matter jurisdiction lie "if Petitioner establishes an exception to the FSIA applies to lift Nigeria's sovereign immunity protections" and that "'once shown, the sovereign bears the ultimate burden of persuasion to show the exception does not apply.'" (Motion to Dismiss, at 6-7.) Petitioner has established an exception, and Respondent cannot carry its burden.

---

[11] District courts in this Circuit have applied the *Titan* test to determine whether courts have subject matter jurisdiction under the Federal Arbitration Act in the context of the arbitration exception. *See e.g.*, *Gebre LLC v. Kyrgyz Republic*, No. CV 20-1795 (ABJ), 2022 WL 2132481, at *3 (D.D.C. June 14, 2022) (citing *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co*., 241 F.3d 135, 146 (2d Cir. 2001) ("The Second Circuit has observed that an agreement to arbitrate exists, and therefore a court has subject matter jurisdiction under the FAA, when: (1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope.")); *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 184 (D.D.C. 2016).

15

The Award was made pursuant to a valid agreement to arbitrate (a point that Respondent does not dispute) and the Award is governed by an international treaty in force in the United States calling for the recognition and enforcement of arbitral awards, the New York Convention.  Thus, this Court has subject matter jurisdiction over Respondent to enforce Petitioner's Award.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court deny Respondent's Motion to Dismiss for Lack of Jurisdiction Under the FSIA and grant Petitioner's Petition to Recognize and Enforce Foreign Arbitral Award.

Dated:  July 5, 2022                                                      Respectfully submitted,


By:  /s/ Emma Lindsay

Emma Lindsay (*pro hac vice*)
Jovana Crncevic (*pro hac vice*)
WITHERS BERGMAN LLP
430 Park Avenue, 10th Floor
New York, New York 10022
Telephone: (212) 848-9800
Fax: (212) 848-9888
Emma.Lindsay@withersworldwide.com
Jovana.Crncevic@withersworldwide.com

Steven Moore, DC Bar No. CT0012
WITHERS BERGMAN LLP
1700 East Putnam Avenue, Suite 400
Greenwich, Connecticut 06870
Telephone: (203) 302-4100
Fax: (203) 302-6609
Steven.Moore@withersworldwide.com

*Attorneys for Petitioner Zhongshan Fucheng Industrial Investment Co., Ltd.*