**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ZHONGSHAN FUCHENG INDUSTRIAL
INVESTMENT CO., LTD.,

        Petitioner,

        v.

FEDERAL REPUBLIC OF NIGERIA,

        Respondent.

Civil Action No. 22-170 (BAH)

Oral Argument Requested

**REPLY BRIEF IN SUPPORT OF FEDERAL REPUBLIC OF NIGERIA'S
MOTION TO DISMISS FOR LACK OF JURISDICTION
UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT, 28 U.S.C. § 1605**

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ........................................................................................................ 1

**ARGUMENT** ................................................................................................................................. 6

    I.     The New York Convention Does Not Apply Because This Treaty-Based Dispute Is Not Commercial. ..................................................................................... 6

          A.    Petitioner Conceded That Its Relationship With Nigeria Was Noncommercial. ......................................................................................... 6

          B.    Petitioner and Nigeria's Relationship Arising From The Application Of The Nigeria-China Treaty Is Quintessentially Sovereign, Not Commercial. ........................................................................ 9

          C.    Prior Precedent Does Not Address The Applicability Of The New York Convention To Bilateral Investment Treaty Disputes. .................... 11

    II.    As The New York Convention Does Not Apply, Nigeria Is Immune From Suit. .......................................................................................................................... 14

**CONCLUSION** ............................................................................................................................ 15

# **TABLE OF AUTHORITIES**

**Cases**

*Africard Co. v. Republic of Niger*, 210 F. Supp. 3d 119 (D.D.C. 2016) .......................................... 4

*BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233 (D.D.C. 2015) .................................. 10

*Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144 (2d Cir. 2021) ............................. 11

\* *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99 (D.C. Cir. 2015) ................................ 1, 12

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312 (2017) . 6

*Campagnie Sahélienne d'Enterprise v. Republic of Guinea*, No. 20-1536, 2021 U.S. Dist. LEXIS 10442 (D.D.C. June 14, 2021) ........................................................................................ 4

*Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015) ..................................... 12

*Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57 (D.D.C. 2013) .......................... 12, 14

*Citizens Bank v. Alafabo, Inc.*, 539 U.S. 52 (2003) ....................................................................... 2

*Customs & Tax Consultancy LLC v. Dem. Rep. Congo*, No. 18-1408, 2019 U.S. Dist. LEXIS 162136 (D.D.C. Sept. 16, 2019) ....................................................................................... 4

\* *Diag Human v. Czech Rep. Ministry of Health*, 824 F.3d 131 (D.C. Cir. 2016) ......................... 1

*Gebre LLC v. Kyrgyz Republic*, No. 20-1795, 2022 U.S. Dist. LEXIS 106179 (D.D.C. Jun. 14, 2022) ............................................................................................................................. 2, 10

\* *Process & Indus. Devs. v. Fed. Republic of Nigeria*, 962 F.3d 586 (D.C. Cir. 2020) ................. 6

*Republic of Ecuador v. Chevron Corp.,* 638 F.3d 384 (2d Cir. 2011) ......................................... 11

\* *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ............................................................................ 14

*Schneider v. Kingdom of Thail.*, 688 F.3d 68 (2d Cir. 2012) ....................................................... 12

*Schneider v. Kingdom of Thail.*, No. 10 Civ. 2729, 2011 U.S. Dist. LEXIS 158832 (S.D.N.Y. Mar. 14, 2011) .................................................................................................................. 12

\* *Tatneft v. Ukraine*, 21 F.4th 829 (D.C. Cir. 2021) .................................................................... 12

*Tatneft v. Ukraine*, 301 F. Supp. 3d 175 (D.D.C. 2018) .............................................................. 12

*Turan Petro Inc. v. Ministry of Oil & Gas of Kaz.*, No. 21-7023, 2022 U.S. App. LEXIS 7980

   (D.C. Cir. Mar. 25, 2022) ........................................................................................................ 5

\* *United States v. Morrison*, 529 U.S. 598 (2000) ................................................................... 2, 11

**Statutes**

Foreign Sovereign Immunities Act, 28 U.S.C. § 1605 ......................................................... 5, 6, 15

**Other Authorities**

Alexis Blane, *Sovereign Immunity as a Bar to the Execution of International Arbitral Awards*, 41

