**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ZHONGSHAN FUCHENG INDUSTRIAL INVESTMENT CO., LTD., | |
| Petitioner, | Civil Action No. 22-170 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| FEDERAL REPULIC OF NIGERIA, | |
| Respondent. | |

**<u>MEMORANDUM OPINION</u>**

Petitioner Zhongshan Fucheng Industrial Investment Co., Ltd. ("Zhongshan") instituted this suit against Respondent, the Federal Republic of Nigeria ("Nigeria"), to enforce an arbitration award that—nearly two years after issuance—Nigeria has failed to pay.  Nigeria now moves to dismiss the petition for lack of subject matter jurisdiction and personal jurisdiction, pursuant to Federal Rules of Civil Procedure 12(b)(1)–(2), on the grounds of sovereign immunity not exempted under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* *See* Resp't's Mot. Dismiss for Lack of Jurisdiction Under the FSIA ("Resp't's Mot."), ECF No. 24.  Petitioner counters that the requirements of the FSIA's arbitration exception are met, and jurisdiction may therefore be exercised.  *See* Pet'r's Mem. Opp'n Resp't's Mot. Dismiss ("Pet'r's Opp'n"), ECF No. 26.  For the reasons explained below, petitioner has the better of the arguments under the binding precedent of the D.C. Circuit, requiring denial of Nigeria's motion to dismiss.

**I.     BACKGROUND**

1

A.       **Nigeria's Seizure of Zhongshan's Assets**

The present dispute emerges from a Chinese business investment in Nigeria—once successful enough to have garnered coverage by the Economist Intelligence Unit as an example of "China's economic model in Africa"—that ended in the expropriation of the company's assets, the flight of its executives from Nigeria after one executive was arrested at gunpoint and physically beaten by the police, and, ultimately, a $55-million-plus arbitration award against Nigeria.[1]  The locus of the saga is a free-trade zone, called the Ogun Guangdong Free Trade Zone, in Nigeria's southwestern region in Ogun State, not far from Lagos.

As set forth in the arbitral tribunal's findings of facts in its Final Award, ECF No. 2-1, starting in 2007, Ogun State contracted with various Chinese companies, including petitioner, to develop the subject free-trade zone.  Specifically, Ogun State entered an agreement with Guangdong Xinguang International China-Africa Investment Ltd. ("CAI") and CCNC Group, Ltd., pursuant to which the three entities would jointly own the Ogun Guangdong Free Trade Zone Company ("OGFTZ") for a period of 99 years, and CAI would lead the development of the Zone, encompassing nearly 8 square miles of land.  *See* Decl. of Hussein Haeri Supp. Pet. Recognize & Enforce Foreign Arbitral Award ("Haeri Decl. Supp. Pet."), Ex. A, Final Arbitration Award dated March 26, 2021 ("Final Award") ¶¶ 4–5, ECF No. 2-1.  After three years of limited progress, on June 29, 2010, OGFTZ entered an agreement with petitioner's parent company, Zhuhai Zhongfu Industrial Group Co. Ltd. ("Zhuhai"), giving Zhuhai control of developing and operating a fraction of the Zone's area into Fucheng Industrial Park.  *Id.* ¶¶ 6–8.

---

[1]       The Economist Intelligence Unit's profile of the Ogun Guangdong Free Trade Zone was referenced by the arbitral tribunal in its final award decision.  *See* Decl. of Hussein Haeri Supp. Pet. Recognize & Enforce Foreign Arbitral Award ("Haeri Decl. Supp. Pet."), Ex. A, Final Arbitration Award dated March 26, 2021 ("Final Award") ¶ 127, ECF No. 2-1; Economist Intelligence Unit, Zones of Influence (last accessed January 21, 2023), https://growthcrossings.economist.com/video/zones-of-influence/.

That year, Zhuhai effectively transferred its rights to petitioner, which operated in Nigeria through its wholly-owned Nigerian subsidiary Zhongfu International Investment (NIG) FZE ("Zhongfu"). *Id.* ¶¶ 3, 9.[2]

From 2010 until the breakdown of the relationship in 2016, Zhongfu invested substantial assets into developing Fucheng Industrial Park.  For example, to attract industrial lessees to the Park, Zhongfu built roads, upgraded communications, sewage, and power systems, and opened community services including a hospital, hotel, supermarket, and bank.  *Id.* ¶¶ 21–22.  By early 2014, the Park had attracted approximately sixteen businesses.  *Id.* ¶ 23.  During this period, CAI's management of the overall Zone had apparently broken down, resulting in Ogun State's termination of the company's participation in the OGFTZ in 2012 and appointment of Zhongfu to take its place as part owner of the OGFTZ in 2013.  *Id.* ¶¶ 13–20.