   N.Y.U. J. Int'l L. & Pol. 453 (2009) ...................................................................................... 9

*Deutsche Bank AG v Democratic Socialist Republic of Sri Lanka* ICSID Case No ARB/09/2,

   Award (31 October 2012) ....................................................................................................... 8

\* Draft Articles on Responsibility of States for Internationally Wrongful Acts, With

   Commentaries, U.N. Doc. A/56/10 (2001) ............................................................................ 7

**Treatises**

\* Restatement (Third) of Foreign Relations Law (1987) ......................................................... 5, 13

Restatement of International Commercial Arbitration and Investor-State Arbitration (2019). 5, 13

      \* Authorities upon which Nigeria chiefly relies are marked with asterisks.

**PRELIMINARY STATEMENT**

The Award at issue is unlike other arbitration awards routinely enforced in this Circuit. It arose neither from a commercial agreement between Petitioner and Nigeria, nor from a contractual or other business relationship between them.[1] No such agreement or relationship ever existed here. Instead, the Award arose from the Nigeria-China Treaty; specifically, because of Nigeria's sovereign conduct—mainly an alleged expropriation—deemed to have violated the protections Nigeria afforded under the Treaty to Chinese nationals, like Petitioner.

Petitioner does not explain how or why the Nigeria-China Treaty, or Nigeria's conduct deemed to have violated the Treaty and that gave rise to the Award, establish a "legal relationship . . . which is considered as commercial," *Diag Human v. Czech Rep. Ministry of Health*, 824 F.3d 131, 136 (D.C. Cir. 2016), as is required for the New York Convention to apply to the Award. Petitioner similarly fails to engage with Circuit precedent defining "commercial" in this context to mean "matters or relationships … that arise out of or in connection with commerce." *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99, 105 (D.C. Cir. 2015). The Nigeria-China Treaty does not govern how Nigeria and China conduct commerce, nor does it set forth what commercial activity is permitted in either country. Rather, as Nigeria explained and Petitioner acknowledged in its Opposition, the Nigeria-China Treaty is "comprehensively focused on regulating state conduct in the protection of investments." Opp'n at 14 (quoting Mot. at 9).[2] It

---

[1] All capitalized terms not otherwise defined below have the same meaning as in Nigeria's Memorandum of Points and Authorities in Support of its Motion to Dismiss for Lack of Jurisdiction (the "Motion," Dkt. No. 24-1).

[2] Petitioner's reliance on *Gebre LLC v. Kyrgyz Republic* for the proposition that "the regulation of such state conduct" meets the "arise out of or in connection with commerce" requirement under *Diag Human* is misplaced. Opp'n at 14. *Gebre* does not say that. *Gebre* found that the dispute in that case was commercial because it "arose out of a series of license agreements between the parties [Gebre and Kyrgyzstan] to transfer shares of company stock and mine rare earth elements in

seeks to prevent Nigeria and China from expropriating and otherwise abusing their police powers regarding investments made by each other's nationals. That is decidedly not conduct "affecting commerce," as reasoned by the Supreme Court in the context of the Commerce Clause of the U.S. Constitution. *United States v. Morrison*, 529 U.S. 598, 618-19 (2000) (distinguishing between "police power" and the Commerce Clause); *see also id*. at 584 (Thomas, J., concurring) ("we always have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power"). As Nigeria explained in its Motion—without retort from Petitioner—this Circuit adopted that reasoning in deciding what conduct is "commercial" under the Federal Arbitration Act, which codifies the New York Convention. *See* Mot. at 18 (quoting *Belize Soc. Dev.*, 794 F.3d at 104) (the Act reaches contracts "evidencing a transaction involving commerce"—"the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress's Commerce Clause Power") (quoting *Citizens Bank v. Alafabo, Inc.*, 539 U.S. 52, 56 (2003)).