Zhongfu's woes began in April 2016, when the Secretary of Ogun State indicated in a letter to OGFTZ—apparently on the advice of the Chinese Consulate in Lagos—that CAI had been acquired by Guangdong New South Group ("NSG"), and that this transfer may have somehow entitled NSG, rather than Zhongfu, to ownership of the Zone.  *Id.* ¶¶ 33–34.  Ogun State had received a *note verbale*, a diplomatic note, from the Economic and Commercial Section of the Chinese consulate in Lagos, dated March 11, 2016, which stated that the acquisition of CAI "will legally lead to the replacement of the management rights of the OGFTZ which is now in the hands of [Zhongfu] to Guangdong New South Group."  *Id.* ¶ 33.[3]  In May

---

[2]   The tribunal noted in its Final Award that, although Zhongfu had apparently assumed Zhuhai's interests in the Zone by 2010—as reflected in an October 10, 2010-dated deed entitling Zhuhai to delegate its rights and obligations to third parties—the assignment of interests between Zhuhai and Zhongfu was formalized in a January 15, 2013 document.  Final Award ¶ 16, ECF No. 2-1.

[3]   This detail of the Chinese government's involvement in—if not outright instigation of—Ogun State's ejection of Zhongfu from the Zone did not detain the arbitral tribunal for long, and Nigeria apparently did not call, or even "suggest[]," that any agents of the Chinese government could be identified to provide evidence of the underlying reasons for replacement of petitioner with NSG as manager of the Zone.  Final Award ¶¶ 93–94.  The tribunal's admitted lack of clarity on this element of the underlying facts is unsettling in light of the whisper in the

2016, according to petitioner, Ogun State purported to terminate its 2013 agreement that appointed Zhongfu as part owner of the Zone, and reneged on the 2010 agreement that had given Zhongfu and Zhongshan management rights of the Fucheng Industrial Park.  Pet'r's Pet. to Recognize & Enforce Foreign Arbitral Award ("Pet.") ¶¶ 18–19, ECF No. 1.  In July 2016, Ogun State's Secretary texted Zhongshan's managing director Jianxin Han, urging him to "leave peacefully when there is opportunity to do so," and the following month, warrants were issued for the arrest of Han and Wenxiao Zhao, who had served as the Chief Financial Officer of the OGFTZ.  Final Award ¶¶ 37, 39.  Zhao was arrested at gunpoint, physically beaten, and detained for ten days by police before he and Han could flee the country—unceremoniously closing the book on Zhongshan's management of the OGFTZ and Fucheng Industrial Park.  *Id.* ¶¶ 39–40.

### B.    Subsequent Arbitration Proceedings

Petitioner commenced an arbitration proceeding against Nigeria on August 30, 2018 pursuant to a bilateral treaty between Nigeria and China.  Pet. ¶ 22–23.[4]  The bilateral investment treaty, called the Agreement Between the Government of the People's Republic of China and the

---

Final Award's pages that Zhongfu's administration of the Zone might have fallen short of expectations.  *See, e.g., id.* ¶ 29 (noting a May 18, 2015-dated letter from the Secretary of Ogun State complaining about Zhongfu's performance); *id.* ¶¶ 115–120 (noting that the parent companies of CAI and Zhongfu signed an "entrustment of equity management agreement" in March 2012, in which CAI's share of the Zone would be "entrusted" to Zhongfu—a detail that the arbitral tribunal apparently found perplexing and about which it "had an initial degree of concern about the accuracy" of Zhongfu's witness's testimony, but that it ultimately found irrelevant).  The factual findings by the arbitral tribunal, however, are not reviewable by this Court, nor are they presently challenged by Nigeria.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 110 (D.D.C. 2017) (describing courts' deferential standard in reviewing foreign arbitral awards as "allowing vacatur of an award not if 'the panel committed an error—or even a serious error' but 'only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice'" (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671–72 (2010))).

[4]      Petitioner, via Zhongfu, initially sought relief through the Nigerian courts, initiating one lawsuit in the Federal High Court in Abuja, Nigeria, against Nigeria's Export Processing Zones Authority ("NEPZA"), the Attorney-General of Ogun State, and another company that was a partner of the OGFTZ, *see* Final Award ¶ 42, and another lawsuit in Ogun State High Court against OGFTZ, Ogun State, and the Attorney-General of Ogun State, *id.* The lawsuits sought reinstatement of Zhongfu's management and possession of the Zone based on the 2010 and 2013 contracts, *id.* ¶ 43, but both proceedings "were discontinued" in March and April 2018, *id.* ¶ 44.  Zhongfu also began arbitration proceedings in the Singapore International Arbitration Center against, *inter alia*, Ogun State, but that proceeding was enjoined by the Ogun State High Court. *Id.* ¶ 45.

Government of the Federal Republic of Nigeria for the Reciprocal Promotion and Protection of

Investments ("China-Nigeria BIT"), represents an agreement between the countries to promote

bilateral investment by guaranteeing that the other country's investors would be treated equally

and protected from the nationalization of their investments.  *See generally* Haeri Decl. Supp.

Pet., Ex. B, China-Nigeria BIT, ECF No. 2-2.  Article 9 of the China-Nigeria BIT provides that,

when any dispute arises between one of the countries and an investor from the other country—

*e.g.*, a dispute between Nigeria and a Chinese investor—that cannot be resolved by the parties,

either party may request that an ad hoc arbitral tribunal settle the dispute with a binding decision.