Consistent with this, the Nigeria-China Treaty chiefly protects investments from a series of sovereign conduct. It does not govern the terms of an investment, including when or how it should be made or operated, or what returns can be realized. For all of that, Petitioner relied on a series of agreements, including a 2010 Framework Agreement and 2013 Joint Venture Agreement ("JVA") that its subsidiary Zhongfu executed with OGFTZ and Ogun State, respectively. *See* Pet. ¶¶ 16-17. As Petitioner concedes, it brought the arbitration to protect its rights under those agreements. *See id*. ¶ 18 ("in breach of its obligations under the BIT, Nigeria … deprived Petitioner and Zhongfu of their rights under the 2010 Framework Agreement and/or the 2013

---

Kyrgyzstan." *Gebre LLC v. Kyrgyz Republic*, No. 20-1795, 2022 U.S. Dist. LEXIS 106179, at *9, (D.D.C. June 14, 2022).

JVA").[3]  For this reason, Petitioner's reliance on Article 1 of the Nigeria-China Treaty is misplaced.  That article merely defines an "investment" broadly to mean "every kind of asset" and lists five "not exclusive" categories of assets.  *See* Nigeria-China Treaty (Dkt. No. 2-2), art. 1.  That definition does not "show[] a commercial relationship between the investor and the host State in which the investment is made," as Petitioner incorrectly asserts.  Opp'n at 6.  It only explains that "every kind of asset" owned by a Chinese national within Nigeria will be protected against the sovereign conduct the Nigeria-China Treaty proscribes.  Again, the Treaty is not concerned with the terms and conditions of an investment, including its making, holding, or disposition.

The "commercial relationship" regarding Petitioner's investment was formed with OGFTZ and Ogun State, not Nigeria, under the 2010 Framework Agreement and 2013 JVA.  Petitioner was never in privity with Nigeria.  *See* Award (Dkt. No. 2-1), ¶¶ 33-41, 72.  Petitioner tactically chose to walk away from that commercial relationship and, having caused its subsidiary Zhongfu to file claims domestically before Nigerian courts and internationally before a Singapore International Arbitration Centre ("SIAC") commercial arbitration tribunal under those agreements, abandoned those claims to pursue its investment-treaty arbitration against Nigeria.  *Id*. ¶¶ 42-43, 45, 53, 58.  In the arbitration, Petitioner emphatically cast its investment-treaty claims as non-commercial, arguing to the investment-treaty tribunal: "This dispute relates to a shocking series of actions by which multiple emanations of the Nigerian State came together to forcibly evict the

---

[3] Precisely because of this, the Award finds that Petitioner's damages amount to the loss of Zhongfu's rights under the agreements.  *See* Award (Dkt. No. 2-1), ¶ 78 ("What would be treated as lost is Zhongfu's rights, and it is they that were valued by Mr. Matthews … it seems to us that the natural inference is that the depreciation in the value of Zhongfu as a result of the loss of its interests would have been equivalent to the value of the rights which were lost."); *see also* Opp'n at 5 ("The Tribunal [rendered the Award] based on a detailed analysis of the harm that Respondent's breaches of the Investment Treaty caused to Petitioner's investment and awarded Petitioner compensation for the loss of its rights … under the 2010 Framework Agreement and the 2013 JVA").

Claimant from Nigeria and seized its valuable investment." Zhongshan Statement of Claim (Dkt. No. 24-4), ¶ 1. Further distinguishing its international law claims against Nigeria (at issue) from the commercial claims Zhongfu abandoned, Petitioner argued to the investment-treaty tribunal: "there is a difference between litigation concerning matters of local law, as in the proceedings before the Nigerian courts, and investment treaty disputes concerning breaches of treaty obligations and international law." Zhongshan Statement of Reply (Dkt. No. 24-3), ¶ 153. Agreeing with Petitioner, the arbitration tribunal found Petitioner brought non-commercial, investment-treaty claims governed by public international law. *See* Mot. at 11 (citing Award (Dkt. No. 2-2), ¶¶ 72-73)).