*See id.* at Art. 9.

Petitioner brought five claims against Nigeria for breaches of the China-Nigeria BIT in

the arbitral action.  First, petitioner claimed that Nigeria violated its obligation of fair and

equitable treatment of Chinese investors under Art. 3(1).  Pet. ¶ 23.  Second, petitioner claimed

that Nigeria unreasonably discriminated against it, violating Art. 2(3), and third, that Nigeria

failed to provide the "continuous protection" afforded by Art. 2(2).  *Id.*  Fourth, petitioner

claimed that Nigeria violated its contract with petitioner, violating Art. 10(2).  *Id.*  Finally,

petitioner claimed that Nigeria wrongfully expropriated Zhongshan's investments without

compensation, in violation of Art. 4.  *Id.*

The London, United Kingdom-located arbitral tribunal rendered its Final Award on

March 26, 2021, finding that Nigeria had violated Zhongshan's rights under the China-Nigeria

BIT.  Specifically, the tribunal determined that Nigeria took actions that were "plainly designed

to deprive, and indeed succeeded in depriving, Zhongfu of its rights" under the 2010 and 2013

agreements.  Final Award ¶¶ 125–26.  In addition, the tribunal found that Ogun State, Nigeria's

Export Processing Zones Authority ("NEPZA"), and the police—all state actors—took

discriminatory and coercive steps against Zhongfu that resulted in Nigeria taking possession of Zhongfu's investment in the country. *Id*. ¶¶ 125–32. Nigeria was ordered to pay Zhongshan approximately $55.6 million in compensation for the expropriation, $75,000 in "moral damages," $9.4 million in interest calculated between the July 22, 2016-dated expropriation and rendering of the award, approximately $3 million in legal fees and costs related to the arbitration, approximately $430,000 in other costs, and post-Award interest on the preceding sums—a total figure approaching $70 million, and growing. Pet. ¶ 33.[5]

Nigeria has already tried and failed to shirk this arbitration award in the United Kingdom. Approximately one month after the Award's rendering, Nigeria filed an arbitration claim form in the English High Court, collaterally challenging the Award under the English Arbitration Act on the basis that the tribunal lacked jurisdiction. Although Nigeria later discontinued this challenge, petitioner was still not paid the sums awarded by the tribunal. *Id*. ¶¶ 35–41. On December 8, 2021, petitioner commenced enforcement proceedings in the United Kingdom, and the English court issued an order that recognized the Award. *Id*. ¶ 42.

### C.    Instant Litigation

On January 25, 2022, Zhongshan initiated the instant lawsuit, pursuant to the Federal Arbitration Act (the "FAA"), which provides for confirmation of arbitral awards falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517 (the "New York Convention"), *see* 9 U.S.C. § 201–207. *See* Pet. ¶ 1. The FAA provides that the New York Convention is enforceable in the courts of the United States, to which courts a party may apply for an order confirming an arbitral award issued under the

---

[5]    The Award enumerated certain of the damages—namely, the compensation, moral damages, and pre-Award interest on both—in U.S. dollars, and the legal fees and costs related to the arbitration in British pounds. As a result, the Court's calculation of the total figure, which converted all sums into U.S. dollars, is a mere estimate.

Convention. *Id.* §§ 201, 207.  In response, Nigeria filed the pending motion to dismiss for lack of subject-matter and personal jurisdiction under the FSIA, contending that no exception to the FSIA applies because the award does not fall under the New York Convention, Resp't's Mot., ECF No. 24, which motion petitioner opposes, Pet'r's Opp'n, ECF No. 26.  With briefing now complete, *see* Resp't's Reply, ECF No. 27, Nigeria's motion to dismiss is now ripe for review.

## II.   LEGAL STANDARD

"Federal courts are courts of limited jurisdiction," *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)), and "have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto," *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 980 (D.C. Cir. 2017) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)).  To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), plaintiff thus "bears the burden of invoking the court's subject matter jurisdiction." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  "Where a plaintiff has asserted jurisdiction under the FSIA and the defendant foreign state has asserted 'the jurisdictional defense of immunity,' the defendant state 'bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'" *Belize Social Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015) (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  Further, in deciding a motion to dismiss on the basis of the FSIA, courts' subject-matter and personal jurisdictional inquiries often collapse into the same question: "If none of the exceptions to sovereign immunity set forth in the Act applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983).

*See also Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018) ("Under the FSIA, personal jurisdiction exists where (1) subject matter jurisdiction has been satisfied, and (2) proper service has been effected." (citing 28 U.S.C. § 1330(b))). Nigeria does not contend that service was improper, so the jurisdictional challenges merge.