Because the only relationship between the parties is the protection from proscribed sovereign conduct afforded to Chinese nationals by Nigeria under the Nigeria-China Treaty, the Award is fundamentally distinct from circumstances in which courts have found that a direct relationship between a foreign state and an investor was commercial for purposes of the New York Convention. *See* Mot. at 13-14.[4] The fact that the relationship between Nigeria and Petitioner is noncommercial is also consistent with the Restatement (Third) of Foreign Relations Law and the Restatement of International Commercial Arbitration and Investor-State Arbitration, both of which note that certain investor-State relationships are noncommercial for purposes of the New York Convention. *See* Restatement (Third) of Foreign Relations Law § 487 (1987) cmt. f (explaining that investor-State arbitrations that are based on an international agreement are not subject to the

---

[4] *See also Diag Human*, 824 F.3d at 136; *Belize Soc. Dev. Ltd.*, 794 F.3d at 100; *Campagnie Sahélienne d'Enterprise v. Republic of Guinea*, No. 20-1536, 2021 U.S. Dist. LEXIS 10442, at *4 (D.D.C. June 14, 2021); *Customs & Tax Consultancy LLC v. Dem. Rep. Congo*, No. 18-1408, 2019 U.S. Dist. LEXIS 162136, at *10 (D.D.C. Sept. 16, 2019); *Africard Co. v. Republic of Niger*, 210 F. Supp. 3d 119, 124 (D.D.C. 2016).

New York Convention, noting: "arbitration of a controversy of a public international law character … such as a … dispute about … performance under an international agreement … is not subject to the New York Convention"); Restatement of International Commercial Arbitration and Investor-State Arbitration (2019) § 1-1 cmt. E, Reporters Note e (explaining the definition of commercial for purposes of the New York Convention would "ordinarily" but not necessarily "include awards arising from an investment dispute").[5]

Ultimately, Petitioner cannot have it both ways. Having truly abandoned commercial claims to pursue international law claims against Nigeria for expropriation and other alleged abuses of police powers, Petitioner purposefully put the Award outside the scope of the New York Convention. Because the New York Convention does not apply, the "arbitration exception" to Nigeria's jurisdictional immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(6), is not met. That being Petitioner's sole ground for seeking to establish subject matter jurisdiction against Nigeria, all other jurisdictional arguments have been waived and the case must accordingly be dismissed. *See Turan Petro Inc. v. Ministry of Oil & Gas of Kaz.*, No. 21-7023, 2022 U.S. App. LEXIS 7980, at *6 (D.C. Cir. Mar. 25, 2022) (holding plaintiffs "forfeited reliance on the [FSIA] waiver exception by failing to raise it" in their opening brief).

As a sovereign state, Nigeria is entitled to a threshold determination of its immunity defense precisely because of the comity considerations that undergird the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq*.[6] *See Process & Indus. Devs. v. Fed. Republic of Nigeria*,

---

[5] While the Restatement (Third) of Foreign Relations Law acknowledges that certain investor-State disputes arising out of a "contract between a government and a private person" may constitute as commercial for purposes of the New York Convention, there is no such contract at issue here, as Nigeria and Petitioner were never in privity. Restatement (Third) of Foreign Relations Law § 487 cmt. f (1987).

[6] For this reason, Nigeria has not waived any of its New York Convention, Article V defenses to enforcement of the petition should this Court determine that the New York Convention applies.

962 F.3d 586, 576 (D.C. Cir. 2020) (explaining the "'basic objective of the FSIA is to respect the independence and dignity' of foreign sovereigns .… [Courts] must resolve colorable assertions of immunity before the . . . . merits . . . .") (quoting *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017)).  As such, the Petition should be dismissed for lack of jurisdiction under the FSIA prior to an assessment of Nigeria's merits defenses.

**ARGUMENT**

I.  <u>The New York Convention Does Not Apply Because This Treaty-Based Dispute Is Not Commercial.</u>

   A.  Petitioner Conceded That Its Relationship With Nigeria Was Noncommercial.

The alleged expropriation and abuse of Nigeria's police powers discussed in the Award had consequences in the commercial sphere, with Petitioner's subsidiary Zhongfu bringing claims in Nigeria and before a SIAC international arbitration tribunal under the operative agreements (the "Commercial Claims"), and in the public international law plane, with Petitioner bringing claims under the Nigeria-China Treaty (the "Treaty Claims").  Petitioner tactically chose to proceed exclusively with the Treaty Claims and caused its subsidiary to abandon the Commercial Claims brought outside of the investment-treaty arbitration.  The Award explicitly distinguishes between these two types of claims, finding that the Commercial Claims were based "on alleged breaches of [Zhongfu's] contractual and possessory rights" whereas in the Treaty Claims "Zhongshan's case … [was] based <u>squarely</u> on the Treaty."  *See* Award (Dkt. No. 2-1), ¶ 86 (emphasis added); *see also id.* ¶ 74 (distinguishing Petitioner's Treaty Claims from the Commercial Claims).