When a jurisdictional skirmish "present[s] a dispute over the factual basis of the court's subject matter jurisdiction . . . the court must go beyond the pleadings and resolve" any dispute necessary to the disposition of the motion to dismiss. *Feldman v. F.D.I.C.*, 879 F.3d 347, 351 (D.C. Cir. 2018) (quoting *Phoenix Consulting*, 216 F.3d at 40). In such situations, the "court may properly consider allegations in the complaint and evidentiary material in the record," affording plaintiff "the benefit of all reasonable inferences." *Id.; see also Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) ("In considering a motion to dismiss for lack of subject matter jurisdiction . . . we 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" (quoting *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005))). Absent "evidentiary offering[s]," *Feldman*, 879 F.3d at 351, however, courts must seek jurisdictional assurance by accepting as true all material "factual allegations in the complaint and contru[ing] the complaint liberally," and again "granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. F.D.I.C.,* 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks omitted).

## III.   DISCUSSION

For this Court to have subject matter jurisdiction over a petition to enforce a foreign arbitral award against a foreign sovereign, two inter-related requirements must be satisfied: (1) "there must be a basis upon which a court in the United States may enforce a foreign arbitral

award," and (2) the foreign state "must not enjoy sovereign immunity from such an enforcement." *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999). Both requirements are addressed in turn.

### A.    Jurisdiction under the Federal Arbitration Act

The New York Convention is an international treaty ratified by the United States that provides for signatory states' recognition of arbitral awards "made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." *Process & Indus. Dev. Ltd. v. Fed. Republic of Nigeria ("P&ID")*, 27 F.4th 771, 774 (D.C. Cir. 2022) (quoting New York Convention, art. I(1)).  The FAA codified the New York Convention into law, providing that "[a]n action . . . falling under the Convention shall be deemed to arise under the laws and treaties of the United States," and granted district courts original jurisdiction over such actions.  9 U.S.C. § 203.

For an arbitral award to "fall[] under the Convention," two requirements—both optional elements of the New York Convention that the United States adopted at ratification—must be satisfied.  *See* Restatement (Third) of the Foreign Relations Law of the United States § 487 cmts. b, f (Am. L. Inst. 1987).  First, the arbitral award must be "rendered within the jurisdiction of a signatory country," pursuant to the reciprocity reservation of the Convention.  *Creighton*, 181 F.3d at 123.  The United Kingdom, where the at-issue arbitration award was rendered, is a member of the New York Convention.  *See* New York Arbitration Convention, Contracting States, http://www.newyorkconvention.org/countries (last visited Jan. 22, 2023).  Second, pursuant to the Convention's commercial reservation, which the United States adopted as a part of a minority of the Convention's signatories, the award must "aris[e] out of a legal relationship,

whether contractual or not, which is considered as commercial."  9 U.S.C. § 202; *Belize Social Dev. Ltd.*, 794 F.3d at 103.  This commercial reservation is the basis for Nigeria's instant motion.

Nigeria argues that petitioner is "precluded from relying on the New York Convention to recognize and enforce the Award in this Court," because the China-Nigeria BIT giving rise to petitioner's arbitral award "does not establish a 'legal relationship . . . which is considered as commercial.'"  Resp't's Mot. at 8, 13 (quoting *Diag Human, S.E. v. Czech Republic Ministry of Health*, 824 F.3d 131, 136 (D.C. Cir. 2016)).  The FAA does not define the term "commercial," but the D.C. Circuit has interpreted the term expansively.  "In the context of international arbitration, 'commercial' refers to 'matters or relationships, whether contractual or not, that arise out of or in connection with commerce.'"  *Belize Social Dev. Ltd.*, 794 F.3d at 103–104 (quoting Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1–1 (2012)); *see also id.* at 104 (noting the relationship between the "term's broad compass" and "the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power" (quoting *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003))).

Nigeria's attempts to cast the Final Award as arising from a non-commercial relationship lack support in D.C. Circuit precedent.  According to Nigeria, the China-Nigeria BIT is "quintessentially sovereign" and cannot form the basis for a commercial relationship between a private investor and either country.  *See* Resp't's Mot. at 13–15; Resp't's Reply at 13–15.  Next, Nigeria contends that Zhongshan conceded the non-commercial character of its relationship with Nigeria by litigating initially against Ogun State, as reflected in the arbitral record.  *See* Resp't's Mot. at 15–18; Resp't's Reply at 10–12; *see also supra* n.4.  Finally, Nigeria challenges the Final Award as being "unlike other arbitration awards routinely enforced in this Circuit" because this

Award did not arise from a business relationship between Nigeria and Zhongshan, but solely from the China-Nigeria BIT.  Resp't's Reply at 5.

Each argument is considered in turn and none is persuasive.