---

*See Process & Indus. Devs. v. Fed. Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020) (holding "the district court erred in requiring Nigeria to defend the merits before resolving its colorable immunity assertion.").  Nigeria reserves the right to raise these defenses at the appropriate juncture.

- 6 -

Contradicting its earlier position and the Award's findings, Petitioner now seeks to mischaracterize the Award as commercial in nature. It is not.

Attempting to minimize the Award's distinction between the Commercial Claims and the Treaty Claims, Petitioner argues that the "discussion of applicable law does not speak to whether there was a commercial relationship between Petitioner and Respondent." Opp'n at 5 n.3. Petitioner misses the point. "[I]nternational law determined whether Respondent's actions were lawful or unlawful," as Petitioner argues, *see id.*, precisely because the conduct at issue was sovereign and an "internationally wrongful act" under public international law, *see* Award ¶ 72. Had Nigeria's conduct been commercial in nature, as Petitioner implies here, it would have fallen outside of the Nigeria-China Treaty—which concerns only sovereign conduct—and the arbitration tribunal's jurisdiction.[7]

In the arbitration, Petitioner did not plead breach of contract or similar commercial claims. *See* Zhongshan Statement of Claim (Dkt. No. 24-4), ¶¶ 218-75. It argued Nigeria's exercise of "core State powers such as police powers" and other sovereign conduct, which allegedly resulted in the expropriation of Petitioner's assets in Nigeria. *Id.* ¶ 206. *See also id.* ¶ 1 (alleging a "shocking series of actions by which multiple emanations of the Nigerian State came together to forcibly evict the Claimant from Nigeria and seized its valuable investment"); ¶ 12 (alleging

---

[7] The Draft Articles on Responsibility of States for Internationally Wrongful Acts ("ARSIWA"), cited in the Award at ¶ 72 and relied upon by Petitioner in the arbitration, *see* Dkt. No. 24-4 ¶¶ 204, 208, reflect this distinction. The Commentary to Article 5 of the ARSIWA explains: "If it is to be regarded as an act of the State for purposes of international responsibility, the conduct of an entity must accordingly concern governmental activity and not other private or commercial activity in which the entity may engage." Draft Articles on Responsibility of States for Internationally Wrongful Acts, With Commentaries, art. 5 cmt. 5, U.N. Doc. A/56/10 (2001), https://legal.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf. *See* Zhongshan Statement of Claim (Dkt. No. 24-4), ¶¶ 204, 208 (arguing that the complained of conduct was an internationally wrongful act attributable to Nigeria under Article V of the ARSIWA because it was "undertaken by the entit[ies] in the exercise of [governmental] authority").

termination of its rights "without administrative due process" and "draconian actions of the Nigerian authorities," including threats and arrests); ¶ 18 (alleging a "taking of the Claimant's investment").

Agreeing with Petitioner, the Award accepts that the conduct was sovereign and thus attributable to Nigeria, *see* Mot. at 11-12 (summarizing points), and distinguishes that conduct from Petitioner's separate Commercial Claims, citing a line of cases that makes that precise distinction when determining whether actions of an entity affiliated with a state can be attributed to the state under public international law. *See* Award (Dkt. No. 2-1), ¶¶ 72-73 (citing *Deutsche Bank AG v Democratic Socialist Republic of Sri Lanka* ICSID Case No ARB/09/2, Award, ¶ 559 (31 October 2012) (finding dispute arose under BIT because it "does not derive from the fact that CPC failed to comply with its payment obligations to Deutsche Bank under the Hedging Agreement, but from the fact that Respondent intervened as a sovereign by virtue of its State power")). Consistent with this, the Award differentiates "a 'mere' breach of contract by a local authority [that] could not of itself be attributed to the state" from an "action complained of [that] would otherwise amount to a breach of the treaty in issue, then it would be attributed to the state." *Id.* ¶ 74.