### 1. *The Award's Basis in the China-Nigeria BIT Does Not Render the Parties' Legal Relationship* **Per Se** *Non-Commercial*

Nigeria asserts the bold argument that, as a matter of law, the China-Nigeria BIT cannot form the basis of an arbitral award that falls within the coverage of the New York Convention's commercial reservation.  Resp't's Mot. at 13–15.  Nigeria urges a distinction between "certain direct contractual arrangements between sovereigns and investors, which are subject to the New York Convention, and international treaties, which are not."  Resp't's Reply at 17.  The parties do not dispute that the China-Nigeria BIT is a treaty and, under Nigeria's reasoning, falls in the latter category.  *See* Resp't's Mot. at 14 (observing that "the Nigeria-China Treaty is comprehensively focused on regulating state conduct in the protection of investments" and is not "a commercial agreement between Petitioner and Nigeria").  Nigeria claims to derive this hardline distinction from the Restatement (Third) of Foreign Relations Law.  Resp't's Reply at 17–18; Resp't's Mot. at 14 ("'international agreements,' like the Nigeria-China Treaty, that involve 'two or more states' and are 'governed by international law' are 'not subject to the New York Convention' because they are not commercial" (quoting, barely, Restatement (Third) of Foreign Relations Law §§ 301, 487 cmt. f)).

Nigeria, however, has cherry-picked the quoted text out of context.  The relevant portion of § 487 comment f from the Restatement reads in full as follows:

> Ordinarily, arbitration of a controversy of a public international law character, such as a boundary dispute or a dispute about interpretation of or performance under an international agreement (see § 301), is not subject to the New York Convention, and an

award resulting from such an arbitration is not subject to enforcement through civil

courts. *See* § 904 and Comment e thereto.

Restatement (Third) of Foreign Relations Law § 487 cmt. f.  Nigeria reasons that, as an

"international agreement" under Restatement (Third) of Foreign Relations Law § 301, the China-

Nigeria BIT is "'not subject to the New York Convention' because [it is] not commercial."

Resp.'s Mot. at 14 (quoting Restatement (Third) of Foreign Relations Law § 487).  Yet, this

comment does not broadly exclude *all* international agreements from the Convention's scope, as

Nigeria apparently reads the text.  Rather, the comment only excludes controversies "of a public

international law character," citing § 904 of the Restatement ("interstate arbitration"), which

concerns *only arbitrations between states*.  Of course, this arbitration took place between Nigeria

and Zhongshan, a private actor—not two states.

Moreover, the remainder of the comment makes clear the extremely narrow scope of the

commercial reservation's exclusion, which as noted does not cover *all* arbitrations arising under

international agreements.  Indeed, earlier in the same comment, the Restatement expressly

advises that "[d]isputes arising out of investment agreements are not excluded by" the

commercial reservation.  Restatement (Third) of Foreign Relations Law § 487 cmt. f.  The

Restatement goes on to explain that this reservation merely "excludes arbitration agreements and

awards *arising out of matrimonial or custody disputes, disputes concerning succession to*

*property, and labor disputes*, and for the United States also other disputes excluded from the

United States Arbitration Act under 9 U.S.C. § 1."  *Id.* (emphasis added).  *See also Island*

*Territory of Curacao v. Solitron Devices, Inc.,* 356 F. Supp. 1, 13 (S.D.N.Y. 1973) ("Research

has developed nothing to show what the purpose of the 'commercial' limitation was.  We may

logically speculate that it was to exclude matrimonial and other domestic relations awards, political awards, and the like.").[6]

Nigeria's novel argument contradicts U.S. courts' regular confirmation of arbitral awards rendered under similar treaties. According to the logic of Nigeria's argument, any arbitral award rendered pursuant to a sovereign state's violation of a treaty created under public international law would be "*per se* noncommercial," Resp't's Mot. at 17, and fall outside of the New York Convention. *See also* Resp't's Mot. at 15 (arguing that BITs, "as international agreement[s] governed by and applying public international law, fall[] outside the ambit of the New York Convention as a matter of U.S. foreign relations law"). The D.C. Circuit has confirmed many arbitral awards in which sovereign nations have been found to breach treaty—rather than contract—obligations. *See, e.g., Tatneft v. Ukraine,* 21 F.4th 829 (D.C. Cir. 2021) (confirming arbitral award rendered pursuant to Ukraine-Russia BIT); *Chevron Corp. v. Ecuador*, 795 F.3d 200, 203–204 (D.C. Cir. 2015) (confirming arbitral award rendered pursuant to BIT between United States and Ecuador); *LLC Komstroy v. Republic of Moldova*, 2019 WL 3997385, *1–2 (D.D.C. Aug. 23, 2019) (confirming arbitral award pursuant to multilateral Energy Charter Treaty); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 105–108 (D.D.C. 2017) (confirming arbitral award resulting from Venezuelan expropriation of investments pursuant to BIT between Canada and Venezuela); *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 118–120 (D.D.C. 2015) (confirming arbitral award rendered pursuant to BIT between Canada and Venezuela). This Court declines to swim

---

[6]    Nor does Nigeria's citation to the Restatement on International Commercial Arbitration support its argument, since this Restatement likewise embraces a broad definition of arbitral agreements, disputes, and awards that are "commercial" in nature. *See* Restatement (Third) of the U.S. Law of Int'l Comm. and Inv'r-State Arbitration § 1.1, cmt. e (Am. Law Inst., Proposed Final Draft 2019) ("[A] dispute or award may be commercial even though one of the parties to it is a sovereign State and even though the dispute arises out of public regulatory acts.").

upstream against the common practice of confirming arbitral awards rendered pursuant to violations of treaties based on respondent's cherry-picked and partial quotation from a Restatement.