Ultimately, the Award finds the complained of conduct sovereign in nature and constituting an "actual and threatened illegitimate use of the state's power … ." *Id.* ¶ 126. As noted, that finding is dispositive of Petitioner's argument because it confirms that the Award did not arise from a commercial relationship between Petitioner and Nigeria, but from an alleged "illegitimate use of the state's power" contrary to public international law.

B. Petitioner and Nigeria's Relationship Arising From The Application Of The Nigeria-China Treaty Is Quintessentially Sovereign, Not Commercial.

The fact that Petitioner made an investment in Nigeria that was protected from adverse sovereign conduct under the Nigeria-China Treaty does not create a "plainly commercial" relationship between Petitioner and Nigeria, as Petitioner argues. Opp'n at 12. As noted, the Nigeria-China Treaty does not govern any of the terms of Petitioner's investment or what it could do with that investment. It is an instrument through which Nigeria and China undertake to promote mutual "respect" for "sovereignty and laws," to "intensify the cooperation of both States on the basis of equality and mutual benefits," and to "create favourable conditions for greater investment" in both sovereign states. Nigeria-China Treaty (Dkt. 2-2), 1. As such, the Nigeria-China Treaty is "quintessentially [] sovereign."[8]

The sovereign nature of the Nigeria-China BIT is further confirmed by the conduct it reaches. As Petitioner concedes, it is an international treaty "comprehensively focused on regulating state conduct in the protection of investments." Opp'n at 14 (quoting Mot. at 9); *see also* Nigeria-China Treaty (Dkt. No. 2-2), arts. 2-4. At base, bilateral investment treaties, such as the Nigeria-China Treaty, "are designed to protect investors against 'political risk,' generally understood as government policies that so alter the investment environment that an investment no longer retains its value." Alexis Blane, *Sovereign Immunity as a Bar to the Execution of International Arbitral Awards*, 41 N.Y.U. J. Int'l L. & Pol. 453, 477 (2009).

Petitioner asks this Court to disregard the sovereign nature of the China-Nigeria Treaty because the "subject matter" of Petitioner's investment was commercial. Opp'n at 9-10. This

---

[8] Alexis Blane, *Sovereign Immunity as a Bar to the Execution of International Arbitral Awards*, 41 N.Y.U. J. Int'l L. & Pol. 453, 487 (2009) (explaining "the act of treaty formation is itself quintessentially a sovereign act" that "bind[s] the signatory states under international law" and that "[b]ilateral investment treaties are no different").

again ignores the fundamental fact that the Nigeria-China Treaty does not regulate or provide the terms governing Petitioner's investment and that no independent legal relationship existed between Nigeria and Petitioner regarding those investments.  Rather, the "subject matter" of the arbitration was the fact that certain sovereign conduct, allegedly constituting an "internationally wrongful act," breached the sovereign protections Nigeria undertook to provide to Chinese nationals under the Nigeria-China Treaty.  Award (Dkt. No. 2-1), ¶ 72 (citing ARSIWA); *see also id*. (defining an "internationally wrongful act" as a "breach of an international law obligation"); Zhongshan Statement of Claim (Dkt. No. 24-4), ¶ 284 ("The expropriatory conduct was unlawful as Nigeria failed to comply with the requirements in Article 4 of the BIT and international law, which prohibit Nigeria from expropriating investments of Chinese investors unless the measures concerned were for the public interest under a domestic legal procedure, without discrimination and accompanied by the payment of fair compensation.").  Petitioner's reliance on cases in which courts in this Circuit have found the commercial requirement met where there is an independent direct relationship between a sovereign and an investor is accordingly misplaced.  *See, e.g.*, *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 243 (D.D.C. 2015) (finding independent settlement agreement to resolve share purchase between sovereign and petitioner satisfied commercial requirement); *Gebre LLC,* 2022 U.S. Dist. LEXIS 106179, at *9 (finding "series of license agreements between the parties" satisfied commercial requirement).