Nigeria attempts to explain away courts' application of the New York Convention in other cases involving treaties similar to the China-Nigeria BIT by arguing that many of those treaties explicitly reference the New York Convention, and that the parties in other cases agreed that the Convention applied to their dispute.  *See* Resp't's Mot. at 15.  Neither of these scattershot attempts to distinguish those cases is persuasive.  First, Nigeria does not explain why a treaty's mere reference to the New York Convention rescues an arbitral award from the treaty's "public international law character" that Nigeria claims would exclude such a treaty-based arbitral award from confirmation.  Referencing the New York Convention, after all, does not transform a treaty into a contract between a state and private actor.  This argument is particularly perplexing given that, in one of the cases upon which Nigeria relies as support for this point, the treaty at issue merely refers to the New York Convention to discuss the Convention's requirement that parties agree in writing to arbitration, rather than the Convention's commercial reservation.  *See* Resp't's Mot. at 15 (citing *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 70 (D.D.C. 2013)); *Chevron Corp. v. Republic of Ecuador*, Case No. 12-cv-1247 (JEB), Decl. of Edward G. Kehoe, Ex. 1, U.S.-Ecuador BIT at art. VI(4)(b), ECF No. 4-1.[7]  Second, respondent cites to *Crystallex Int'l Corp.*, 244 F. Supp. 3d at 109, seeming to argue that the New York Convention applied in this case because the respondent did not object to the court's jurisdiction.  Resp't's Mot. at 15.  This argument ignores that, in *Crystallex,* as here, the

---

[7]       Further, as petitioner notes, not all arbitral awards that have been confirmed in the D.C. Circuit arise from treaties that expressly reference the New York Convention.  *See* Pet'r's Opp'n at 17 (noting that the Russia-Ukraine BIT at issue in *Tatneft,* 21 F.4th 829, "does not mention that the New York Convention applies to enforcements of awards arising under it").

applicability of the New York Convention folded into the question of the court's subject-matter jurisdiction and, thus, whether Venezuela consented to jurisdiction is irrelevant since "[i]t is axiomatic that subject matter jurisdiction may not be waived" and "a federal court must raise the issue because it is 'forbidden—as a court of limited jurisdiction—from acting beyond [its] authority.'" *Diag Human S.E. v. Czech Republic, Ministry of Health*, 64 F. Supp. 3d 22, 27 (D.D.C. 2014) (quoting *NetworkIP, LLC v. F.C.C.,* 548 F.3d 116, 120 (D.C. Cir. 2008)), *rev'd on other grounds*, 824 F.3d 131 (D.C. Cir. 2016). Nigeria makes no convincing argument to explain away the crush of cases that undercut its theory.

### 2.    *The Arbitration Record Does Not Prove That the Dispute was Non-Commercial*

Nigeria next turns to the record of the underlying arbitration to argue that the dispute was non-commercial, asserting a new distinction between what it calls "Treaty Claims" and "Commercial Claims." In support of this argument, Nigeria recounts that petitioner had initially brought claims in the Nigerian courts and the Singapore International Arbitration Center (SIAC)—the latter pursuant to a clause in the 2013 agreement—alleging breach of contract claims under its series of agreements with Ogun State. *See* Resp't's Reply at 10; *see also* Final Award ¶¶ 43–45. Nigeria describes petitioner's discontinuance of both proceedings as a "tactical[]" decision to "proceed exclusively with the Treaty Claims" and "abandon the Commercial Claims." Resp't's Reply at 10. As a result, as Nigeria's argument goes, the Final Award was based on Nigeria's *sovereign,* rather than *commercial*, conduct—or, by way of analogy to the limits of the Commerce Clause, the country's use of its police power, rather than commerce power. *See* Resp't's Mot. at 15–18; Resp't's Reply at 11–12.

The flaw in this argument stems from predication on a false dichotomy between sovereign and commercial conduct in the context of the New York Convention. A similar

argument was considered and rejected by the D.C. Circuit in *Belize Social Dev. Ltd. v. Government of Belize,* 794 F.3d 99, 104–105 (D.C. Cir. 2015). There, Belize argued that, in granting a private telecommunications company tax and duty exemptions pursuant to an agreement, "it exercised 'powers peculiar to sovereigns' as opposed to 'powers that can also be exercised by private citizens,' and thus its actions were not commercial." *Id.* at 105 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). This argument attempted to define the commercial reservation by reference to the FSIA's "commercial activity" exception, 28 U.S.C. § 1605(a)(2), under which a foreign state is only held to "engage[] in commercial activities when it acts in the manner of a private player within the market." *Belize Social Dev. Ltd.,* 794 F.3d at 104. The D.C. Circuit rejected this narrow view of the commercial reservation, holding that "[u]nlike with the FSIA, Congress was not codifying the restrictive theory of foreign sovereign immunity when it ratified and implemented the New York Convention." *Id.* at 105. Instead, because the Convention's "purpose was to 'encourage the recognition and enforcement of commercial arbitration agreements in international contracts' . . . 'commercial' in the context of international arbitration refers to matters which have a connection to commerce." *Id.* (quoting *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007)). Accordingly, as Zhongshan correctly posits, "there can be no debate that the multimillion-dollar investment that Petitioner made in Nigeria to develop, manage and operate a free trade zone near Lagos was connected with commerce." Pet'r's Opp'n at 5–6. *See Belize Social Dev. Ltd.,* 794 F.3d at 104 (holding that "taxes Belize levies against a company . . . have a connection with commerce . . . as do the duties Belize charges").