Here, the nature of Petitioner's investment, as defined through a series of agreements to which Nigeria was not a party, cannot alter the nature of the Nigeria-China Treaty or the sovereign nature of the conduct it seeks to regulate.  Nor can those third-party agreements dictate whether the extrinsic legal relationship between Nigeria and Petitioner is commercial for purposes of the New York Convention.  As the Second Circuit recently explained, a "bilateral investment

agreement is an agreement between two sovereign states that in effect constitutes a unilateral standing offer to submit to arbitration with investors of the other sovereign when certain conditions are met." *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 155 (2d Cir. 2021) (citing *Republic of Ecuador v. Chevron Corp.,* 638 F.3d 384, 392 (2d Cir. 2011)).  The conditions in question here—that the conduct of organs of the Nigerian state were attributed to Nigeria so as to constitute internationally wrongful acts in violation of the Nigeria-China Treaty—rendered the legal relationship between Nigeria and Petitioner fundamentally noncommercial.

By focusing on the conditions and attributes of its investment, Petitioner studiously avoids discussion of the actual sovereign conduct that led to Nigeria's liability under the Nigeria-China BIT.  *See supra*.  Petitioner invokes the Commerce Clause as a source of the limitations on the term "commerce" for purposes of the New York Convention.  Opp'n at 8.  As noted, however, the Opposition fails to engage with U.S. courts' consistent refusal to allow the exercise of police powers, like those exercised by Nigeria, under the Commerce Clause.  *See* Mot. at 13 (citing *Morrison*, 529 U.S. at 618-19 (Thomas, J., concurring) ("[W]e have always rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power")).  Because the exercise of police powers is inconsistent with the Commerce Clause, axiomatically, no commercial relationship can form when a state exercises those police powers.  Yet, that is precisely what Petitioner argues here.

C. Prior Precedent Does Not Address The Applicability Of The New York Convention To Bilateral Investment Treaty Disputes.

Petitioner concedes there is a dearth of cases addressing whether "an investment treaty award like Petitioner's … arise[s] out of a non-commercial relationship and therefore falls outside the New York Convention."  Opp'n at 14.  In the absence of binding precedent, Petitioner seeks to rely on easily distinguishable, inapposite cases.  As a preliminary matter, many of Petitioner's

cited cases arose out of a direct legal relationship the petitioner had with a foreign sovereign, and are thus inapposite for the reasons discussed, *supra*. *See, e.g.*, *Diag Human*, 824 F.3d at 135 (discussing Framework Agreement); *Belize Soc. Dev., Ltd. v. Gov't of Belize*, 794 F.3d 99, 100 (D.C. Cir. 2015) (discussing Accommodation Agreement).

Petitioner only identifies three cases in which courts have applied the New York Convention to confirm an award obtained pursuant to a bilateral investment treaty. *See* Opp'n at 13-14 (citing *Tatneft v. Ukraine*, 21 F.4th 829 (D.C. Cir. 2021); *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015); *Schneider v. Kingdom of Thail.*, 688 F.3d 68 (2d Cir. 2012)). Unlike here, in each of these three cases, there was no dispute that the New York Convention applied, and the courts accordingly did not address whether the legal relationship between the parties related to commerce. *See Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 187 (D.D.C. 2018) (describing Ukraine's jurisdictional objections which did not extend to whether or not the dispute was commercial); *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 62 (D.D.C. 2013) (finding New York Convention applied to award without addressing commercial requirement); *Schneider v. Kingdom of Thail.*, No. 10 Civ. 2729, 2011 U.S. Dist. LEXIS 158832, at *10-11 (S.D.N.Y. Mar. 14, 2011) (listing Thailand's objections under the New York Convention, which did not extend to its applicability).[9]

---

[9] Furthermore, in each of these three instances the arbitration agreement explicitly invoked the UNCITRAL procedural arbitration rules which were issued by the same body that drafted the New York Convention and the drafters therefore could arguably have been said to have contemplated the applicability of the New York Convention. *See Tatneft*, 21 F.4th at 833 ("The Russia—Ukraine Bilateral Investment Treaty incorporates the United Nations Commission on International Trade Law's (UNCITRAL) arbitration rules."); *Chevron Corp.*, 795 F.3d at 207 ("Under [the UNCITRAL arbitration] rules, which the BIT incorporates by reference . . ."); *Schneider*, 688 F.3d at 70 ("The Terms of Reference empowered the tribunal to 'consider . . . objections to jurisdiction' and provided that the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules were to be the applicable procedural rules.").