### 3.    *No Underlying Contract Between Nigeria and Zhongshan is Required*

Finally, Nigeria urges that the "Award at issue is unlike other arbitration awards routinely enforced in this Circuit" because "it arose neither from a commercial agreement between

Petitioner and Nigeria, nor from a contractual or other business relationship between them." Resp't's Reply at 5.  To be sure, nearly every case enforcing an arbitration award against a foreign sovereign in this Circuit has involved an underlying contract or business agreement between the petitioner and foreign sovereign.  *See, e.g., P&ID,* 27 F.4th at 772 (describing underlying twenty-year natural gas supply and processing agreement between Irish engineering company and Nigeria); *Diag Human*, 824 F.3d at 135 (describing underlying "Framework Agreement"  between arbitration parties Czech Republic and foreign blood plasma company by which company supported modernization of Czech Republic's blood plasma supply and services in exchange for share of the total volume of plasma produced); *Belize Social Dev. Ltd.*, 794 F.3d at 100–01 (involving underlying agreement between Belize and petitioner's predecessor-in-interest, a telecommunications company, pursuant to which company would purchase property from Belize); *Gebre LLC v. Kyrgyz Republic*, 2022 WL 2132481, *2 (D.D.C. June 14, 2022) (foreign company signed series of license agreements with Kyrgyz authorities to mine rare earth elements).  In contrast, Nigeria is correct—and petitioner does not dispute, *see* Pet'r's Opp'n at 15 n.8—that the underlying agreements leading to Zhongshan's investments in the Zone and Industrial Park "[were] formed with OGFTZ and Ogun State, <u>not</u> Nigeria."  Resp't's Reply at 7 (emphasis in original).

This distinction drawn by Nigeria between the parties involved in the facts underlying the arbitral award at issue (*i.e.*, involving a business arrangement between a private party and part of a sovereign country) versus previous awards confirmed in this Circuit (*i.e.*, involving business arrangements between a private party and a sovereign country), falls short of showing that the instant parties' legal relationship is therefore not commercial.  As the FAA provides, a legal relationship need not arise from contract to be commercial, *see* 9 U.S.C. § 202, with the crucial

factor being that "the subject matter [of the arbitration] is commercial." *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 184 (D.D.C. 2016) (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 146 (2d Cir. 2001)). Here, the subject matter of the underlying arbitration related to commerce: Zhongshan's status as a foreign investor in Nigeria, pouring millions of dollars into developing the free trade zone, "has an obvious connection to commerce." *Diag Human*, 824 F.3d at 136 (describing "the provision of healthcare technology and medical services" as having "an obvious connection to commerce" based on health care's role in the "global economy").

Notably, Nigeria focuses principally on urging adoption of its characterization of the parties' relationship as non-commercial. *See, e.g.,* Resp't's Mot. at 15 ("The record of the arbitration confirms the *non-commercial nature of the parties' legal relationship* that is the foundation for the Award.") (emphasis added); Resp't's Reply at 14–15 (arguing that petitioner's agreements with Ogun State cannot "dictate whether the extrinsic legal relationship between Nigeria and Petitioner is commercial for purposes of the New York Convention" and urging that "[t]he conditions in question here . . . rendered the legal relationship between Nigeria and Petitioner fundamentally noncommercial"). Only passingly, in reply, does Nigeria allude to the absence of a direct contractual or business relationship between Zhongshan and Nigeria as precluding the existence a "legal relationship" between the parties—a condition precedent to the requirement that the arbitral award "aris[e] out of a legal relationship, whether contractual or not, which is considered as commercial." 9 U.S.C. § 202; *see* Resp't's Reply at 14 (noting that "no independent legal relationship existed between Nigeria and Petitioner regarding [the latter's] investments" in service of its argument that Nigeria's conduct was "sovereign" rather than commercial).

Regardless, the parties plainly shared a "defined legal relationship, whether contractual or not," *Diag Human*, 824 F.3d at 135, based on the China-Nigeria BIT.  In *Diag Human*, the D.C. Circuit held that, even if failing to qualify as a contract, a "Framework Agreement" between a blood plasma company and the Czech Republic created a legal relationship, because the Agreement "explicitly contemplated which parties it would obligate, the extent of the obligations, the remuneration exchanged for meeting the obligations, and the legal framework to govern the arrangement."  *Diag Human*, 824 F.3d at 135.  The China-Nigeria BIT, too, creates a legal framework "entitling [Chinese investors] to the standards of treatment guaranteed by" Nigeria.  Pet'r's Opp'n at 7.  Further, the treaty constitutes "an already-binding arbitration contract" between Nigeria and China, with investors from both countries, including petitioner, acting as the equivalent of third-party beneficiaries, *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 41 (2014), or at the very least, the treaty operates as Nigeria's "standing offer to all potential [Chinese] investors to arbitrate investment disputes," *Chevron*, 795 F.3d at 206.  Nigeria cannot and does not explicitly dispute that the BIT thus creates a legal relationship—even if not a contractual one—between the parties.