Nor can the Restatement on International Commercial Arbitration be read as foreclosing Nigeria's argument that this bilateral investment treaty arbitration was noncommercial. *See* Opp'n at 1, 6, 7, 14 (citing Restatement (Third) of U.S. Law of Int'l Com. & Inv. State Arb., § 1.1, cmt. e (2019)). That Restatement is clear that its definition of "commercial" is intentionally broad to bring multiple forms of arbitration within the "ambit of the … Restatement". Restatement of U.S. Law of Int'l Com. & Inv. State Arb., § 1.1, cmt. e, Reporter's Note e. Because of this, the Restatement cautions that this definition of commercial "is not intended to provide a unified definition governing every context in which the commercial character of a transaction or relationship leads to application of the principles stated." *Id.; see also id.* (suggesting the definition of commercial for purposes of the New York Convention would "ordinarily" but not necessarily "include awards arising from an investment dispute"). The Award here is precisely one of those awards that escapes the definition of commercial under this Restatement.

In its opening brief, Nigeria explained that the Restatement (Third) of Foreign Relations Law removes arbitrations based on international treaties such as the Nigeria-China Treaty from the reach of the New York Convention. *See* Mot. at 2, 8, 11 (explaining how the Restatement distinguishes between international agreements and other forms of commercial arrangements to which a sovereign might be a party). Petitioner reduces its discussion of the Restatement of Foreign Relations Law to a footnote, in which it claims this distinction "is contradicted by the Restatement … itself." Opp'n at 12 n.9 (citing Restatement (Third) of Foreign Relations Law § 487 cmt. f). When read as a whole, section 487 of the Restatement clearly distinguishes between certain direct contractual arrangements between sovereigns and investors, which are subject to the New York Convention, and international treaties, which are not. *See* Restatement (Third) of Foreign Relations Law § 487 cmt. f. Thus, the Restatement explains that "the fact that an

agreement to arbitrate is in [a] <u>contract</u> between a government and a private person may confirm its commercial character." *Id.* (emphasis added).  No contract existed between Petitioner and Nigeria, as noted, *supra*.  The Restatement next clarifies that "arbitration of a controversy of a public international law character such as … performance under an international agreement … is not subject to the New York Convention." *Id*.  That is precisely the case here, where Petitioner's controversy arose under the Nigeria-China Treaty.

As the underlying legal relationship between Nigeria and Petitioner is fundamentally noncommercial and a holding to the contrary is not even counseled by prior Circuit precedent, the Court should hold that the Award does not fall under the New York Convention.

II.   <u>As The New York Convention Does Not Apply, Nigeria Is Immune From Suit.</u>

Petitioner does not dispute that the Petition must be dismissed if the prerequisites for the New York Convention are not met because the arbitration exception to the FSIA requires the Award be "governed by a treaty or other international agreement."  Opp'n at 15 (quoting *Chevron Corp.*, 949 F. Supp. 2d at 62).  As Petitioner does not assert any other exception to immunity under the FSIA and the New York Convention does not apply to the underlying Award, which evinces a noncommercial legal relationship between Nigeria and Petitioner, the case should be dismissed on the basis of the FSIA.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("[A] foreign state is presumptively immune from the jurisdiction of the United States courts; unless a specified [FSIA] exception applies.").

## CONCLUSION

For the foregoing reasons, the Petition to Recognize and Enforce Arbitral Award against Nigeria must be dismissed for lack of jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*

Date: July 12, 2022

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

*/s/ Raúl B. Mañón*
Raúl B. Mañón (*Pro Hac Vice*)
Maria Gomez (*Pro Hac Vice*)
200 South Biscayne Boulevard, Suite 3400
Miami, FL 33131
T: (305) 577-7000
F: (305) 577-7001
Email: raúl.manon@squirepb.com
      maria.gomez@squirepb.com

-and-

Alexandra E. Chopin (D.C. Bar No. 490736)
2550 M Street, N.W.
Washington, DC 20037
T: (202) 457-5623
F: (202) 457-6315
Email: alexandra.chopin@squirepb.com

*Counsel for Respondent Federal Republic of Nigeria*