### B. Nigeria Is Not Immune Under the FSIA.

Having established that this matter falls under the New York Convention, and thereby the FAA, the next question is whether Nigeria is immune from suit under the FSIA.  The FSIA is "a comprehensive statute containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.'"  *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (quoting *Verlinden*, 461 U.S. at 488).  The FSIA "provides, with specified exceptions, that a 'foreign state shall be immune from the jurisdiction of the courts of the United States . . . ."  *Bolivarian Republic of Venezuela v.*

*Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 173 (2017) (quoting 28 U.S.C. § 1604).

Accordingly, "subject matter jurisdiction in any [FSIA] action depends on the existence of one of the specified exceptions to foreign sovereign immunity." *Verlinden,* 461 U.S. at 493.

At issue here is the arbitration exception, 28 U.S.C. § 1605(a)(6), which permits U.S. courts to confirm an arbitration award rendered outside of the United States in certain instances.[8] The exception provides, in pertinent part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is brought . . . to confirm an award made pursuant to . . . an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force . . . calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6). For the Court's jurisdiction to attach pursuant to the arbitration exception, "the existence of an arbitration agreement, an arbitration award and a treaty governing the award are all jurisdictional facts that must be established." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021) (citing *Chevron*, 795 F.3d at 204). As to these three requirements, petitioner bears "a burden of production" to support a claim that the

---

[8]     Congress amended the FSIA in 1988 to include the arbitration exception, ensuring that foreign agreements to arbitrate and arbitral awards governed by certain treaties would be enforceable in U.S. courts, even against sovereigns. *See Process & Indus. Dev. Ltd. v. Fed. Republic of Nigeria*, 506 F. Supp. 3d 1, 10 (D.D.C. 2020), *aff'd on other grounds,* 27 F.4th 771 (D.C. Cir. 2022). This exception facilitated the participation of U.S. courts in upholding the international arbitration system that has flourished since the post-World War II era, designed to facilitate cross-border investments and business dealings. The conventional wisdom undergirding the international arbitration system is that promising foreign investors an efficient and fair alternative dispute-resolution mechanism outside of potentially biased local courts would encourage foreign direct investment, insulated from the uncertainties created by the host country's domestic politics and law. *See generally* Jeswald W. Salacuse & Nicholas P. Sullivan, *Do BITS Really Work? An Evaluation of Bilateral Investment Treaties and Their Grand Bargain*, 46 Harv. Int'l L. J. 67, 68–79 (2005) (arguing that arbitration provisions in BITs are a "mechanism that gives important, practical significance to BITs, a mechanism that truly enables these bilateral treaties to afford protection to foreign investment," and that BITs have promoted foreign direct investment in developing countries and the United States); Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 70 Yale L. J. 1049 (June 1961) (detailing the reasons for the United States' ratification of the New York Convention).

arbitration exception applies; "the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Chevron*, 795 F.3d at 204.

Petitioner has met its burden of production as to all three requirements under the arbitration exception.  First, as to the existence of the arbitration agreement, petitioner has alleged, without dissent from Nigeria, that both parties consented to the arbitration—Nigeria via Art. 9 of the China-Nigeria BIT, which provided that either party may submit a dispute to an *ad hoc* tribunal, and Zhongshan via filing a Request for Arbitration.  Pet. ¶¶ 24–25.  *See Stati*, 199 F. Supp. 3d at 188 ("All that is required is that the petitioner make a 'prima facie showing that there was an arbitration agreement by producing the [treaty] and the notice of arbitration.'" (quoting *Chevron*, 795 F.3d at 205)).  Petitioner has also met its burden as to the second and third requirements by producing the Final Award and referring to the New York Convention. *See* Final Award, ECF No. 2-1; *see also Creighton*, 181 F.3d at 123–24 (describing the "New York Convention [as] 'exactly the sort of treaty Congress intended to include in the arbitration exception'" (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993))).  Nigeria, meanwhile, has failed to discharge its burden of persuasion to establish that this arbitral award falls outside the scope of the New York Convention, for the reasons stated *supra,* in Part III.A.  Resultantly, the Court finds that the arbitration exception to the FSIA applies, stripping Nigeria of sovereign immunity and establishing the Court's subject-matter and personal jurisdiction over the case.

**IV.     CONCLUSION**

For the foregoing reasons, the Federal Republic of Nigeria's Motion to Dismiss is

**DENIED**.  An order consistent with the Memorandum Opinion will be entered

contemporaneously.

Date: January 26, 2023

_____
BERYL A. HOWELL
Chief Judge